NEVADA LEGAL SERVICES
  Ron Sung (NV 13047)
  rsung@nlslaw.net
530 South 6th Street
Las Vegas, NV 89101
Tel:   (702) 388-1641, Ext 148
Fax:   (702) 386-0404

BRANCART & BRANCART
  Christopher Brancart (NV 8969)
  cbrancart@brancart.com
Post Office Box 686
Pescadero, CA  94060
Tel:   (650) 879-0141
Fax:   (650) 879-1103

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| **CANDY TORRES,** | ) No. |
| **Plaintiff,** | ) **COMPLAINT** |
| vs. | ) |
| **ALLAN ROTHSTEIN and KYLE PUNTNEY,** | ) |
| | ) |
| **Defendants.** | ) |

1.     In this fair housing action, plaintiff Candy Torres sues her landlords and their agents for discrimination and harassment in violation of the federal Fair Housing Act, 42 U.S.C. § 3601 *et seq*., and related state laws.

### I. JURISDICTION AND VENUE

2.     Jurisdiction is conferred on this Court by 28 U.S.C. § 1331 in that the claims alleged herein arise under the laws of the United States.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to hear and determine plaintiff's state law claims because those claims are related to plaintiff's federal

law claim and arise out of a common nucleus of related facts.  Plaintiff's federal
and state law claims form part of the same case or controversy under Article III of
the United States Constitution.

3.     Venue is proper under 28 U.S.C. § 1391 in that the claims alleged
herein arose within Clark County, Nevada.

## II.  PARTIES

4.     Plaintiff Candy Torres rents and occupies with her five minor
children a dwelling located at 11893 Wedgebrook Street in Las Vegas
(Wedgebrook House), paying a portion of her rent with an HUD housing choice
voucher, issued by Southern Nevada Regional Housing Authority (SNRHA).

5.     Defendant Allan Rothstein is the property manager of the
Wedgebrook House.  Rothstein is a state-licensed real estate professional; he
obtained his Nevada property manager license in 2009 and his Nevada real estate
broker license in 2013.  Since 2008, Rothstein has operated his real estate business
under a variety of fictitious business names, including Allan Rothstein's Property
Management and Real Estate Services, Allan Rothstein's Realty Group, and Allan
Rothstein's Complete Real Estate and Property Management Services, among
others. Rothstein advertises his real estate services and dwellings for rent or sale,
including the Wedgebrook House, through a variety of internet media.

6.     Defendant Kyle Puntney is the owner of the Wedgebrook House.
Puntney purchased the Wedgebrook house in 2009.  He employed Rothstein as
property manager of the Wedgebrook House and authorized Rothstein to act on his
behalf in any dealings with Torres and SNRHA.

7.     Each defendant acted as the principal and agent of each other
defendant.  Each defendant is directly, personally, and vicariously liable for any
injury caused Torres based on the facts alleged in this complaint.

///

-2-

### III. FACTUAL ALLEGATIONS

#### A.   Torres applies to rent the Wedgebrook House

8.      In August 2018, Torres and her five minor children were homeless living from week to week in a local residential hotel.   On August 20, 2018, SNRHA, Las Vegas's public housing authority, approved Torres for a Section 8 housing choice voucher (HCV).   Pursuant to her HCV voucher, SNRHA agreed to subsidize Torres's rental of private dwelling with four bedrooms costing $1,550.00 or less per month.  Torres searched housing websites to locate a home for her family. When she found a home that appeared suitable, she left an inquiry on the listing website.

9.      In September 2018 Torres observed Rothstein's listing for rental of the Wedgebrook House.  Torres indicated her interest via the website.  Rothstein called Torres in response to that inquiry. Torres explained the terms of her HCV voucher and Rothstein encouraged Torres to come to his home and complete a written application and invited her to inspect the Wedgebrook House.

10.      Torres inspected the Wedgebrook House. Although it was dirty and in need of cosmetic repairs she decided to apply.  The house was spacious, located in a nice neighborhood, and near good schools for her kids.   On September 29, 2018, Torres traveled to Rothstein's home in Henderson to obtain an application to rent the Wedgebrook house.

#### B.   HUD's regulations governing Rothstein's rental of the Wedgebrook House to Torres

11.      Because a portion of Torres's rent was paid using a housing choice voucher, her rental of the Wedgebrook House was subject to several HUD regulations in addition to Nevada's landlord-tenant statutes.

12.      The federal HCV program, commonly known as Section 8, funds local public housing authorities (PHA), like Las Vegas's SNRHA, to subsidize rent payments by low-income families to private landlords.  Since its start in 1975, the

1  HCV program has grown into the largest affordable housing program in the United
2  States subsidizing the rent of more than 2.2 million households. Under the HCV
3  program, a recipient typically pays up to 40% of her household income in rent
4  with the local PHA paying the balance directly to the landlord.

5         13.   The HCV program regulates the conduct of each party in this action
6  through several interlocking contracts.  The PHA, here SNRHA, contracts with
7  HUD for funds to administer the HCV program.   An HCV recipient, here Torres,
8  must apply and qualify to participate in the HCV program and continue to abide
9  by the program requirements.  Once accepted by the PHA, each recipient has 60
10  days to locate a suitable rental dwelling operated by a private landlord who is
11  willing to participate in the HCV program.  The recipient enters into a tentative
12  year-long lease with the private landlord, here defendants, which is submitted to
13  the PHA. That submission triggers an inspection of rental dwelling, here the
14  Wedgebrook House, by the PHA to determine if it meets HUD's housing quality
15  standards.  If the dwelling passes that inspection, then the landlord executes a
16  housing assistance payments (HAP) contract with the PHA pursuant to which the
17  PHA agrees to pay the difference between the HCV tenant's rental contribution
18  and the fair market value for rental of the dwelling.

19         14.   Although the HCV program largely replicates the private rental
20  market, it imposes several obligations on landlords, like defendants here, through
21  the HAP contract.   The HAP contract requires each landlord to attach and
22  incorporate HUD's tenancy addendum, a standard form (HUD-52641-A), into the
23  lease executed between the landlord and tenant.
24  If there is a conflict between the landlord's lease and HUD's tenancy addendum,
25  the language in the tenancy addendum controls.

26         15.   The HAP contract also regulates how much and for what a landlord
27  may charge an HCV tenant for rental of a dwelling.  The total rent charged under
28  the lease may not exceed the fair market rent cap determined by the PHA.   Under

the HAP contract, the PHA pays a predetermined portion of the tenant's rent each month to the landlord.  The landlord must credit that sum as a partial payment of rents owed under the lease agreement.  Each month, the tenant must pay her share of the rent directly to the landlord, but nothing more.   Under the HAP contract and tenancy addendum, a landlord may "not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to [landlord]. Rent to [landlord] includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease."   A landlord is barred from charging "extra amounts for items customarily included in rent to owner in the locality."   Any payment in excess of these restrictions must be immediately returned by the landlord to the tenant.

16.     Under the HCV program, a landlord may terminate a tenancy for good cause only, such nonpayment of rent or serious tenant misconduct.  Any eviction may only be effected by way of a court action, but only after the landlord has provided written notice to the tenant and PHA "that specifies the grounds for termination of tenancy."

17.     Finally, the HAP contract also explicitly puts each landlord on notice that in "accordance with applicable equal opportunity statutes, Executive Orders, and regulations, the owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status or disability in connection with the lease."

### C.   Rothstein's sexual harassment of Torres

18.     On October 1, 2018, Torres delivered her completed, notarized rental application to Rothstein at his home.  She also brought three money orders, comprising the total sum of money she could raise that Rothstein demanded as a condition of holding the Wedgebrook House and processing her application. Rothstein accepted her application and these payments from Torres; he wrote out a receipt stating, "App fee nonrefundable $235," and "earnest money refundable

$550."  But Rothstein wanted more; he demanded that Torres come up with more money.  Lacking any additional funds, Torres offered to clean and repair the Wedgebrook House, improving its value and ensuring the dwelling passed HUD's quality housing standards.   Rothstein agreed that trade for work was a good start, but not enough.   He asked Torres to give him a "hand job." Torres refused.  She repeated that she would clean and repair the Wedgebrook House before the HUD inspection, demanded that Rothstein process her application, and left.

19.   As promised, Torres invested significant time and money to improve the Wedgebrook House before starting her tenancy.   She purchased paint and painted the walls.   She purchased and installed new floor covering.   She cleaned the interior as well.

20.   After completing her work on the Wedgebrook House, Torres requested that SNRHA inspect the dwelling.  SNRHA required that the terms of lease be provided by defendants to SNRHA and that at least one defendant execute the HAP contract.  Rothstein supplied SNRHA with Puntney's signature, dated November 17, 2018, on the HAP contract.  Defendants' HAP contract contained HUD's tenancy addendum and specified that the total rent paid to defendants for the Wedgebrook House was $1475 per month of which SNRHA would pay $1330 and Torres would pay $145.

### D.  Defendants' unlawful rental requirements

21.   Rothstein required Torres to sign two leases.  The first, executed by Puntney as owner, covered the period between November 17 and November 30; the second, executed by Rothstein as owner's agent, covered her year-long tenancy at the Wedgebrook House.

22.   Rothstein demanded that Torres travel to his home to sign the second lease on November 23 and that she bring more money to pay for the security deposit, first month's rent, and addition charged invented by Rothstein. Torres delivered all the money she had to Rothstein, a total of $1,822.00.

-6-

1   Rothstein scribbled out a receipt stating,"11-23-2018 paid balance 1822."

2

3       23.     Rothstein then required Torres to sign a stack of papers to complete

4   her year-long rental of the Wedgebrook House.  The first was a 12-page form

5   lease, which Torres signed.  Next, Rothstein required Torres to sign a stack of

6   lease attachments: A smoke detector disclosure form, a "consent to act" form, an

7   "illegal activity" form, a "duties owed Nevada real estate licensee" form, a "hold

8   harmless agreement (property sight unseen)" form, and last a form entitled, "Direct

9   Consent for Sexual Intercourse and/or Fellatio or Cunnilingus." Unless Torres

10  signed each of these forms, Torres could not lease the Wedgebrook House,

11  Rothstein said.

12      24.     The last form – the "Direct Consent for Sexual Intercourse and/or

13  Fellatio or Cunnilingus" – startled Torres.  The title alone shocked her.  She

14  protested that this form was too weird to be proper.  Rothstein had highlighted in

15  yellow the spots on the form that he insisted that Torres initial or sign; he

16  reiterated that each form was part of the lease and each had to be signed by Torres

17  to lease the Wedgebrook House.  Under protest, Torres scribbled her signature on

18  the Direct Consent form, collected her copies and left.

19      **E.  Defendants'** *Direct Consent for Sexual Intercourse and/or Fellatio or*

20          *Cunnilingus* **rental requirement**

21      25.     Defendants' "Direct Consent for Sexual Intercourse and/or Fellatio or

22  Cunnilingus" form is an extraordinary document, made all the more bizarre for its

23  appearance as a condition for rental of a dwelling.  It states:

24          The RESPONDENT/S hereby and freely gives their total consent to the
            INITIATOR/S to engage in sexual activities with the RESPONDENT/S
25          with the understanding that sexual intercourse as defined by the State of
            Nevada will occur. This consent and agreement is valid for the period of
26          FIVE years and does hereby freely give implied consent to consecutive or
            concurrent sexual encounters between the RESPONDENTS/S and the
27          INITIATOR/S.

28  It includes terms that range from the patently inaccurate –

RESPONDENT/S has not been forced into sexual activities under the threat of economic sanctions . . .  unless she complies with INITIATOR/S requirement or request for sexual intercourse

– to the chillingly precautionary –

RESPONDENT does not currently have a boyfriend/girlfriend/parent who is larger, meaner, and more physically aggressive, owns firearms and/or is more possessive than the INITIATOR/S.

### F.  Defendants' other lease terms

26.  Although far less extraordinary, defendants' lease agreement contained a wide variety of other rental terms that violated state law or HUD regulations, including unlawful fees and charges, illegal provisions regarding cost-shifting in an eviction action, unlawful liquidated damages provisions, and terms regarding the provision and payment of utilities that contradicted defendants' HAP contract.

### G.  Defendants' threaten and attempt to evict Torres

27.    As soon as Rothstein had extracted as much money as he could from Torres – and she had rebuffed his demand for sex – he immediately started to threaten to evict her family from the Wedgebrook House.  Each month since November 2018, Rothstein has engaged in coercion and threats against Torres. He has threatened to evict her for nonpayment of unlawful fees and charges, refused her rent when offered, and – working through his agent John Haydukovich – initiated an eviction action against Torres.

28.    Starting in February 2019, defendants – while collecting HAP payments from SNRHA – served two inaccurate five-day eviction notices on Torres claiming that she owed rent for monies paid by SNRHA and a slew of unlawful fees and charges.   Defendants' most recent notice, dated February 13, asserted that Torres owed defendants the sum of $1,057.00 in back rent for the period between January 3 and February 28, 2019.

29.    With the help of Nevada Legal Services, Torres filed in the state eviction court a response to these unlawful notices on February 15, contesting the

amount owed, asserting that defendants had refused to accept her rent, and stating, "Rothstein's attitude toward me changed after I refused to be with him sexually."

30.     In reply, Haydukovich filed a "landlord's affidavit" on March 13, attesting under oath, among other things –

·     That Torres's rent was $1475.00 per month, making no mention or credit for the $1330.00 paid to Rothstein under his HAP contract with SNRHA;

·     That Torres paid her security deposit in full in the amount of $925.00;

·     That Torres's rent was delinquent as of February 2, 2019;

·     That Torres owed $4,112.00 in rent; and,

·     That Torres owed no late charges, NSF check fees, or other sums.

31.  But when pressed by Nevada Legal Service to prove their claims, defendants agreed to drop their eviction against Torres.

**H. Defendants' unlawful housing practices**

32.     Defendants, and each of them, injured Torres by committing, directly or through their agents, the following unlawful and discriminatory housing practices:

a.     Conditioning the availability of a dwelling, including the price, qualification criteria, or standards or procedures for securing the dwelling, on a person"s response to harassment because of sex;

b.     Subjecting a person to harassment because of sex that attempts to cause the person to vacate a dwelling or abandon efforts to secure the dwelling;

c.     Denying or limiting services or facilities in connection with the rental of a dwelling, because a person failed or refused to provide sexual favors;

d.     Conditioning the terms, conditions, or privileges relating to the rental of a dwelling, or denying or limiting the services or facilities in connection therewith, on a person's response to harassment because of sex;

-9-

e.      Subjecting a person to harassment because of sex that has the effect of imposing different terms, conditions, or privileges relating to the rental of a dwelling or denying or limiting service or facilities in connection with the rental of a dwelling;

f.      Expressing to agents, brokers, employees, prospective sellers or renters or any other persons a preference for or limitation on any purchaser or renter because of sex of such persons;

g.      Representing to an applicant that a unit is unavailable because of the applicant's response to a request for a sexual favor or other harassment because of sex;

h.      Coercing a person, either orally, in writing, or by other means, to deny or limit the benefits provided that person in connection with the rental of a dwelling of sex;

i.      Threatening, intimidating or interfering with persons in their enjoyment of a dwelling because of the sex of such persons;

k.      Retaliating against any person because that person has made a complaint, testified, assisted, or participated in any manner in a proceeding under the Fair Housing Act;

l.      Retaliating against any person because that person reported a discriminatory housing practice to a housing provider or other authority; and,

m.      Engaging in unlawful or deceptive trade practices.

**I. Injuries**

33.     As a result of defendants' unlawful conduct, Torres suffered emotional distress, including humiliation, embarrassment, mental anguish and attendant bodily injury, violation of her civil rights, and loss of dignity.  Torres also suffered an invasion to her private right of occupancy, depriving her of the use and enjoyment of her tenancy, invasion of her privacy, defamation, and

1   wrongful eviction.  Accordingly, Torres is entitled to compensatory damages
2   under the Fair Housing Act, 42 U.S.C. § 3613(c)(1), among other statutes.

3      34.    In committing the unlawful acts alleged in this complaint, defendants
4   acted with reckless disregard of Torres's federally protected rights. Accordingly,
5   Torres is entitled to punitive damages, which she seeks under the Fair Housing
6   Act, 42 U.S.C. § 3613(c)(1), only.

7      35.    There now exists an actual controversy between the parties regarding
8   defendants' duties under the federal and state fair housing laws.  Accordingly,
9   Torres is entitled to declaratory relief under her federal and state law claims
10  including, but not limited to, 42 U.S.C. § 3613(c)(1), 28 U.S.C. §§ 2201-2202, and
11  Rule 57 of the Federal Rules of Civil Procedure.

12     36.    Unless enjoined, defendants will continue to engage in the
13  discriminatory housing practices alleged in this complaint.  Torres has no adequate
14  remedy at law.  Torres is now suffering and will continue to suffer irreparable
15  injury from defendants' acts and the pattern or practice of discrimination unless
16  relief is provided by this Court.  Accordingly, Torres is entitled to injunctive relief
17  under her federal and state law claims including, but not limited to, 42 U.S.C. §
18  3613(c)(1) and Rule 65 of the Federal Rules of Civil Procedure.

19                        **IV.  CLAIMS**
20                **A. First Claim:  Fair Housing Act**

21     37.    Plaintiff realleges and incorporates by reference each paragraph
22  previously alleged in this complaint.

23     38.    Each defendant injured Torres by committing discriminatory housing
24  practices in violation of the federal Fair Housing Act, 42 U.S.C. § 3601, *et seq*.

25             **B.  Second Claim:  Nevada Fair Housing Law**

26     39.    Plaintiff realleges and incorporate by reference each paragraph
27  previously alleged in this complaint.

28     40.    Each defendant injured Torres by committing unlawful housing

1  practices in violation of the Nevada Fair Housing Law, NRS 118.010, et seq.

2      **C.  Third Claim: Quiet Enjoyment & Privacy Occupancy**

3      41.   Plaintiff realleges and incorporate by reference each paragraph

4  previously alleged in this complaint.

5      42.   Each defendant injured Torres by invading Torres's private right

6  occupancy and infringing her right of quiet enjoyment in violation of NRS

7  40.230-40.240, 118A.380-118A-390, and related Nevada state laws.

8      **D.  Fourth Claim: Wrongful Eviction**

9      43.   Plaintiff realleges and incorporate by reference each paragraph

10  previously alleged in this complaint.

11      44.   Each defendant injured Torres by threatening to evict Torres from her

12  dwelling in violation of NRS chapter 118A.

13      **E.  Fifth Claim: Deceptive Trade Practices**

14      45.   Plaintiff realleges and incorporate by reference each paragraph

15  previously alleged in this complaint.

16      46.   Each defendant injured Torres by committing deceptive trade

17  practices in violation of NRS 41.600, 598.0915, Chapter 118A, and related

18  Nevada state laws.

19      **F.  Sixth Claim:  Invasion of Privacy**

20      47.   Plaintiff realleges and incorporate by reference each paragraph

21  previously alleged in this complaint.

22      48.   Each defendant injured Torres by invading her privacy as condition of

23  rental of a dwelling.

24      **G.  Seventh Claim:  Defamation**

25      49.   Plaintiff realleges and incorporate by reference each paragraph

26  previously alleged in this complaint.

27      50.   Each defendant injured Torres defaming her by making or causing to

28  be made false statements about Torres in violation of NRS 200.510, among other

related Nevada state laws.

### H. Sixth Claim: Negligence

51.     Plaintiff realleges and incorporate by reference each paragraph previously alleged in this complaint.

52.     Each defendant injured Torres by want of ordinary care or skill in the management of their property, person, or agents in violation of NRS 41.130 and related Nevada state laws.

### V.  RELIEF

Wherefore, plaintiff prays for entry of a judgment against each defendant that:

1.     Awards compensatory damages under each claim alleged herein;

2.     Awards statutory damages under the applicable Nevada Revised Statutes;

3.     Awards punitive damages under the Fair Housing Act only;

4.     Declares that each defendant has violated the Fair Housing Act and applicable Nevada Revised Statutes;

5.     Enjoins all unlawful practices complained about herein and imposes affirmative injunctive relief requiring each defendant, its partners, agents, and require defendants to take affirmative steps to counteract and cure their unlawful and discriminatory practices;

6.     Awards reasonable attorneys' fees and costs; and,

///

///

///

///

-13-

7.      Awards any other relief deemed just by the Court.

*   *   *

Dated:   April 8, 2019.

Respectfully submitted,

NEVADA LEGAL SERVICES                    BRANCART & BRANCART
Ronald Sung (NV 13047)
rsung@nlslaw.net                              */s/ Christopher Brancart*
530 South 6th Street                          Christopher Brancart (NV 8969)
Las Vegas, NV 89101                           cxrancart@brancart.com
Tel:    (702) 388-1641, Ext 148              Post Office Box 686
Fax:    (702) 386-0404                        Pescadero, CA  94060
                                              Tel:    (650) 879-0141
                                              Fax:    (650) 879-1103

Attorneys for Plaintiff

-14-