# EXHIBIT 1

Candy Torres Deposition (excerpts)

Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 2 of 150
Candy Torres
Torres vs Rothstein, et al.

```
 1                UNITED STATES DISTRICT COURT

 2                    DISTRICT OF NEVADA

 3

 4  CANDY TORRES,                   )
                                    )
 5         Plaintiff,               )
                                    )
 6         vs.                      ) CASE NO.
                                    ) 2:19-CV-00594-APG-GWF
 7  ALLAN ROTHSTEIN and KYLE        )
    PUTNEY,                         )
 8                                  )
           Defendants.              )
 9  _____)

10

11

12

13

14

15

16              DEPOSITION OF CANDY TORRES

17         Taken on Thursday, January 16, 2020

18               At 10:14 o'clock a.m.

19         At 375 E. Warm Springs Road, Ste. 105

20               Las Vegas, Nevada 89119

21

22

23

24

25  REPORTED BY:    MARY DANE McCOY, CCR NO. 219
```



**ROCKET REPORTERS**

888.832.0050        www.RocketReporters.com

Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 3 of 150
Candy Torres
Torres vs Rothstein, et al.                                                    2

```
 1                        APPEARANCES

 2   For the Plaintiff:

 3        Christopher Brancart, Esq.

 4        Brancart & Brancart

 5        8205 Pescadero Creek Road

 6        Loma Mar, California 94021

 7        650.879.0141

 8        650.879.1103 Fax

 9        cbrancart@brancart.com

10               and

11        Gregory Paul, Esq.

12        Nevada Legal Services

13        209 N. Pratt Avenue

14        Las Vegas, Nevada 89705

15        702.386.0404

16        702.388.1641 Fax

17        gpaul@nlslaw.net

18
     For the Defendant Rothstein:
19
          Charles "CJ" E. Barnabi, Jr., Esq.
20
          The Barnabi Law Firm, PLLC
21
          375 East Warm Springs Road, Ste. 104
22
          Las Vegas, Nevada 89119
23
          702.475.8903
24
          702.966.3718 Fax
25
          cj@barnabilaw.com
```



Candy Torres
Torres vs Rothstein, et al.                                                    3

```
1   For the Defendant Putney:

2        Daniel T. Foley, Esq.

3        Foley & Oakes, PC

4        1210 S. Valley View Blvd., Ste. 208

5        Las Vegas, Nevada 89102

6        702.384.2070

7        702.384.2128  Fax

8        dan@foleyoakes.com

9
    ALSO PRESENT:
10
         Spencer Campbell, Legal Assistant
11
         Kyle Putney
12
         Allan Rothstein
13
         Marie Twist, Paralegal
14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                 LAS VEGAS, NEVADA; JANUARY 16, 2020

 2                         10:14 A.M.

 3                           -o0o-

 4                       CANDY TORRES,

 5   having been first duly sworn to testify to the truth,

 6   testified as follows:

 7                        EXAMINATION

 8   BY MR. BARNABI:

 9        Q.   Morning, Ms. Torres, we are here today to

10   have your deposition taken.  Have you had your

11   deposition taken before?

12        A.   No.

13        Q.   You were at Allan Rothstein's deposition

14   yesterday though, correct?

15        A.   Correct.

16        Q.   So are you kind of familiar with how a

17   deposition is undertaken?

18        A.   Yeah, yes.

19        Q.   Do you want me to go over some of the ground

20   rules for your familiarity?

21        A.   Sure.

22        Q.   Okay.  The deposition, everything is being

23   recorded, everything is under oath as if you were in a

24   court of law even though we are in an informal setting

25   as we are here today.  Your deposition testimony will
```



Candy Torres
Torres vs Rothstein, et al.                                                29

```
 1   BY MR. BARNABI:
 2        Q.   Okay.  So we will move to Mr. Rothstein.
 3   When was the first time that you met Mr. Rothstein?
 4        A.   It was the last week of September of 2018.
 5        Q.   Could you describe Mr. Rothstein's physical
 6   movement at that time?
 7             MR. BRANCART:  Objection, vague.
 8             THE WITNESS:  Well, the first time I had
 9   contact with him was through the phone.
10   BY MR. BARNABI:
11        Q.   Oh, sorry, I should have backed up.  How did
12   you contact Mr. Rothstein?
13        A.   He called me.
14        Q.   Okay, and that was in regard to the
15   Wedgebrook property?
16        A.   Correct.
17        Q.   How did you come upon trying to obtain
18   information about the Wedgebrook property?
19             MR. BRANCART:  Objection, vague.
20             Go ahead.
21             THE WITNESS:  There is different websites,
22   you can put a check mark on all the houses that you
23   like, and it sends out requests for them to call you
24   back.
25   ///
```



Candy Torres
Torres vs Rothstein, et al.                                              31

1   vague.

2           Go ahead.

3           THE WITNESS:  Yes.

4   BY MR. BARNABI:

5       Q.   And why did you select the Wedgebrook

6   property?

7       A.   Because it was in a nice location.  The

8   location and the schools were awesome.

9       Q.   And do you feel it was your only choice in

10  the valley?

11          MR. BRANCART:  Objection, vague.

12          THE WITNESS:  Yes, yes, at that time, yes.

13  BY MR. BARNABI:

14      Q.   Okay.  And so you mentioned that you

15  initially contacted Mr. Rothstein by telephone; is that

16  correct?

17          MR. BRANCART:  Misstates.

18          THE WITNESS:  He contacted me.

19  BY MR. BARNABI:

20      Q.   Okay, so he contacted you.  Could you tell me

21  what you recall from that conversation?

22      A.   He told me that -- he gave me his name, he

23  told me that he was willing -- he loved working with

24  Section 8 clients because it was secure payment, and

25  that he was willing to work with me for the Wedgebrook



1   house.

2        Q.   Did you arrange a time to look at the

3   Wedgebrook house at a later date?

4        A.   No, I just -- no.

5        Q.   Okay.  So what was your next involvement in

6   regards to the Wedgebrook property then?

7        A.   He gave me -- on the first call he told me

8   how much I needed to give him to get it off the market,

9   and it would go towards the deposit.  That was the

10   first phone call.  And he gave me a time and date for

11   that following Saturday at 1:00 p.m. at the address

12   that he provided.

13        Q.   And during the same time, had you been

14   approved for the Section 8 program?

15             MR. BRANCART:  Objection, vague.

16             Go ahead.

17             THE WITNESS:  I've always been approved for

18   the Section 8.

19   BY MR. BARNABI:

20        Q.   Okay.  I'm going to mark Exhibit 80.

21             (Exhibit 80 was marked.)

22             MR. BRANCART:  If you can pass them around.

23             MR. FOLEY:  Okay.

24   BY MR. BARNABI:

25        Q.   This is correspondence dated July 3rd, 2019.



**ROCKET REPORTERS**

888.832.0050     www.RocketReporters.com

Case 2:19-cv-00594-APG-EJY  Document 68-2  Filed 04/17/20  Page 9 of 150
Candy Torres
Torres vs Rothstein, et al.                                          39

```
 1                    10:58 a.m. to 11:14 a.m.)
 2   BY MR. BARNABI:
 3        Q.   We will pick up kind of where we left off,
 4   looking at Exhibit 2, the complaint.  And I'll turn
 5   your attention to Paragraph 8.  On the first sentence
 6   of that Paragraph 8 it says that you had five children
 7   and that you were homeless, "living from week to week
 8   in a local residential hotel."
 9             Is that correct?
10        A.   Yes.
11        Q.   Could you tell me how long that had been
12   transpiring prior to August 2018?
13        A.   I moved in around August to the weekly.
14        Q.   Help me understand.  So are you saying that
15   you were homeless because you didn't have like a
16   permanent residence then?
17        A.   Well, I wasn't homeless --
18             MR. BRANCART:  Let me just object, only as
19   far as she didn't write the document.
20             But go ahead.
21             THE WITNESS:  I was living at the weekly.
22   BY MR. BARNABI:
23        Q.   Okay.  It goes on to read in that paragraph
24   that SNRHA approved you for $1550 or less per month for
25   a private dwelling.
```



**ROCKET REPORTERS**
888.832.0050        www.RocketReporters.com

1          Is that correct?

2      A.    Four bedroom.

3      Q.    Four bedroom.  And we looked at Exhibit 80,

4  do you have a copy of that?  Do you know if Exhibit 80

5  is the approval that is mentioned in that sentence that

6  describes the approval?

7          MR. BRANCART:  Just for the record, this

8  document Exhibit 80 is dated about a year later, July

9  3rd, 2019.

10          MR. BARNABI:  I see, you're right, I'll

11  withdraw it.

12      Q.    Moving on, it goes on to talk about in

13  Paragraph 9 how you came into contact with

14  Mr. Rothstein.  If I recall correctly, you discussed

15  the property, the Wedgebrook property, initially by

16  telephone; is that correct?

17      A.    Yes.

18      Q.    And then in Paragraph 10, moving forward,

19  this is the second sentence, it says, "Although it was

20  dirty and in need of cosmetic repairs, she decided to

21  apply."

22          Do you have any further recollection of why

23  you believed it was dirty or in need of cosmetic

24  repairs?

25      A.    Well --



**ROCKET REPORTERS**

888.832.0050    www.RocketReporters.com

Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 11 of 150
Candy Torres
Torres vs Rothstein, et al.                                              43

1      A.   No.

2      Q.   Can you tell me what is incorrect about that

3  statement?

4      A.   It was not Henderson, it was a Las Vegas

5  address.  And I did not know it was his home, I thought

6  it was an office.

7      Q.   Do you remember the whereabouts of the home

8  in the valley, like major cross streets or anything

9  like that?

10     A.   It's off of Sahara and Durango.

11     Q.   But did you go there to obtain an application

12 to rent the Wedgebrook property?

13     A.   I went there to drop off the holding amount

14 that he had asked me on the first conversation.  And to

15 start the process with the application.

16     Q.   Okay.  So that was on September 29 of 2018?

17     A.   It was the last Saturday of September.

18     Q.   Okay, all right.  Was that the first time you

19 had met Mr. Rothstein in person?

20     A.   Yes.

21     Q.   Okay.  Let's turn to the next page and look

22 at paragraph -- excuse me, let me stay on 10 for a

23 minute.

24          I'll hand you what will be marked as

25 Exhibit 81.



**ROCKET REPORTERS**
888.832.0050    www.RocketReporters.com

Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 12 of 150
Candy Torres
Torres vs Rothstein, et al.                                                52

1          Then 947, obviously it's the wrong faucet,

2   sink faucet.

3          MR. BARNABI:  Okay.

4          THE WITNESS:  Then -- yeah.

5   BY MR. BARNABI:

6      Q.   That's it?

7      A.   That's it.

8      Q.   Okay.  So these damages were apparent when

9   you first looked at the house?

10     A.   Yes.

11     Q.   But prior to the inspection by the Section 8

12  authorities.

13         And it mentions in -- let me turn to the

14  paragraph -- let me withdraw that.

15         Was there a point in time after your

16  inspection that you offered to make repairs to the

17  property?

18     A.   It was before inspection.

19     Q.   It was before the inspection?

20         MR. BRANCART:  Are you talking about the HUD

21  inspection guys, when you are talking about --

22  BY MR. BARNABI:

23     Q.   Let's talk about the initial inspection

24  pre-HUD.

25     A.   So my initial inspection?



1        Q.    Right.

2        A.    Yes, I had offered to clean.

3        Q.    Let me give you the question again.  So prior

4   to the HUD inspection, did you offer to Mr. Rothstein

5   to repair some of the issues that you saw and mentioned

6   in the house?  Did you offer to make any repairs?

7        A.    I did.  We had came to an agreement.

8        Q.    Okay.  Can you explain to me what your

9   understanding of that agreement was?

10       A.    That if I cleaned the house from top to

11   bottom with windows, he was going to waive the 475

12   cleaning deposit, that and the -- and then the carpet

13   that was installed, he was -- he didn't tell me the

14   amount, but he was to help me reduce the final balance

15   for the deposit.

16       Q.    Okay.  Would it be fair to state that you

17   believed that these repairs needed to be performed so

18   you could get approval from HUD for the voucher?

19       A.    Oh, I knew they had to be done before

20   inspection in order for the inspection to pass.

21       Q.    Was your belief formed on your prior dealings

22   with Section 8?

23       A.    With the other houses?

24       Q.    Yes.

25       A.    Well, I had never gotten a house like this.



**ROCKET REPORTERS**
888.832.0050          www.RocketReporters.com

Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 14 of 150
Candy Torres
Torres vs Rothstein, et al.                                                    54

1        Q.    Having gone through those other experiences

2   though, were you aware that -- let me back up.

3            Having had those other experiences, was it

4   your belief that Section 8 wouldn't approve you for a

5   voucher if they came and saw it as it was?

6        A.    Well, it was a hazard, the carpet and tile.

7   It would not pass inspection.

8        Q.    Okay.  Let's move on to Paragraph 14, lines

9   24 and 25.  I'll read that.  It says if -- it's in

10  Exhibit 2, we are going back to the complaint at

11  page 4, Lines 24 and 25.  It states if there is a

12  conflict between the landlord's lease and HUD's tenancy

13  addendum, the language in the tenancy addendum

14  controls.

15           To the best of your knowledge without

16  rendering a legal opinion --

17           MR. BRANCART:  Where are you reading?

18           MR. BARNABI:  Page 4, Exhibit 2, lines 24 and

19  25.

20           MR. BRANCART:  Okay.

21  BY MR. BARNABI:

22       Q.    In regard to that quote I just read, what is

23  your understanding of that phrase, if you have any

24  understanding?

25       A.    I don't understand.



**ROCKET  REPORTERS**
888.832.0050        www.RocketReporters.com

1  your application at his home; is that correct?

2       A.   Can you repeat the question, please?

3       Q.   According to paragraph 18, it mentions that

4  you brought your completed notarized application to

5  Rothstein at his home; is that correct?

6       A.   I didn't bring him the application.  I got

7  the application.

8       Q.   Do you recall what time of day that was on

9  October 1st of 2018?

10      A.   I don't remember the time.

11      Q.   Do you have an estimation of whether it was

12 in the morning, noon, or night?

13      A.   Noon, afternoon.

14      Q.   Okay.  So at that time you provided

15 Mr. Rothstein with your application, and deposits, and

16 other items identified in that paragraph, correct?

17      A.   No, that was -- no.

18      Q.   Okay.  So when you met with Mr. Rothstein on

19 the 1st of October, 2018, can you tell me what

20 transpired to the best of your recollection?

21      A.   I didn't meet him on October of 2018.

22      Q.   Okay.  If you were to insert a date where

23 October 1st, 2018, is currently, what date do you

24 believe should be inserted?

25      A.   It was when I first met him.



Candy Torres
Torres vs Rothstein, et al.                                                      58

1      Q.    So that would be --

2      A.    Sometime the last week of September.

3      Q.    Okay.  I believe prior in the complaint it

4  said a date of September 29th.  Would that be accurate?

5      A.    It was the last Saturday of September.

6      Q.    So you are meeting Mr. Rothstein the last

7  Saturday of 2018, and can you tell me what you

8  recollect from when you met him on that date?

9      A.    Sure.  I brought three money orders and the

10 voucher package.

11     Q.    Do you recall the conversation that you and

12 Mr. Rothstein had at that point in time?

13     A.    He said everything looked good, that he

14 needed me to get some forms printed and notarized for

15 the owner to approve my application.

16     Q.    And did Mr. Rothstein have a response to

17 that, or did you have a response to that?  How did the

18 conversation progress -- let me withdraw that.

19           How did the conversation progress after that

20 point?

21     A.    He wrote down on a piece of note what he

22 wanted me to type in cap letters.

23     Q.    I'm not quite sure I understand what you're

24 saying.  Can you explain to me what you --

25     A.    I dropped --



Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 17 of 150
Candy Torres
Torres vs Rothstein, et al.                                                59

```
 1              MR. BRANCART:  Let him finish.
 2   BY MR. BARNABI:
 3        Q.   You mentioned that he wrote down what he
 4   wanted from you; is that correct?
 5        A.   The next steps.
 6        Q.   Okay.  And those next steps were?
 7        A.   To get some forms notarized, proof of income,
 8   and a paragraph that he wanted me typed up.
 9        Q.   At that time to your knowledge had
10   Mr. Rothstein run your credit report?
11        A.   I don't know.
12        Q.   Did you tell Mr. Rothstein of your credit
13   score?
14        A.   I don't remember.
15        Q.   At that time -- well, let me back up, strike
16   that.
17             It mentions on page 6, line 2, it says,
18   "Lacking any additional funds, Torres offered to clean
19   and repair the Wedgebrook house, improving its value
20   and ensuring the dwelling passed HUD's quality housing
21   standards."
22             Is that an accurate representation of what
23   you believe also transpired at that meeting?
24             MR. BRANCART:  Are you talking about the last
25   Saturday in September 2018?
```



Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 18 of 150
Candy Torres
Torres vs Rothstein, et al.                                              60

1          MR. BARNABI:  The only one we have been

2   talking about.

3          THE WITNESS:  No, I'm sorry, I don't recall

4   that conversation on that meeting.

5   BY MR. BARNABI:

6      Q.   Okay.  And let me read another quote.  It

7   starts at line 4, says, Rothstein agreed that trade for

8   work was a good start, but not enough.

9          Do you recall any of that type of

10  conversation?

11         MR. BRANCART:  During this last Saturday in

12  September?

13         MR. BARNABI:  The only one we've been talking

14  about.

15         THE WITNESS:  Not the first -- not the first

16  initial meeting.

17  BY MR. BARNABI:

18     Q.   Okay.  And I'll read to you the next

19  sentence.  It says, He asked Torres to give him a "hand

20  job".  Torres refused.

21         Did that occur at this same meeting the last

22  Saturday of September 2018?

23     A.   No, it did not.

24     Q.   Did that occur at all?

25     A.   The asking of a hand job?



Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 19 of 150
Candy Torres
Torres vs Rothstein, et al.                                                    61

1      Q.   Right.

2      A.   Yes, it did.

3      Q.   Can you tell me when you believe that

4  occurred?

5      A.   After inspection had passed.

6      Q.   Do you --

7      A.   After November 17th.

8      Q.   So it's your recollection here today that

9  that did not occur on October 1st, 2018; is that

10  correct?

11      A.   Correct.

12      Q.   Okay.  And so just so I'm correct, you

13  believe that actually occurred on November 17 of 2018?

14          MR. BRANCART:  Objection, misstates

15  testimony.

16          THE WITNESS:  No, not November 17th.

17  BY MR. BARNABI:

18      Q.   Okay.  The quote that I just read you about

19  the "hand job", that occurred on which date?

20      A.   After.

21      Q.   What is your best recollection of the date

22  that that transpired?

23      A.   After the inspection passed.

24      Q.   Do you have an estimation as to the date that

25  that --



Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 20 of 150
Candy Torres
Torres vs Rothstein, et al.                                                      62

1        A.    November 17th.

2        Q.    And what was your reaction to that?

3        A.    To what?

4        Q.    To that statement that you are alleging he

5   mentioned on November 17, 2018, where he asked for a

6   hand job, and you refused?

7        A.    I was shocked.

8        Q.    In addition to being shocked, did you talk to

9   him, convey any words expressing your shock?

10       A.    I just looked at him, and I was -- I said,

11  No, Allan, keep it professional.

12       Q.    Okay.  And did you take any further action in

13  regard to that, or is that -- you just left it at that?

14       A.    I just came up with an excuse and left.

15       Q.    What was your excuse?

16       A.    That one of my kids needed to be taken to the

17  hospital.

18       Q.    After he allegedly made that comment, you

19  left the house?

20       A.    I left.

21       Q.    And that was on November 17th of 2018?

22       A.    No.

23       Q.    Okay.  Well --

24            MR. FOLEY:  The inspection was the 17th.

25            MR. BARNABI:  Sorry.



**ROCKET REPORTERS**

888.832.0050        www.RocketReporters.com

```
 1        Q.    Let me clarify so I'm on the same page.  The

 2   comment about the hand job, what is the date that you

 3   believe that was made?

 4        A.    I don't know.

 5        Q.    Was it some time around the 17th?

 6        A.    It was after the 17th.

 7        Q.    After the 17th?

 8        A.    Yes.

 9        Q.    It goes on in paragraph 19 that you agreed to

10   invest significant time and money to improve the

11   Wedgebrook property before starting your tenancy; is

12   that correct?

13        A.    Yes.

14        Q.    What improvements specifically did you make?

15        A.    I purchased paint and painted the whole

16   downstairs.  The carpet got changed from the downstairs

17   living room.  Patches had to be -- walls had to be

18   patched.  The upstairs carpet had to be rewashed, and

19   it was filthy.

20        Q.    So during --

21        A.    There was no toilet installed.

22        Q.    So when did you -- excuse me, strike that.

23              During what timeframe did you make those

24   repairs?

25        A.    I'm sorry, filters had to be put on and smoke
```



Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 22 of 150
Candy Torres
Torres vs Rothstein, et al.                                              64

1  detectors had to be put on.

2      Q.   Anything else?

3      A.   I can't remember.

4      Q.   So during what timeframe did you undertake

5  those repairs?

6      A.   Every -- I would do it after work.  And I

7  would work on it till like 3:00 in the morning.

8      Q.   Do you have a specific date range, to the

9  best of your recollection, that you can recall?

10     A.   Sometime in October.

11     Q.   October.  And did you keep receipts of the

12 things that you purchased to make those repairs?

13     A.   No.

14     Q.   Did you take any pictures yourself of the

15 dwelling during this time period while you were making

16 these repairs that showed the precondition prior to you

17 making those repairs?

18     A.   I did.

19     Q.   And so do you still have those pictures?

20     A.   I do.

21          MR. BRANCART:  The pictures of the repairs

22 that were done, I can't tell you what particular status

23 it was, but I think we gave you the pictures that we

24 had of the house.

25          THE WITNESS:  Yes.



Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 23 of 150
Candy Torres
Torres vs Rothstein, et al.                                              66

1        Q.    Okay.   That was the service that you paid

2   approximately $500 for, right?

3        A.    Around, yeah.

4        Q.    So you performed the repairs and then

5   afterwards HUD does their inspection; is that correct?

6        A.    Correct.

7        Q.    And you said that inspection was after

8   November 17 of 2018; is that correct?

9        A.    The inspection was on the 17th.

10       Q.    Okay.   So were you there during the time of

11   their inspection?

12       A.    I was.

13       Q.    Was Mr. Rothstein there as well?

14       A.    No, he was not.

15       Q.    Was there anyone else there?

16       A.    A friend.

17       Q.    Your friend's name?

18       A.    Daniel Valle.

19       Q.    Do you have the contact information for

20   Mr. Valle, his phone number, or address, or anything

21   like that?

22       A.    I do, on my phone I do.

23             MR. FOLEY:  How do you spell the last name?

24             THE WITNESS:  V-A-L-L-E, just one E, Valle.

25   ///



Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 24 of 150
Candy Torres
Torres vs Rothstein, et al.                                                    68

1      Q.   Correct.  Okay.  And you mentioned you

2   weren't sure as to the date, it was some time after

3   inspection; is that correct?

4      A.   Correct.

5      Q.   And you mentioned that you were shocked by

6   the comment?

7      A.   I was.

8      Q.   Correct.  At this point you're still deciding

9   to carry through with the lease process; is that

10  correct?

11     A.   I had to.

12     Q.   You said you had to.  Could you describe why

13  you felt you had to?

14     A.   Because inspection had already passed, and so

15  I was -- the house was already on the system, so I -- I

16  had to.

17     Q.   Okay.  So at this time you were going through

18  the HUD approval process, could you have just selected

19  a different property and started the process there?

20     A.   I couldn't.  I could not have.

21     Q.   So let's say hypothetically you decided to

22  stop the lease process with the Wedgebrook house.  It's

23  your testimony that you couldn't go and use the voucher

24  or restart the approval at another property?

25     A.   No.



Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 25 of 150
Candy Torres
Torres vs Rothstein, et al.                                                      69

1          MR. BRANCART:  Objection, vague, overbroad,

2   lack of foundation.

3          Go ahead.

4          THE WITNESS:  I have to wait one full year in

5   order to be able to move out of the Wedgebrook house.

6   BY MR. BARNABI:

7      Q.   So it's your belief that if you are approved

8   and you start the process, if you back out, you can't

9   be approved for another full year?

10     A.   Yeah, yes.

11     Q.   Okay.  So after the inspection, was there a

12  point in time where you entered a lease agreement for

13  the property?

14         MR. BRANCART:  Objection, vague, vague as to

15  time.

16         THE WITNESS:  Can you repeat?

17  BY MR. BARNABI:

18     Q.   Did you end up leasing the Wedgebrook

19  property after the inspection?

20     A.   Yes.

21     Q.   Okay.  We will turn to Exhibit 35, and if you

22  would keep Exhibit 2 with you.  Paragraph --

23         MR. BRANCART:  Before we jump into another

24  exhibit, can we take a break, please?

25         MR. BARNABI:  Sure.



Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 26 of 150
Candy Torres
Torres vs Rothstein, et al.                                                    70

1          Off the record, please.

2               (Whereupon, a recess was taken from

3               12:11 p.m. to 12:21 p.m.)

4    BY MR. BARNABI:

5          Q.   So, Ms. Torres, we left off at a point in

6    time between the inspection, which occurred on

7    November 17, 2018, and you were going to execute a

8    lease agreement in regard to the Wedgebrook property.

9    You've testified previously that if you had backed out

10   of getting that property, that you would not be able to

11   apply for Section 8 for approximately one year

12   following; is that correct?

13         A.   Yes.

14         Q.   So at that time did you ever make comments to

15   Mr. Rothstein that you were desperate about getting

16   into that house, making sure that worked for you and

17   your family?

18              MR. BRANCART:  Objection, vague.

19              THE WITNESS:  Can you repeat the question?

20   BY MR. BARNABI:

21         Q.   Did you indicate to Mr. Rothstein that you

22   were desperate to get into the Wedgebrook property at

23   that point in time?

24              MR. BRANCART:  Objection, vague.

25              THE WITNESS:  I didn't say I was desperate.



Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 27 of 150
Candy Torres
Torres vs Rothstein, et al.                                            71

1  BY MR. BARNABI:

2      Q.   Okay.  How would you characterize your need

3  to make sure you were going to be able to lease the

4  Wedgebrook property?

5      A.   I don't understand the question.

6      Q.   Okay.  Did you want to live somewhere else

7  other than Wedgebrook?

8      A.   I wanted to get out of the Budget Suites.

9      Q.   So you wanted to get out of the Budget

10  Suites.  Was that an immense desire or was that very

11  important to you?

12      A.   Yes.

13      Q.   Did you at that time, in expressing those

14  opinions, did you -- excuse me, back up, move to

15  strike.

16          Did you express those opinions to

17  Mr. Rothstein at that point in time?

18          MR. BRANCART:  Objection, vague.

19          THE WITNESS:  I told him I wanted to move my

20  kids out of that Budget Suites.

21  BY MR. BARNABI:

22      Q.   And did you say words to him that indicated

23  more than it was just a passing desire, that you really

24  wanted to make the lease in living at that property

25  transpire?



```
 1              MR. BRANCART:  Objection, vague.
 2              THE WITNESS:  No.
 3  BY MR. BARNABI:
 4       Q.   Let me say it a different way.  So did it
 5  matter to you if you weren't able to live at Wedgebrook
 6  at that point in time?
 7              MR. BRANCART:  Objection, vague.
 8              THE WITNESS:  It did matter.
 9  BY MR. BARNABI:
10       Q.   Okay.  And how intense -- excuse me, back up.
11              How intensely did you want to move into
12  the --
13              THE COURT REPORTER:  I'm sorry, pardon me?
14  BY MR. BARNABI:
15       Q.   How intensely was your desire to move into
16  the Wedgebrook property?
17       A.   Oh, I wanted to move, I wanted to move into
18  the property.
19       Q.   So is it fair to say that you were very
20  committed to moving into the property?
21       A.   Yes.
22       Q.   And that notwithstanding the comment that
23  Mr. Rothstein made or allegedly made in regard to a
24  hand job, you were going to let that property
25  regardless?
```



**ROCKET REPORTERS**
888.832.0050        www.RocketReporters.com

1     A.   Yeah, well, I had to, I think I had

2 already -- yeah.

3     Q.   Okay.  So you end up entering into a lease

4 agreement on or about the 23rd of November, 2018; is

5 that correct?

6          MR. BRANCART:  Objection, vague.

7          THE WITNESS:  Which lease?

8 BY MR. BARNABI:

9     Q.   Turn to Exhibit 35.  I'll hand you what has

10 been marked as Exhibit 35 previously.  We will look

11 first at pages 442 through 454.  Do you see those page

12 numbers?

13     A.   I do.

14     Q.   Okay.  And that is a document entitled

15 Residential Lease Agreement.  Do you recall this

16 document?

17     A.   I don't know which lease this is.

18     Q.   Okay.  Well, let me turn your attention to

19 page 454 at line 24 approximately.  Is that your

20 signature?

21     A.   It is.

22     Q.   Do you recall specifically signing this lease

23 agreement?

24     A.   I do.

25     Q.   So you did execute the document on the day



**ROCKET REPORTERS**
888.832.0050          www.RocketReporters.com

1  that you signed it, the 23rd of November, 2018?

2      A.   Yes.

3      Q.   Did you execute the document of your own free

4  will?

5           MR. BRANCART:  Objection, vague, overbroad.

6           THE WITNESS:  What do you mean by execute?

7  What does execute mean?

8  BY MR. BARNABI:

9      Q.   Did you sign the document based on your --

10  let me back up.

11          Did you voluntarily sign the agreement?

12          MR. BRANCART:  Objection as to the use of the

13  word voluntarily, vague.

14          Go ahead.

15          THE WITNESS:  Yes.

16  BY MR. BARNABI:

17     Q.   Okay.  So by signing the document, would you

18  agree that these were the terms and conditions that you

19  and the landlord were both going to operate under?

20          MR. BRANCART:  Objection, lack of foundation,

21  overbroad, vague, calls for a legal conclusion,

22  incomplete hypothetical.

23  BY MR. BARNABI:

24     Q.   You can answer.

25     A.   Yes.



1      Q.   Okay.  We will go over a few provisions in

2  the agreement.  If I could have you turn to the page

3  identified as 443, it's the second page, Paragraph 9.

4  It's stated -- well, excuse me, the paragraph called

5  Condition of Premises.  It states, Tenant agrees that

6  Tenant has examined the premises, including the grounds

7  and all buildings and improvements, and that they are,

8  at the time of this lease, in good order, good repair,

9  safe, clean, and rentable condition.

10          Would you agree with that statement?

11          MR. BRANCART:  Objection, vague, vague as to

12  time, calls for a legal conclusion.

13          THE WITNESS:  I don't agree with what it

14  says.

15  BY MR. BARNABI:

16      Q.   Okay.  So when you signed the agreement, did

17  you indicate to Mr. Rothstein that you did not agree

18  with that statement?

19      A.   I did not.

20      Q.   Okay.  And in regard to Section 7 at the top

21  of that same page, entitled Additional Fees, and

22  Section A, Late Fees, it states, In the event tenant

23  fails to pay rent when due, tenant shall pay a late fee

24  of $85 plus $75 per day for each day after zero days

25  that the sum was due.  Such amounts shall be considered



Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 32 of 150
Candy Torres
Torres vs Rothstein, et al.                                                    76

1  to be rent.

2          Do you recall any specific conversations you

3  had with Mr. Rothstein in regard to that section?

4       A.   No.

5       Q.   Turning your attention to the page No. 444,

6  11, entitled Eviction Costs.

7          MR. BRANCART:  Okay, thank you.

8  BY MR. BARNABI:

9       Q.   Do you recall any specific conversations you

10 had with Mr. Rothstein in regard to that paragraph at

11 the time of signing the lease agreement?

12      A.   No, I don't.

13      Q.   Okay.  Paragraph 16, entitled, Utilities, on

14 the same page, do you have any specific recollections

15 with Mr. Rothstein in regard to that paragraph?

16      A.   Yes.

17      Q.   What did you state?

18      A.   That it was wrong.

19      Q.   Did you ask Mr. Rothstein to make changes?

20      A.   I did.

21      Q.   Did he make those changes?

22      A.   He did not.

23      Q.   Did you follow up with him at a later date

24 and time to ensure that he made your requested changes?

25      A.   I don't remember.



Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 33 of 150
Candy Torres
Torres vs Rothstein, et al.                                              77

1        Q.   Okay.  Turning to Section 24, it's on

2   page 447, entitled, Termination.  I'll read that.  It

3   states, Upon termination of the tenancy, tenant shall

4   surrender and vacate the premises and shall remove any

5   and all of tenant's property.  Tenant shall return

6   keys, personal property and premises to the landlord in

7   good, clean, and sanitary condition, normal wear

8   excepted.

9            Did you have any conversations with

10  Mr. Rothstein in regard to that paragraph at the time

11  that you signed the lease?

12       A.   No.

13       Q.   And we will come back to that.  During the

14  time of your tenancy, do you believe you kept the

15  Wedgebrook property in conformity -- or, excuse me, let

16  me back up.

17           In regards to the Wedgebrook property, during

18  the time of your tenancy, do you believe you kept the

19  house in a state that was -- let me back up.  We will

20  come back to it.

21           In turning to the page identified as 449, the

22  section named Inventory.  Do you recall having any

23  specific recollection in regard to that section with

24  Mr. Rothstein at the time of signing the lease?

25       A.   No.



Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 34 of 150
Candy Torres
Torres vs Rothstein, et al.                                                    78

1      Q.   Turning to page 451 of the same exhibit,

2  Section 35, it states, In the event of any court

3  action, the prevailing party shall be entitled to be

4  awarded against the losing party all costs and expenses

5  incurred thereby, including but not limited to,

6  reasonable attorney's fees and costs.

7           In regard to that section, do you recall

8  having any specific conversations with Mr. Rothstein on

9  the day you signed?

10     A.   No.

11     Q.   Okay.  Do you understand what that provision

12 entails?

13     A.   I don't, no.

14     Q.   Okay.  Turning to page 453 of the same

15 exhibit, the section entitled, Additional Terms And

16 Conditions.  Do you recall any specific conversations

17 you had with Mr. Rothstein in regard to that section on

18 the date that you signed the lease agreement?

19     A.   No.

20     Q.   Let's turn to the page identified as 455, it

21 is a document entitled, Hold Harmless Agreement.  Do

22 you recall signing this document?

23     A.   Yes.

24     Q.   Did you have a chance to review that document

25 before you signed it?



 1        A.    No.

 2        Q.    So are you saying that -- well, describe to

 3  me why you believe you were not provided time to review

 4  the document?

 5        A.    I was just trying to sign fast and get out.

 6        Q.    So you just wanted to get it over and done

 7  with --

 8        A.    I didn't read through thoroughly.

 9        Q.    -- let me finish my question.

10        Basically you just wanted to get it all

11  signed and leave as quick as possible, would that be

12  accurate?

13        A.    Yes.

14        Q.    So you weren't necessarily reading the

15  documents you were signing, but you were signing them

16  anyway?

17        A.    It was part of the lease.  I didn't read

18  word-by-word, but I didn't even know what a hold

19  harmless means.

20        Q.    Okay.  So is it fair to say that you had

21  time, but you just wanted to complete the signing of

22  all the paperwork as quick as possible?

23        MR. BRANCART:  Objection, vague, lack of

24  foundation.

25        Go ahead.



Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 36 of 150
Candy Torres
Torres vs Rothstein, et al.                                                      80

1          THE WITNESS:  I didn't want to be there with

2    Rothstein.  I just wanted to get out.

3    BY MR. BARNABI:

4          Q.   So you didn't ask for additional time to

5    review any of these documents that we are looking at in

6    Exhibit 35?

7          A.   No.

8          Q.   Okay.  But it's your testimony that you

9    believe you did sign this document?

10         A.   Yes.

11         Q.   And on the next page, page 456, it's titled,

12   Duties Owed By A Nevada Real Estate Agent.  Do you

13   recall signing this document?

14         A.   No.

15         Q.   Are those your initials down towards the

16   bottom of the page?

17         A.   Yes.

18         Q.   Did you not put those initials there?

19         A.   Those are my initials there.

20         Q.   So you put your initials, but you just didn't

21   do your whole signature?

22         A.   It's not here.

23         Q.   Okay.  So it's your testimony that you did

24   put your initials on that page?

25         A.   Yes.



**ROCKET REPORTERS**
888.832.0050    www.RocketReporters.com

Case 2:19-cv-00594-APG-EJY    Document 68-2    Filed 04/17/20    Page 37 of 150
Candy Torres
Torres vs Rothstein, et al.                                                    81

1        Q.   Okay.  And on the following page, 457, that

2   is also another copy of the duties owed, and is that

3   your signature at the bottom of the page?

4        A.   Yes.

5        Q.   Turn to the next page 458, the document

6   entitled --

7                  (Off-record discussion held with

8                   counsel.)

9             THE WITNESS:  I didn't sign this.

10            MR. BRANCART:  On the document we were just

11   talking about, 457, this was one of those documents not

12   during the signing of 11/23, but was a document signed

13   prior in their meetings.

14   BY MR. BARNABI:

15       Q.   Is that your testimony, Ms. Torres?

16       A.   Yes.

17       Q.   Okay.

18            MR. FOLEY:  Also there are a couple different

19   signatures it looks like.  Can you verify that on that

20   page?

21            MR. BARNABI:  Yes.

22       Q.   We will move to 458, and this is a Consent to

23   Act agreement.  Is that your signature on the bottom

24   right of that page?

25       A.   Yes.



1      Q.   It indicates that there is a time that starts

2  after the 11/23/18 next to your signature, could you

3  tell me what time that was signed?

4      A.   9:57.

5      Q.   Do you know whether that is a P for p.m. or A

6  for a.m.?

7      A.   I don't know what it is.  It looks like a.m.,

8  but it could be p.m.

9      Q.   So would it be your belief that you signed

10 that document on the 23rd of November, 2018, at

11 9:57 a.m. then?

12     A.   I don't know.

13     Q.   So it could be a.m. or it could be p.m.?

14     A.   It could be a.m. or p.m.

15     Q.   Turning to page 459, is that your signature

16 at the bottom of the page?

17     A.   Yes.

18     Q.   That was a Lease Addendum For Illegal

19 Activity.

20          460, Smoke Detector Agreement, that is page

21 460.  Is that your signature above the tenant's

22 signature line?

23     A.   Yes.

24     Q.   461 on November -- excuse me -- page 461,

25 there is the Standard Sign Placement Agreement, looks



**ROCKET REPORTERS**

888.832.0050          www.RocketReporters.com

Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 39 of 150
Candy Torres
Torres vs Rothstein, et al.                                                    83

1  like it's dated November 23, 2018.  Is that also your

2  signature?

3       A.   Yes.

4       Q.   Turning to 462, the Rent Receipt Agreement,

5  is that likewise your signature?

6       A.   Yes.

7       Q.   And turning lastly to pages 463 and 464.

8  First on 463, are those your initials at the bottom of

9  the document?

10      A.   Yes.

11      Q.   Excuse me, on page 463.  I'm sorry --

12      A.   Yes.

13      Q.   Thank you.  And on 464, is that also your

14 signature?

15      A.   Yes.  And it was p.m. on page --

16      Q.   458?

17      A.   458, yeah.

18           MR. FOLEY:  Is that the same on 462, p.m. at

19 the top?

20           MR. BRANCART:  462?

21           THE WITNESS:  Yes, p.m.

22           MR. FOLEY:  10:00 p.m. on that one, right?

23           THE WITNESS:  Uh-huh.

24           MR. FOLEY:  Is that yes?

25           THE WITNESS:  Yes.



1  BY MR. BARNABI:

2      Q.    In regard to the time of day, was there a

3  specific reason why the documents were executed at

4  approximately 10:00 p.m. on November 23, 2018?

5      A.    It was after work.

6      Q.    Where were you working at the time?

7      A.    City Clean.

8      Q.    I'm sorry, I didn't catch --

9      A.    City Clean.

10     Q.    City Clean?

11     A.    City Clean Services.

12     Q.    What were you doing at that time at City

13  Clean Services?

14     A.    I was janitorial, cleaning.

15     Q.    Is that a business that is -- well, strike

16  that.

17           Do you know the owner -- excuse me, strike

18  that.

19           Did you have a prior relationship with the

20  owner of that company?

21     A.    Did I have a prior relationship --

22     Q.    Yeah, did you know them from before?

23     A.    No, I just -- just worked.

24     Q.    In regard to pages 463 and 464, do you have

25  any specific recollection of any conversations you had



**ROCKET REPORTERS**
888.832.0050          www.RocketReporters.com

Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 41 of 150
Candy Torres
Torres vs Rothstein, et al.                                                                85

1  with Mr. Rothstein at the time of signing that

2  document?

3       A.   I do.

4       Q.   Can you state those recollections?

5       A.   I asked him what was this form for.

6       Q.   What was his response?

7       A.   It was part of the lease.

8       Q.   And there was no further response after that?

9  Did you ask him -- so he responded to you it's part of

10 the lease.  Did you have a response to that?

11      A.   I just told him it's weird, I've never seen

12 this before in any other lease.

13      Q.   Okay.  And notwithstanding, you testified

14 though that you did sign the agreement?

15      A.   I signed it.

16      Q.   At that time that you signed these agreements

17 and documents on the 23rd of November, 2018, this was

18 subsequent to the comment that you allege Mr. Rothstein

19 made in regards to the "hand job"; is that correct?

20      A.   Can you repeat the question, please?

21      Q.   Did you sign these agreements that we just

22 reviewed in Exhibit 35 after Mr. Rothstein had made the

23 comment about a hand job?

24      A.   Yes.

25      Q.   Yet notwithstanding that comment, you still



1  are the sexual comments that Mr. Rothstein made to you?

2      A.   When he asked me for a hand job.

3      Q.   Was that the only time that any comment of

4  that nature was mentioned to you?

5      A.   Yes.

6      Q.   So throughout the process when you initiated

7  communication with Mr. Rothstein in September of 2018

8  through signing the lease agreement and other documents

9  on November 23 of 2018, there were no other sexual

10 comments like the hand job comment throughout that

11 entire span; is that correct?

12     A.   He had said stuff to me but not to this

13 nature of the hand job.

14     Q.   So he mentioned other things of that variety

15 that aren't mentioned in the complaint?

16     A.   He had said that I was pretty, and asked if I

17 had a husband or boyfriend.

18     Q.   Okay.  So when he mentioned that you were

19 pretty, did you take that as a sexual comment?

20          MR. BRANCART:  Objection, vague as to time.

21          Go ahead.

22          THE WITNESS:  Not a sexual comment.

23 BY MR. BARNABI:

24     Q.   Did you feel it was inappropriate for him to

25 say that you were pretty?



**ROCKET REPORTERS**
888.832.0050          www.RocketReporters.com

Candy Torres
Torres vs Rothstein, et al.                                                    90

1          MR. BRANCART:  Objection, vague, vague as to

2  time.

3          THE WITNESS:  It was inappropriate.

4  BY MR. BARNABI:

5     Q.   When was the time that that comment was made?

6     A.   Before I signed the November 23rd lease.

7     Q.   Do you have a more accurate estimate?  Is

8  that just your best estimation?

9     A.   That is my best estimation.

10    Q.   Okay.  Now you mentioned that he said you

11  were pretty, but he also asked if you had a boyfriend;

12  is that correct?

13    A.   Correct.

14    Q.   When do you believe that comment was made?

15    A.   Before the 17th.

16    Q.   So before the inspection transpired on the

17  17th of November, 2018?

18    A.   (No audible response.)

19    Q.   And did you take that also as a sexual

20  comment?

21    A.   No.

22    Q.   Do you recall any other thoughts that you had

23  at the time that he made that comment?

24    A.   I thought that what did that have to do with

25  the lease and the house, getting the house.



Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 44 of 150
Candy Torres
Torres vs Rothstein, et al.                                          192

1   BY MR. FOLEY:

2        Q.   Okay.  Did you know it was spacious?

3        A.   The houses looked big.

4        Q.   So you have the meeting on the 29th of

5   September, the last Saturday in September.  And do you

6   believe it was at that time that you delivered the

7   rental application to Mr. Rothstein or was it as listed

8   here on Paragraph No. 8 in the complaint, Exhibit 2,

9   that is on page 5, where it says it was October 1st

10  that you delivered the completed and notarized

11  application to him at his home?

12            MR. BRANCART:  What paragraph are you looking

13  at?

14            MR. FOLEY:  18 on page 5.

15            MR. BRANCART:  18 on page 5.  Object, I think

16  the question is vague in terms of how it's using

17  application but -- you can answer.

18            THE WITNESS:  Oh, I don't remember.

19  BY MR. FOLEY:

20       Q.   Okay.  So is it possible that you were at

21  Mr. Rothstein's house on both September 29 and October

22  1st, 2018, as set forth in the complaint?

23       A.   Yes.

24       Q.   Okay.  And then would the next time you

25  actually went to the house be November 23rd when all of



**ROCKET REPORTERS**

888.832.0050          www.RocketReporters.com

Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 45 of 150
Candy Torres
Torres vs Rothstein, et al.                                                193

1  the lease documents were eventually signed?

2      A.   No.

3      Q.   When was the next time you went to the house?

4      A.   It was October, the beginning of October to

5  drop off the notarized proof of income and another

6  paper that -- a paragraph that he had me type up.

7      Q.   Okay.  So then through that meeting in some

8  other time in October, that would have been the third

9  time you visited Mr. Rothstein's house.  And then would

10  there be any others other than the date you went and

11  signed the leases on November 23rd?

12     A.   Yes.

13     Q.   There were?

14     A.   There were.

15     Q.   Okay.  So we have got three dates, the 29th

16  of September, the 1st of October, mid October, and when

17  was the next time?

18         MR. BRANCART:  Object, mischaracterizes the

19  testimony as to mid October, but --

20  BY MR. FOLEY:

21     Q.   What is the date in October, excuse me?

22     A.   I don't remember the date.  But I know it was

23  in October.

24     Q.   Middle?  Beginning?  End?

25     A.   I don't remember.



1      Q.   Okay, other time in October?

2      A.   Yes.

3      Q.   Okay.  We do know you did go on

4  November 23rd, correct?

5      A.   Yes.

6      Q.   Another time or more between the October,

7  unknown time in October, and the November 23rd visit,

8  correct?

9      A.   Yes.

10     Q.   When was that and what was that for?

11     A.   It was -- he -- I -- he had me fill out the

12  voucher package.

13     Q.   When was that?  Was that in November?

14     A.   October.

15     Q.   So another October visit after the one we

16  have characterized as the other October visit, okay.

17  Then any other visits to the house?

18     A.   Yes.

19     Q.   When was that?

20     A.   In October.  That was Section 8 had denied

21  the application.

22     Q.   And so why did you go to the house again in

23  October?

24     A.   To clarify what was wrong.

25     Q.   Was Mr. Rothstein helping you with your



 1  Section 8 application?

 2       A.    I was helping him.

 3       Q.    Okay.  Was he the one that was submitting it

 4  for you?

 5       A.    I had --

 6             MR. BRANCART:  Objection, lack of foundation,

 7  vague.

 8             Go ahead.

 9             THE WITNESS:  I was the one that had to

10  submit it when it was ready.

11  BY MR. FOLEY:

12       Q.    So why were you dealing with Mr. Rothstein?

13       A.    Because he had me fill out the voucher

14  package.

15       Q.    So that was, as I have it, your fifth visit

16  to his personal residence, four of those visits being

17  in October.  What is the next --

18       A.    October.

19       Q.    Another October visit.  What was that for?

20       A.    They wouldn't take the -- they wouldn't

21  approve the package unless Rothstein provided a form

22  where it states that he was authorized to manage the

23  Wedgebrook house.

24       Q.    Okay.  Why did you need to come to his house

25  for purposes of him filling out a form about his



Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 48 of 150
Candy Torres
Torres vs Rothstein, et al.                                                  196

1  authorization to manage the Wedgebrook house?

2      A.   He didn't want to drive to Section 8.

3      Q.   Pardon me?

4      A.   He wouldn't drive to Section 8.

5      Q.   He wouldn't write?

6      A.   He wouldn't drive.  I was the one coming and

7  going.

8      Q.   Why did you -- when they were saying they

9  wouldn't give it to him unless he obtained the

10 authorization, which we have seen and looked at, from

11 Mr. Putney authorizing Mr. Rothstein to list and sign

12 the leases, why did you need to go to his house to

13 assist or be involved with him obtaining that form?

14         MR. BRANCART:  Objection, asked and answered.

15         THE WITNESS:  Because he couldn't reach the

16 top files of where the form was supposed to be or he

17 said it would be.

18 BY MR. FOLEY:

19     Q.   Okay.  So because of a physical limitation on

20 his inability to reach high, he had you come over to

21 the house to reach up on top of some files, or

22 cabinets, or shelves and retrieve a form?

23     A.   Correct.

24     Q.   And this too was in October, correct?

25     A.   Correct.



Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 49 of 150
Candy Torres
Torres vs Rothstein, et al.                                              197

1      Q.   And did you find that to be the case when you
2   went over there for that purpose, that the subject
3   forms were in a location that was unreachable by
4   Mr. Rothstein?
5      A.   The document wasn't there.
6      Q.   Okay.  When is the next time you went to the
7   house?
8      A.   It was the same day.  I go back to Section 8,
9   and I dropped the -- showed them the package.  And then
10  a supervisor took over my case, and she didn't -- she
11  denied the package.  She didn't approve it.
12     Q.   So you went back down to the Housing
13  Authority's office to obtain the form that
14  Mr. Rothstein thought he had up on a high shelf,
15  retrieve the form, then came back to Mr. Rothstein's
16  house with that form?
17          MR. BRANCART:  Objection, misstates.
18          THE WITNESS:  It was backwards.  I went to
19  Housing, then Rothstein, then back, and then Rothstein,
20  and then back, and then it got denied again.
21  BY MR. FOLEY:
22     Q.   So the first visit on this particular day,
23  are you saying there were three visits to his house on
24  that day?
25     A.   I can't remember.



Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 50 of 150
Candy Torres
Torres vs Rothstein, et al.                                              198

1    Q.   Okay.  So the first one was to retrieve the

2   form from a shelf, turned out to not be there, you went

3   down to the Housing Department, correct?

4    A.   We're talking about the same day that I went

5   and came?

6    Q.   The same day that you couldn't get -- the

7   document didn't exist on the high shelf, correct.

8    A.   Uh-huh.

9    Q.   I'm sorry, I'm confused.  Then the first time

10   from there that you went down to the Housing office,

11   what did you do?

12    A.   Wayneisha Thomas, my original caseworker,

13   just gave my case to the supervisor and Robin, the new

14   supervisor, she denied the application.

15    Q.   Was that Wayneisha?

16    A.   Wayneisha, she didn't get involved no more.

17    Q.   Okay.  So Wayneisha gave up the file to

18   somebody else?

19    A.   To Robin.

20    Q.   Robin?

21    A.   Robin.

22    Q.   Okay.  So you met with Robin when you left

23   Rothstein's house and went down to Section 8, and she

24   said she was denying your voucher?

25    A.   Yeah.



Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 51 of 150
Candy Torres
Torres vs Rothstein, et al.                                                    199

1        Q.    And then you went back to Rothstein's --

2              MR. BRANCART:  Misstates the testimony

3   regarding denying the voucher, but go ahead.

4   BY MR. FOLEY:

5        Q.    Well, did she deny the new voucher or not?

6   She said she did.

7        A.    Robin denied the voucher again.

8              MR. FOLEY:  So are you objecting to her

9   answer or to my question?

10             MR. BRANCART:  No, I think what is being

11  objected to is not the holding of the voucher, but the

12  qualification of the house to utilize the voucher.  But

13  it's sort of two different things.  But go ahead.

14             THE WITNESS:  What was the question?

15  BY MR. FOLEY:

16       Q.    So your first visit that day to the Housing

17  Authority's office, Wayneisha handed you off to Robin,

18  and Robin basically denied your application or your

19  voucher, correct?

20       A.    It wasn't filled out correctly.

21       Q.    Okay.

22       A.    So she said I needed to get it fixed.

23       Q.    Okay.  So then did you get new forms from

24  them?

25       A.    I ended up getting a new voucher, a new claim



**ROCKET REPORTERS**
888.832.0050      www.RocketReporters.com

Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 52 of 150
Candy Torres
Torres vs Rothstein, et al.                                                200

1  voucher.

2       Q.   Package?

3       A.   Because it was all scribbled.  It needed to

4  be clean.

5       Q.   Makes sense.  And with that, you then headed

6  back up to Canyon Gate at Mr. Rothstein's residence,

7  correct?

8       A.   Correct.

9       Q.   And then what happened?  The two of you

10 worked on that voucher again, package?

11      A.   I filled out my portion that I was able to

12 help him physically write, and he corrected the part

13 that Robin had not accepted.  And then I go back to

14 Section 8.

15      Q.   Okay, so the same day you are back down to

16 Section 8?

17      A.   Uh-huh.

18      Q.   What happens?

19      A.   She accepted the voucher, but Robin was still

20 asking for the authorization to manage the property and

21 so she makes the phone call.

22      Q.   To?

23      A.   To I believe it was Mr. Kyle.

24      Q.   Do you know for a fact that that is who she

25 called?



Candy Torres
Torres vs Rothstein, et al.                                           201

1       A.    She got the number out of the information
2   from Kyle on the package.
3       Q.    Were you in the room when she made the phone
4   call?
5       A.    I was.
6       Q.    Did you hear her call someone and say -- and
7   talk to Mr. Putney or address Mr. Putney on the phone?
8       A.    I don't know if it was him, but it was -- it
9   was Kyle's number.
10      Q.    Okay.  So but you were able to hear her
11  talking?
12      A.    Yes.
13      Q.    You don't remember her specifically saying,
14  Hello, Mr. Putney, that is Robin from Section 8?
15      A.    Yes.
16      Q.    You do?
17      A.    I do remember.
18      Q.    You remember her saying Mr. Putney's name on
19  the phone?
20      A.    I do, yes.
21      Q.    Okay.  So then what happened?  Was there an
22  exchange of other information, or did she just get a
23  verbal authorization from him?
24      A.    No.
25      Q.    What happened?



1        A.    Whoever answered the phone told her, Why the

2   hell are you calling me.

3        Q.    Did you hear that voice over the phone say

4   that?

5        A.    I did.

6        Q.    Trump testimony here.

7              Then what?

8        A.    He hung up.

9        Q.    Okay.   Then what?

10       A.    Then she looked at me with like a shocked

11  face and asked me, Are you sure you want to deal with

12  this for a whole year?   And I had already given her --

13  I had already given Mr. Rothstein the 785 that he had

14  asked for on the first meeting, and the gas was already

15  under my name, so I told her that I wasn't -- I -- and

16  then my voucher was about to expire.   So I told her

17  that I had no choice, like, I needed to get it.

18       Q.    Okay.

19       A.    And then she approved it.

20       Q.    Did you go back to Rothstein's house again

21  that day?

22       A.    I did.

23       Q.    Okay, why?

24       A.    To pick up the key for the mail and a ladder,

25  and paint, and brushes, and --



Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 55 of 150
Candy Torres
Torres vs Rothstein, et al.                                                    203

1        Q.    I'm sorry, you are talking a little bit low.

2   You went to pick up the key and what?

3        A.    The mail key.

4        Q.    The mail key, okay.

5        A.    Which was the wrong mail key.  The garage

6   opener, which was the wrong garage opener.  A ladder,

7   paint, and it was like two paint brushes.

8        Q.    Okay.  When was the next time you went to his

9   house?

10       A.    It was, I think, the 23rd of November.

11            MR. BRANCART:  Is that the inspection visit?

12            THE WITNESS:  Yeah, but I didn't go back to

13  Rothstein's house until after the inspection.

14  BY MR. FOLEY:

15       Q.    Okay.  So when did you give him the 785,

16  yeah?

17       A.    On the first week.

18       Q.    On the 29th?

19       A.    Yes, beginning -- I mean the last Saturday of

20  September.

21       Q.    Right.  Now your complaint on page 5, again

22  Exhibit 2, Paragraph 18 states that on October 1st you

23  delivered the completed notarized rental application to

24  his home, right?  Was that the day you brought three

25  money orders comprising the total sum of money you



**ROCKET REPORTERS**
888.832.0050      www.RocketReporters.com

Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 56 of 150
Candy Torres
Torres vs Rothstein, et al.                                          204

1  could raise that Rothstein had demanded?  Was that the

2  785?

3       A.   The 785 was September 29th.

4       Q.   Was it in the form of three money orders?

5       A.   Correct.

6       Q.   Okay.  But I think we have established that

7  you then were back there on the 1st, correct?

8       A.   Correct.

9       Q.   You state, continuing on in that same

10 paragraph, that he wrote out a receipt stating, App fee

11 nonrefundable 235, earnest money refundable, 550,

12 correct?

13      A.   Yes.

14      Q.   And so was it on the 29th or October 1st that

15 he told you what you have there in the next sentence,

16 Rothstein wanted more, he demanded that you come up

17 with more money?

18      A.   This was after inspection.  After

19 November 17th.

20      Q.   You are positive about that?  Again, we have

21 gone through this and refreshed your recollection.

22      A.   When he asked for more money?

23      Q.   When you gave him the 785 on September 29th,

24 are you saying he didn't ask you for any more money at

25 that time?



Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 57 of 150
Candy Torres
Torres vs Rothstein, et al.                                                205

1    A.   Not at that time.  Not at that time.

2    Q.   Okay.  Then he didn't ask for that money,

3  additional money on the 1st as is written here in the

4  complaint, correct?

5         MR. BRANCART:  I'm not sure, I think that

6  mischaracterizes the complaint, a legal document filed

7  as to the statement of claims, but --

8         THE WITNESS:  What was your question?

9  BY MR. FOLEY:

10   Q.   Well, my question here is you have in

11 Paragraph 18, it says on October 1 you delivered the

12 rental application, you also brought three money

13 orders.  He wrote out the receipts, and then wanted

14 more.

15        And at that point in time you said you didn't

16 have any additional money, and you offered to clean and

17 repair the Wedgebrook house.

18   A.   That doesn't sound right, this paragraph.

19   Q.   Let me ask you this:  When did he ever ask

20 you -- when did he first ask you or suggest, however it

21 was, that you would do repairs to the house?

22   A.   When we talked about the deposit, the amount

23 of the deposit.

24   Q.   When was that?

25   A.   Early on, early on before, before inspection



1   passed.

2       Q.   Okay.  Of course you did the repairs to the

3   house before the inspection, which was November 17th.

4       A.   November 17.

5       Q.   And you were given the paint brushes, and the

6   ladder, and the paint during this very last visit that

7   you had to the house in October is what you said,

8   correct?

9            MR. BRANCART:  No, objection, I think it

10  misstates testimony.

11  BY MR. FOLEY:

12      Q.   I don't think so, but go ahead.

13      A.   What was your question?

14      Q.   When you got the ladder, and the paint, and

15  the paint brushes from Mr. Rothstein, that was on the

16  last visit that you had to him on this long day that

17  was still in October, correct?

18      A.   Correct.

19      Q.   So as of that point, which was obviously

20  still before the inspection, he had asked you, and you

21  had agreed to do some work on the house, right?

22      A.   He agreed to deduct some money of the rest of

23  the balance that I owed of the deposit.

24      Q.   How much did he agree to deduct?

25      A.   475 for the cleaning, and he didn't say a



**ROCKET REPORTERS**

888.832.0050          www.RocketReporters.com

Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 59 of 150
Candy Torres
Torres vs Rothstein, et al.                                                    207

1  specific amount on the repairing.

2      Q.   So all he agreed to deduct was $475 if you

3  would do the painting?

4           MR. BRANCART:  Objection, misstates

5  testimony.  Also we have covered this earlier today,

6  but so it's asked and answered.

7           Go ahead.

8           THE WITNESS:  No, it was for the cleaning.

9  BY MR. FOLEY:

10     Q.   The cleaning, not the painting, I misheard

11  you, I'm sorry.  And otherwise, did he ever specify how

12  much he was going to deduct for your benefit for you

13  doing the painting and replacing carpet?

14     A.   I didn't know.

15     Q.   Pardon me?

16     A.   Not for the getting it ready for inspection,

17  no.  He just agreed that he was going to help me.

18     Q.   So you went ahead and paid someone off

19  Craig's List, was it $500 for the carpet?

20     A.   Yes.

21     Q.   And you agreed to -- you said you picked up

22  paint from him.  Did you have to buy other paint?

23     A.   I remember buying more paint.

24     Q.   Do you remember how much?

25     A.   Like the little, is it the --



Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 60 of 150
Candy Torres
Torres vs Rothstein, et al.                                                    208

1        Q.    The gallon?

2        A.    The gallon, yeah.

3        Q.    How many gallons?

4        A.    It was -- it was more than two.

5        Q.    Okay.  I think you testified earlier you paid

6    $250 for the paint, 500 for the carpet, 45 for the

7    smoke detectors, 20 for the filters, and weren't sure

8    about the toilet.  Who reset the toilet?

9        A.    I bought -- I bought the thing.

10       Q.    Just the wax ring?

11       A.    I don't know what it's called, but then

12   Mr. Rothstein had somebody go put it back in.

13       Q.    Okay.  So a wax ring is about five bucks?

14       A.    I don't remember, I don't remember.

15       Q.    It's just a yellow ring that sits about an

16   inch high and goes on the toilet before you put it back

17   into the hole, right?

18       A.    Yeah.  I don't remember the color.

19       Q.    All right.  So you took care of the carpet,

20   and the additional paint, and the smoke detectors,

21   filters, and toilet ring without any agreement with

22   Mr. Rothstein as to how much he was going to help you

23   with; is that what you're testifying to?

24       A.    Yes.

25       Q.    And that agreement would have been done



Case 2:19-cv-00594-APG-EJY  Document 68-2  Filed 04/17/20  Page 61 of 150
Candy Torres
Torres vs Rothstein, et al.                                            214

```
 1   take a break.
 2                 (Whereupon, a recess was taken from
 3                 5:09 p.m. to 5:15 p.m.)
 4   BY MR. FOLEY:
 5        Q.   Back on the record.  You realize you are
 6   still under oath?
 7        A.   Yes.
 8             MR. FOLEY:  Can you read back the last
 9   question.
10                 (The record was read by the Court
11                 Reporter.)
12             THE WITNESS:  Can you repeat the question?
13             MR. FOLEY:  She can read it back to you
14   again.
15             MR. BRANCART:  Do you understand the word
16   context?
17             THE WITNESS:  I don't know what context
18   means.
19   BY MR. FOLEY:
20        Q.   What were you discussing?  What was the
21   subject of the meeting that you were having that led to
22   this outrageous request for a sexual act?
23        A.   He had told me that I needed to -- the amount
24   of the deposit that he asked for was what we were going
25   to discuss on that night after work.
```



Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 62 of 150
Candy Torres
Torres vs Rothstein, et al.                                                    215

1      Q.   Had you done any of the painting and carpet
2  and other work yet?
3      A.   Yes.
4      Q.   All of it?
5      A.   (No audible response.)
6      Q.   You have to talk.
7      A.   Yes.
8      Q.   And so that then would have been when in the
9  context, in the chronology of all of these meetings
10 that we had after the inspection?
11     A.   After inspection.
12     Q.   After the HUD inspection?
13     A.   After the HUD inspection but before the
14 signing of the lease.
15     Q.   So we remember another meeting at this house?
16     A.   Yes.
17     Q.   Okay.  And when he said that to you -- let me
18 ask you this:  You had mentioned a couple of the
19 comments he said to you, he said you were pretty, and
20 he asked if you were married or had a boyfriend.  Was
21 that said before -- were those two things said to you
22 at the same time or asked to you at the same time, the
23 were you married, and you're pretty?
24     A.   He asked if I was married on our first
25 conversation on the phone, our very first conversation.



Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 63 of 150
Candy Torres
Torres vs Rothstein, et al.                                              216

1      Q.    Okay.  And did you think that was offensive?

2   I think you kind of said it before that or was he

3   asking you if there was just going to be another person

4   moving into the house?

5      A.    I think he just wanted to know who was going

6   to be living.

7      Q.    So when he said that, you didn't take that as

8   any kind of sexist or sex-related question, correct?

9      A.    Correct.

10      Q.    Was there a time when he asked you if you had

11   a boyfriend, that was different than asking you about

12   if you were married, or was that in the same

13   conversation?

14      A.    That was the only time that he asked if I was

15   married.

16      Q.    Okay.  But you also said he asked if you had

17   a boyfriend.  Was that the same conversation as when he

18   asked you if you were married?

19      A.    No, no.

20      Q.    When did he ask you if you had a boyfriend?

21      A.    Our second meeting.

22      Q.    That would have been the October 1st?  The

23   first meeting was the 29th, the second meeting was

24   October 1?

25      A.    Around there, yes.



1      Q.    When did he say he thought you were pretty?

2      A.    On the second meeting.

3      Q.    That same October 1?

4      A.    Yes.

5      Q.    And when he said that to you, said you were

6 pretty, you testified you felt that was inappropriate?

7      A.    Correct.

8      Q.    Is that right?

9      A.    Yes.

10     Q.    Did you respond to him and say, That's

11 inappropriate, or thank you, or respond in any way?

12     A.    I said thank you.

13     Q.    Was that it?  You didn't say thank you, but

14 maybe it's not appropriate?

15     A.    No, I didn't say that.

16     Q.    So I'm belaboring it because normally the

17 attorneys get it right in the complaint.  But that

18 being said, asking if you have a boyfriend, and saying

19 that you are pretty, I'm going to tell you, it sounds

20 more consistent that that would be when he asked for a

21 hand job, as your attorneys set forth in the complaint

22 that they filed in the Federal District Court for

23 Southern Nevada.

24           MR. BRANCART:  Objection.

25 ///



Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 65 of 150
Candy Torres
Torres vs Rothstein, et al.                                          231

1  used his scooter to go in the master bedroom along with

2  me and my kids to show me -- he had a big screen

3  laptop, he showed me the pictures from the inside of

4  the house.  And that was actually the first time I seen

5  inside pictures.

6       Q.   Okay.

7       A.   Of the property.

8       Q.   So, again, in response to the question, the

9  kids were always with you and Mr. Rothstein while you

10  were in the house that day?

11       A.   On that visit?

12       Q.   Yes.

13       A.   Yes.

14       Q.   Okay.  Do you remember anything else that you

15  did during that visit other than going into the master

16  bedroom and viewing photos of the house on his big

17  screen?

18            MR. BRANCART:  Objection, asked and answered.

19            THE WITNESS:  I don't remember.

20  BY MR. FOLEY:

21       Q.   Okay.  What other meetings did you have where

22  your kids were present?

23       A.   When I paid the 1822.

24       Q.   Do you remember which children were with you?

25  And did they go into the house?



**ROCKET REPORTERS**
888.832.0050        www.RocketReporters.com

Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 66 of 150
Candy Torres
Torres vs Rothstein, et al.                                                    232

```
1        A.   It was my oldest.

2        Q.   Luis?

3        A.   Yes.

4        Q.   He went into the house with you?

5        A.   Yes.

6        Q.   Do you remember, did he stay with you at all

7   times when you were in the house?

8        A.   He was there in the dining room, yes.

9        Q.   What do you remember about the movements

10  through the house at that time and how long the visit

11  was?

12       A.   I don't remember the how long.  I don't

13  remember the time I was -- how long I was in there for,

14  but --

15       Q.   Do you remember anything else that was done

16  at that time other than paying the 1822?

17       A.   Signed two different leases.

18       Q.   Okay.  So was this the -- must have been the

19  November 23rd meeting, correct?

20       A.   Correct.

21       Q.   Okay.  Other meetings where anyone else was

22  present?

23       A.   No.

24       Q.   That's it?

25       A.   Oh -- yes.
```



1          MR. BRANCART:  Objection, misstates prior

2    testimony.

3    BY MR. FOLEY:

4          Q.   Or was it in November?

5          A.   It was after inspection, but before the 23rd.

6          Q.   So between the 17th and the 23rd, and the

7    email to Putney was in October, right?

8          A.   Yes.

9          Q.   And obviously you never told Mr. Putney about

10   the request that Mr. Rothstein had made of you for a

11   hand job, correct?

12         A.   True.

13         Q.   Why not?

14         A.   I was afraid of getting kicked out.

15         Q.   Is that why you didn't file a police report?

16         A.   That's the reason why I did not file a police

17   report.

18         Q.   So I think you said your mother was shocked

19   when she heard it, when you told her, correct?

20         A.   Yes.

21         Q.   Would you describe yourself as being shocked

22   as well?

23         MR. BRANCART:  Objection, vague.

24         Go ahead.

25         THE WITNESS:  I was -- I was humiliated, I



Case 2:19-cv-00594-APG-EJY   Document 68-2   Filed 04/17/20   Page 68 of 150
Candy Torres
Torres vs Rothstein, et al.                                                    253

1  was shocked, I was disgusted.

2  BY MR. FOLEY:

3       Q.   Okay.  You're a single mother of five, right?

4  Well, now you are married, you have been a single

5  mother of five for many years, correct?

6       A.   Correct.

7       Q.   Do you consider yourself a pretty tough gal?

8            MR. BRANCART:  Objection, vague.

9            THE WITNESS:  I don't understand what you

10 mean.

11 BY MR. FOLEY:

12      Q.   I mean, there is nothing like a single mother

13 of any kids in terms of fighting the struggles and

14 getting through life and doing what you do, it's an

15 extremely difficult job, would you agree?

16      A.   Very.

17      Q.   And you take on a lot of battles, and a lot

18 of people and do whatever you have to do to survive and

19 to work for the benefit of your children, right?

20      A.   Right.

21      Q.   Did what Mr. Rothstein say to you in any way

22 kind of disable you, freeze you, keep you from actually

23 functioning in any way?

24            MR. BRANCART:  Objection, compound question,

25 overbroad.



**ROCKET REPORTERS**

888.832.0050          www.RocketReporters.com

Candy Torres
Torres vs Rothstein, et al.                                            281

```
 1          C E R T I F I C A T E   O F   R E P O R T E R

 2
     STATE OF NEVADA      )
 3                           SS:
 4
     COUNTY OF CLARK       )
 5
 6           I, Mary Dane McCoy, a Certified Court

 7   Reporter, duly licensed by the State of Nevada, do

 8   hereby certify:

 9           That I reported the deposition of Candy

10   Torres, commencing on January 16, 2020.

11           That prior to being deposed, the witness was

12   duly sworn by me to testify to the truth;

13           That I thereafter transcribed my said

14   stenographic notes into written form;

15           That the typewritten transcript is a

16   complete, true, and accurate transcription of my said

17   stenographic notes;

18           I further certify that pursuant to NRCP Rule

19   30(e)(1) that the signature of the deponent:

20           XXXX was requested by the deponent or a party

21   before the completion of the deposition;

22           _____ was not requested by the deponent or a

23   party before the completion of the deposition;

24           I further certify that I am not a relative or

25   employee of counsel or of any of the parties involved
```



Candy Torres
Torres vs Rothstein, et al.                                                    282

1    in the proceeding, nor a person financially interested

2    in the proceeding.

3              IN WITNESS WHEREOF, I have set my hand in my

4    office in the County of Clark, State of Nevada, this

5    23rd day of January, 2020.

6

7

8                    _Mary Dane McCay_
9    _____
     Mary Dane McCoy, CCR 219
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



**ROCKET REPORTERS**
888.832.0050      www.RocketReporters.com

**EXHIBIT 2**

Allan Rothstein Deposition (Vol. 1) (excerpts)

Case 2:19-cv-00594-APG-EJY  Document 68-2  Filed 04/17/20  Page 72 of 150

Allan Rothstein, Volume I                                    Candy Torres v. Allan Rothstein, et al.

1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF NEVADA

3

4    CANDY TORRES,                    )
                                      )
5              Plaintiff,             )
                                      )
6          vs.                        )   No.:
                                      )   2:19-cv-00594-APG-EJY
7    ALLAN ROTHSTEIN and KYLE PUNTNEY, )
                                      )
8              Defendants.            )
     _____)
9                                     )
     RELATED CROSS COMPLAINT          )
10   _____)

11

12           DEPOSITION OF ALLAN ROTHSTEIN, VOLUME I

13

14                    Taken at the Offices of
                       Nevada Legal Services
15                     530 South Sixth Street
                       Las Vegas, Nevada 89101

16

17                 On Wednesday, January 15, 2020
                        At 10:46 a.m.
18

19

20

21

22

23

24

25   Reported by:  Sarah M. Winn-Boddie, CCR No. 868

Allan Rothstein, Volume I                                    Candy Torres v. Allan Rothstein, et al.

```
 1    APPEARANCES:

 2      For the Plaintiff:        CHRISTOPHER BRANCART, ESQ.
                                  Brancart & Brancart
 3                                Post Office Box 686
                                  Pescadero, CA 94060
 4                                (650) 879-0141

 5                                AND

 6                                GREGORY PAUL, ESQ.
                                  Nevada Legal Services
 7                                530 South Sixth Street
                                  Las Vegas, Nevada 89101
 8                                (702) 386-0404

 9
        For Defendant Kyle Puntney: DANIEL T. FOLEY, ESQ.
10                                Foley & Oakes
                                  1210 South Valley View
11                                  Boulevard
                                  Suite 208
12                                Las Vegas, Nevada 89102
                                  (702) 384-2070
13
        For Defendant Allan Rothstein:
14
                                  CHARLES E. BARNABI, JR.,
15                                  ESQ.
                                  The Barnabi Law Firm
16                                375 East Warm Springs Road
                                  Suite 104
17                                Las Vegas, Nevada 89119
                                  (702) 475-8903
18
        Also Present:             Kyle Puntney
19                                Candy Torres
                                  Spencer Campbell
20

21                                    *****

22

23

24

25
```

```
 1              WEDNESDAY, JANUARY 15, 2020; LAS VEGAS, NEVADA

 2                            10:46 a.m.

 3                              -oOo-

 4   (In an off-the-record discussion held prior to the

 5   commencement of the proceedings, counsel agreed to waive the

 6   court reporter's requirements under Nevada Rules of Civil

 7   Procedure, Rule 30(b)(4), or Federal Rules of Civil Procedure,

 8   Rule 30(b)(5), as applicable.)

 9   Whereupon,

10                         ALLAN ROTHSTEIN,

11   having been first duly sworn to testify to the truth, the

12   whole truth, and nothing but the truth, was examined and

13   testified as follows:

14                            EXAMINATION

15   BY MR. BRANCART:

16       Q.   Sir, you understand that the court reporter just

17   administered an oath to tell the truth?

18          Do you understand that?

19       A.   Yes.

20       Q.   Okay.  And the oath that she administered, although

21   we're in the informal setting here of the conference room at

22   Nevada Legal Services, carries the very same force and effect

23   and the same penalties of perjury as the oath that's

24   administered in the federal courthouse where this matter will

25   be tried.
```

1      Q.   Okay.

2      A.   Not as -- not as a real estate agent, though.

3      Q.   But just as a --

4      A.   As a private party.

5      Q.   Understood.

6           You hold a real estate license here with the State

7    of Nevada, true?

8      A.   Yes.

9      Q.   Have you been licensed to practice real estate, just

10   so I'm clear, in any other jurisdiction other than Nevada at

11   any time?

12     A.   No.

13     Q.   What is your current business address?

14     A.   755 Sunset Road, Henderson, Nevada 89011.

15     Q.   That location, what type of structure is at that

16   location?  Is it a --

17     A.   A building.

18     Q.   Okay.  Is it an office building? a house? a garage?

19   What is it?

20     A.   Office building.

21     Q.   During -- strike that.

22          Tell me the date that you first started using

23   the 755 Sunset Road address as your business address.

24     A.   I believe it was August of '78.

25     Q.   Is there any signage at that business address that

1    resided, true?

2        A.   Yes.

3        Q.   When did you first commence your residence at

4    8611 -- I'm sorry, 8616?  When did you first commence your

5    residence at that address?

6        A.   Okay.  Now if you could give me that question one

7    more time, please.

8        Q.   Absolutely.  Direct your attention to the

9    address 8616 Canyon View.  Is that a house that you own or

10   rent?

11       A.   I own it.

12       Q.   When did you purchase that dwelling?

13       A.   1994.  '93 for the land.

14       Q.   Okay.  Since 1993, has the 8616 address been your

15   permanent dwelling here within Clark County?

16       A.   Yes.

17       Q.   Have you resided at any other addresses other than

18   the 8616 address since 1994?

19       A.   No.

20       Q.   You indicated that you do conduct business from that

21   address, 8616.  What type of business do you conduct from that

22   address?

23       A.   Real estate.

24       Q.   And what business activities do you perform from

25   that address, 8616, in connection with real estate?

```
 1        A.   Everything that's required in real estate.  I want

 2   to -- can I add to that?

 3        Q.   Of course.

 4        A.   Okay.  I also used a place across the street, a

 5   hamburger place, but I can't think of the name of it.

 6        Q.   Okay.

 7        A.   Sometimes I use their place instead of meeting at my

 8   house.

 9        Q.   All right.

10        A.   And normally that's what I would do.  If a client

11   comes, we meet across the street at the hamburger place.  It's

12   rare that I meet at my house.

13        Q.   All right.  So what I understand you saying is that

14   if you have been conducting real estate activities in your

15   name --

16        A.   Burger King.  That's the name.

17        Q.   Got it.

18             So if I understand what you've told me is that --

19   and tell me if this is correct -- since -- since at

20   least 2000, since at least 2000, you've conducted real estate

21   business activities from the address of the dwelling located

22   at the 8616 Canyon View location, correct?

23        A.   2000, you said?

24        Q.   Yeah.

25        A.   What year did I get my license?
```

1      Q.   I don't know.

2           Let me ask it this way:  From the date you obtained

3   your license, have you been conducting your real estate

4   business from the address at 8616?

5      A.   Yes.

6      Q.   Okay.

7      A.   Also from -- because originally I was not a broker,

8   so I also conducted it from the broker's office.

9      Q.   Okay.  But once you became a broker and were acting

10  on your own, not under the auspice of another broker, your

11  real estate business transactions were conducted out of

12  the 8616 location and you would occasionally meet with clients

13  at the nearby Burger King, true?

14     A.   Yes.  Also at 755 Sunset Road.

15          (Exhibit 68 marked for identification.)

16  BY MR. BRANCART:

17     Q.   I'll show you what will be marked as Exhibit 68.

18  Sir, Exhibit 68 is a Google satellite or street-view image of

19  the address at 8618.  You indicated that you are operating

20  from 8616; is that correct?

21     A.   That is correct.

22     Q.   All right.  Do you see the house here that is your

23  house?

24     A.   Looking at this picture, I can't be sure.

25     Q.   Of the pictures that you -- of the house that you

1    that you saw in the complaint, but -- but I'm asking for your

2    recollection right now.

3            Okay.  Which real estate school did you attend, sir?

4        A.   I believe it was Key Realty, but it could have

5    been -- I think Key Realty was the main school, and my

6    property management school was American Real Estate School,

7    but I'm not positive.

8        Q.   And did you graduate from these real estate schools

9    the same year that you obtained your -- you sat for the exam

10   and obtained your real estate license?

11       A.   I believe so.

12       Q.   Since 2009 when you obtained your real estate

13   license, have you conducted any other types or forms of

14   business other than or in addition to real estate?

15       A.   Please repeat that.

16       Q.   Sure.  You got licensed as a real estate person or

17   professional in 2009, correct?  Is that right?

18       A.   Yes.

19       Q.   Okay.  So from 2009 to present, you have been

20   involved in one way or another in the real estate profession,

21   true?

22       A.   Yes.

23       Q.   And your involvement in the profession since 2009

24   has been that of a licensed real estate professional here

25   licensed by the State of Nevada, true?

1    A.   Yes.

2    Q.   During this period of time, 2009 to present, 2020,

3  have you conducted any other businesses or had any other

4  employment other than the practice of real estate?

5    A.   No.

6    Q.   Okay.  Your business address at 755 says something

7  about like auto parts.  Have you operated the auto parts

8  business at 755 Sunset?

9    A.   What year?

10    Q.   Since 2009 to present.

11    A.   No.

12    Q.   Okay.  Other than performing -- strike that.

13        Other than working as a real estate professional

14  licensed by the State of Nevada since 2009, have you had any

15  other sources of income other than your real estate business?

16    A.   Real estate is my only source of income that I know

17  of -- oh, I'm sorry.  I get a -- Social Security.

18    Q.   Okay.  And real estate has been your only source of

19  income since 2010 to present, true?

20    A.   Yeah.

21    Q.   Okay.  Sir, before arriving here in the state of

22  Nevada, you indicated that you would -- you invested in some

23  real estate in the city of Chicago, true, or in the Chicago

24  area, correct?

25    A.   Yes.

1    in my account, they put them in the wrong account and they had

2    to transfer them.

3        Q.    Okay.  So when you say "they put them in the wrong

4    account," this was when they did wire transfers?

5        A.    Yes.

6        Q.    Okay.  And they went to the wrong account.  Other

7    than the wire transfers, when you received any checks, money,

8    or cash from Torres that was put into your personal

9    possession, you would deposit it in its entirety in your trust

10   account, true?

11       A.    Yes.

12       Q.    And when there was a check that was mis-wired to an

13   account by Torres in the payment of her rent, you transferred

14   that check from the account that it had been mis-wired to to

15   the trust account, true?

16       A.    Yes.

17       Q.    And you receive monthly statements for your trust

18   account, correct?

19       A.    I don't understand that statement.

20       Q.    The bank sends you a monthly statement, correct?

21       A.    Yes.

22       Q.    Okay.  Sir, are you -- since becoming a real estate

23   broker, are you a member of any real estate organizations?

24       A.    Yes.

25       Q.    List for me the real estate organizations of which

1    you're a member.

2         A.   I'm a member of GLVAR.

3         Q.   And what is GLVAR?

4         A.   The Greater Las Vegas Area [sic] of Realtors.

5         Q.   And how long have you been a member of GLVAR?

6         A.   Since I got my license.

7         Q.   Okay.  And to a layperson, would you describe what

8    is GLVAR?

9         A.   It's -- we're Realtors.

10        Q.   Okay.  And what are the privileges that come with

11   being a member of GLVAR?

12        A.   Many.

13        Q.   Would you list them for me, please?

14        A.   Certainly.  We have -- we're able to go to various

15   classes.  It's called education.  We have use of the MLS,

16   Multiple Listing Service.  We also have other things that

17   we -- because we're Realtors, that we can have advantage of,

18   like Panorama, and there's a whole bunch of others.

19        Q.   Okay.  Have you ever held an office with GLVAR, an

20   office like a -- as like a secretary or treasurer or --

21        A.   Oh.

22        Q.   -- committee head?

23        A.   No.

24        Q.   Do you receive a publication from GLVAR?

25        A.   Yes.

```
1          Q.   Is that a monthly publication?

2          A.   We have some weekly, some monthly.  Depends.

3          Q.   Okay.  And do you receive them in the mail or over

4     the internet?

5          A.   Usually it's all done over the internet.

6          Q.   Okay.  There's a code of ethics associated with

7     being a member of the Greater Las Vegas Area Realtors, true?

8          A.   Yes, sir.

9          Q.   And you subscribe to that code of ethics, correct?

10         A.   Yes.

11         Q.   Sir, are you a member of any other real estate or

12    Realtor organizations?

13         A.   You have to be more specific.

14         Q.   Are you a member of NAR, National Association of

15    Realtors?

16         A.   Yes.

17         Q.   You subscribe to their code of ethics?

18         A.   Yes.

19         Q.   How long have you been a member of NAR?

20         A.   As long as GLVAR.

21         Q.   Do you receive their publication, NAR's publication?

22         A.   Rarely.

23         Q.   When you receive the GLVAR publication, you do

24    review it as a matter of practice, correct?

25         A.   Sometimes.
```

1      Q.   All right.  Have you ever written or authored any

2  papers or articles about real estate?

3      A.   No.

4      Q.   Have you ever given any presentations at any real

5  estate meetings about real estate or the practice of real

6  estate?

7      A.   Explain that to me.

8      Q.   Sure.  Sometimes during -- they'll get together to

9  have coffee and, you know, today we're going to hear John

10  Smith speak about know your escrow agent or new things that

11  have happened in real estate in the last legislative session,

12  that kind of thing.

13      A.   Oh.  I can answer that.  No.

14      Q.   You mentioned, sir, that you have access to the

15  Multiple Listing Service, which means you can both look at it,

16  but you can also post on the Multiple Listing Service as a

17  member of GLVAR, true?

18      A.   Yes.

19      Q.   I'm going to show you Exhibit 23, which was

20  previously marked.  Could you identify what Exhibit 23 is?

21      A.   Yeah.  It's a listing for Wedgebrook.

22      Q.   And this is a listing that you put in the Multiple

23  Listing Service for the rental of the Wedgebrook property,

24  true?

25      A.   Yes.

 1     Q.    This is -- the text that's written here was written

 2   by you and the information populating this form was inserted

 3   by you, correct?

 4     A.    I believe so.

 5     Q.    Okay.  It -- this is -- this is posted or as of the

 6   date it's indicated, I believe, is, if you look in the top

 7   right, 9/21/2018.

 8           Do you see that at the upper left?

 9     A.    Oh.  Yeah.

10     Q.    It indicated here on public remarks something we

11   discussed yesterday in the deposition of Mr. Puntney.  It

12   says, quote, Pre-foreclosure balance will be paid off

13   October 1 when owner is released from medical facility.

14           Do you see that?

15     A.    Yes.

16     Q.    What is being -- what are you referring to here?

17   This is language that you wrote, correct?

18     A.    Yes.

19     Q.    Okay.  What is being referred to here by the

20   pre-foreclosure balance?

21     A.    Well, he didn't make all his payments, his mortgage

22   payments, so they put it in pre-foreclosure or foreclosure, I

23   don't know, but it's got to be pre-foreclosure because they

24   didn't closure.

25     Q.    But the property -- there was a notice of default

```
 1    going to make the payment; is that --

 2        A.   Yeah.

 3        Q.   Okay.  So he's going to be released by

 4    October 1st, right?

 5        A.   Yes.

 6        Q.   Okay.  And that upon his release prior to the date

 7    of October 1st, Puntney told you that he was going to pay

 8    off the -- the amount of the default curing the notice of

 9    default and the commencement of foreclosure?

10        A.   Correct.

11        Q.   Okay.

12             Sir, I want to show you now Exhibit 24, and this is

13    an email.  I want to direct your attention, please, to the

14    portion of this email that is the footer that appears in your

15    email transmissions that we've seen in this case, and that is

16    the words asterisk "Risk Reduction Graduate Society member,"

17    asterisk.

18             Do you see that?

19        A.   Yes.

20        Q.   What is Risk Reduction Graduate Society member?

21        A.   I'm very proud to belong to that group, and that's

22    attorneys that teach real estate.

23        Q.   Okay.

24        A.   So the classes that are taught, the education

25    classes, these are all taught by attorneys --
```

1        Q.   Okay.

2        A.   -- instead of having another Realtor teach you.

3        Q.   All right.  So when you say you're a member of this

4   society, what does that -- what does it take to qualify for

5   membership?

6        A.   You have to take three days of contracts.

7        Q.   Okay.

8        A.   And they go into each contract word by word and

9   explain what they mean and what the results are --

10       Q.   Okay.

11       A.   -- so that what you're getting is the information

12   from an attorney that knows about the NRS instead of a

13   Realtor, or maybe not even a Realtor, maybe a teacher, you'd

14   call them a teacher --

15       Q.   Okay.

16       A.   -- that teaches real estate classes.

17       Q.   And I see here that based upon that, it provides you

18   with a higher level of expertise; is that right?

19       A.   I believe so.

20       Q.   And you indicate "legal education."  Is this legal

21   education you're referring to the kind of expertise that you

22   get from being a member of this society and attending these

23   classes?

24       A.   Real estate is based on the NRS, Nevada Revised

25   Statutes.

1        Q.    Okay.

2        A.    Okay.  So when you're trained as to what it means,

3    you have a better legal education.  You're not an attorney,

4    okay?  I mean, we're Realtors, not attorneys.

5        Q.    Got it.  Okay.

6        A.    Okay.  But you have a better understanding of the

7    NRS than you would have if you had a teacher teaching you.

8        Q.    Got it.

9        A.    Basically that's what it means.  And then they have

10   classes every so often as well.

11              (Exhibit 71 marked for identification.)

12   BY MR. BRANCART:

13       Q.    Mm-hmm.

14       A.    So after you take this three days of contracts, then

15   every month or sometimes more, sometimes less, they have an

16   attorney come in and discuss another aspect of real estate.

17       Q.    Mm-hmm.  Okay.  And are you still a member of that

18   organization?

19       A.    Absolutely.

20       Q.    And when was the last time you attended their

21   classes?

22       A.    That's been a while now, because I have a hard time

23   walking and they opened up a new GLVAR, they opened up a new

24   building, and it's a lot of walking.

25       Q.    Okay.  Do you recall the last time?

1    you know, you have to have good cause anyhow to evict

2    somebody, so I assume that the rest of it is okay.  I don't

3    know what HCV stands for.

4        Q.   All right.

5        A.   What does it stand for?

6        Q.   Housing Choice Voucher, which is Section 8.

7             Sir, let's go ahead, then, and move to page 6.  On

8    page 6, I want to direct your attention to paragraphs 19

9    and 22.  I direct your attention on page 6 of the complaint,

10   Exhibit 2, to paragraphs 19 and 22 because in Exhibit 74, you

11   admitted them in the document you filed with the court and

12   signed.

13            So as paragraph 19, which was admitted by you in the

14   answer, reads, "As promised, Torres invested significant time

15   and money to improve the Wedgebrook house before starting her

16   tenancy.  She purchased paint and painted the walls.  She

17   purchased and installed new floor covering.  She cleaned the

18   interior as well," true?

19       A.   True.

20       Q.   22, at the bottom of the page, you admit this

21   paragraph in your answer, Exhibit 74, and the paragraph reads

22   in Exhibit 2 of the complaint, paragraph 22, quote, Rothstein

23   demanded that Torres travel to his home to sign the second

24   lease on November 23rd and that she bring more money to pay

25   for the security deposit, first month's rent, and additional

1    charged invent -- an additional -- and -- should be and

2    additional charge invested by Rothstein.  Torres delivered all

3    the money she had to Rothstein, a total of $1,822.  Rothstein

4    scribbled out a receipt stating 11/23/2018, paid balance,

5    1,822, true?

6         A.   No.

7         Q.   Okay.  Now, you admitted that in your answer that

8    you signed and filed with the court.  Can you explain to us,

9    why is it that you admitted it in the answer you filed with

10   the court, but now you believe it's not true?

11             MR. BARNABI:  Objection.  That's not the most recent

12   answer.

13   BY MR. BRANCART:

14        Q.   No, that's my question.  Do you understand, why

15   would you admit it then but not now?

16        A.   Because of the wording.

17        Q.   Okay.  So the wording changed?

18        A.   The wording didn't change.  My mind changed.

19        Q.   Okay.  Your mind changed.

20             And what is it that changed in your mind?

21        A.   So I didn't realize what this paragraph says.  It

22   says "Rothstein demanded."

23        Q.   Okay.

24        A.   I didn't demand anything from her.

25        Q.   Mm-hmm.

1      A.    Okay.

2      Q.    -- to sign the second lease on November 23rd and

3   that she bring more money to pay for the security deposit,

4   first month's rent, and additional charges that were required

5   by you?

6      A.    Okay.  Now, I didn't require her to travel to my

7   house, because normally everybody goes to Burger King, but she

8   couldn't come to Burger King, so -- she said she was working.

9      Q.    Okay.

10     A.    Okay.  And then she said it was too late to go when

11  she got off work, so -- so she came by the house --

12     Q.    Okay.

13     A.    -- instead.

14     Q.    All right.

15     A.    Okay.

16     Q.    Sir, if I go to page 7, the last of the paragraphs

17  that appear that you admit in your answer that's filed with

18  the court and signed by you dated May 22nd, 2019,

19  Exhibit 74, is paragraph 23, and you admit the truth of

20  paragraph 23 in the answer you filed with the court, which

21  reads, "Rothstein then required Torres to sign a stack of

22  papers to complete her year-long rental of the Wedgebrook

23  house."

24          Still true?

25     A.    What -- what does a stack mean?

```
 1        Q.   A stack --

 2        A.   Is this a stack? this is stack? this a stack?  What

 3   is a stack?

 4        Q.   Okay.  So the -- so we should take out -- take out

 5   signed papers, not a stack?

 6        A.   Yes.

 7        Q.   Okay.  So if we remove "stack," then it's true?

 8        A.   Doesn't sound nice.

 9        Q.   Okay.  If we remove "stack," then it's true,

10   correct?

11        A.   The only time you have to sign a stack of papers is

12   when you're buying a house.

13        Q.   All right.  So -- and then it says, "The first was

14   a 12-page form lease, which Torres signed," right?

15        A.   Yeah.

16        Q.   True?

17        A.   The lease.

18        Q.   Is that true?

19        A.   Yes.

20        Q.   Next, "Rothstein required Torres to sign," it says,

21   "a stack of lease attachments."  You would say not a stack,

22   but lease attachments, correct?

23        A.   Right.

24        Q.   Is that true?

25        A.   True.
```

1    Q.   Okay.  "Smoke detector disclosure form," true?

2    A.   True.

3    Q.   "Consent to act form," true?

4    A.   Yes.

5    Q.   "Illegal activity form," true?

6    A.   Yes.

7    Q.   "A duties owed, Nevada real estate licensee," true?

8    A.   Yes.

9    Q.   "Hold harmless agreement, property sight unseen,"

10   true?

11   A.   True.

12   Q.   "And last, a form entitled 'Direct Consent for

13   Sexual Intercourse and/or Fellatio or Cunnilingus,'" true?

14   A.   True.

15   Q.   "Unless Torres signed each of these forms, she could

16   not lease the Westbrook [sic] house," true?

17   A.   Well, that's one of the first requirements, but it's

18   not the only requirement.

19   Q.   Okay.  It was one of the prerequisites.  She had to

20   sign these forms, true?

21   A.   Yeah.  It's required by the State of Nevada --

22   Q.   Okay.

23   A.   -- and GLVAR to sign those forms.

24   Q.   All right.  So --

25   A.   With the exception of the one that's the consent for

1    sexual intercourse.

2         Q.   Okay.

3         A.   That's not required.

4         Q.   That's not required, but she had to sign these

5    forms --

6         A.   If she wants to come to the house, she has to sign

7    the form.

8         Q.   Okay.

9         A.   Otherwise, we need to meet at Burger King.

10        Q.   All right.  So she had to sign the form, the forms

11   that are listed here, which were addendums to the lease

12   specified here in paragraph 23, consent to act, illegal

13   activities, duties owed, hold harmless agreement, direct

14   consent for sexual intercourse, et cetera, as one of the

15   requirements that she had to fulfill if she wanted to rent the

16   house, true?

17        A.   Could you please repeat that?  Because I missed part

18   of it.

19        Q.   Sure.

20        A.   I was thinking.

21        Q.   Yeah.  No worries.

22             So Ms. Torres was there and required to sign papers

23   in order to be able to rent the house on Wedgebrook, true?

24        A.   True.

25        Q.   She had to sign the lease paper, correct?

```
 1        A.    Yes.

 2        Q.    And she had to sign the addendum to the lease, true?

 3        A.    Yes.

 4        Q.    She had to sign the consent to act form?

 5        A.    Yes.

 6        Q.    She had to sign the smoke detector disclosure form?

 7        A.    Yes.

 8        Q.    Illegal activity form?

 9        A.    Oh.  Yes.

10        Q.    She had to also sign the duties owed, Nevada real

11   estate licensee form?

12        A.    Yes.

13        Q.    Hold harmless agreement, property sight unseen?

14        A.    Yes.

15        Q.    And the form entitled "Direct Consent for Sexual

16   Intercourse," et cetera, true?

17        A.    Yeah.  She wasn't forced to sign the consent --

18        Q.    Okay.

19        A.    -- agreement.

20        Q.    So I understand she wasn't forced to, sir, but those

21   were the forms that you presented to her for signature, true?

22        A.    True.

23        Q.    And she had to sign, execute the forms that were

24   part of the transaction in order to be able to rent the house,

25   that --
```

```
 1   form, the form -- all these forms as part of her executing

 2   these lease documents to rent the house, true?

 3        A.   She had to sign all the documents that are required

 4   for real estate.

 5        Q.   Mm-hmm.  Mm-hmm.

 6        A.   But if she didn't have to sign the consent form, she

 7   needed to go to Burger King to do all this.

 8        Q.   I see.

 9        A.   She didn't want to go to Burger King, so she wanted

10   to sign.  She signed.

11        Q.   I see.  So if I understand you correctly, the reason

12   that you had Ms. Torres sign the direct consent form was a

13   prerequisite or a precondition to her coming to the house to

14   sign the other forms?

15             THE WITNESS:  That's what I said, wasn't it?

16             MR. BARNABI:  Just answer.

17             THE WITNESS:  So same answer.

18   BY MR. BRANCART:

19        Q.   I'm sorry.  I don't really -- I'm not really

20   following what you're saying, sir.

21        A.   Oh.

22        Q.   And so I'm -- Ms. Torres is -- is coming to the

23   house to sign real estate forms that she has to sign --

24        A.   Yes.

25        Q.   -- in order to rent the Wedgebrook house, correct?
```

1     A.   Correct.

2     Q.   And you've informed her that she has to sign these

3  forms in order to rent the house, correct?

4     A.   Correct.

5     Q.   And you -- she goes to the address, the -- the

6  address which is located at 8616, and you present her with the

7  forms that she's to sign, true?

8     A.   Yes.

9     Q.   Okay.  And there's a lease and all these other forms

10  that we list, including the hold harmless agreement and the

11  other things we listed here and the direct consent for sexual

12  intercourse, true?

13     A.   Those forms were there.

14     Q.   Okay.  And you presented them to Ms. Torres,

15  correct?

16     A.   Correct.

17     Q.   Okay.  And they were all signed at one time there on

18  the 23rd, correct?

19     A.   I don't remember the date.

20     Q.   Okay.  But they were all signed all in one sitting,

21  true?

22     A.   That, I don't remember either.

23     Q.   Okay.  Do you remember any of these forms not being

24  signed or re-signed on -- in one sitting, the last time you

25  had her sign the forms?

```
 1        A.   I don't remember the date.

 2        Q.   Okay.  And my question wasn't about the date.  My

 3   question was --

 4        A.   But it should be on the form.

 5        Q.   Okay.  All right.  Now, sir, let's take a look at

 6   Exhibit 35, and I want to direct your attention to Exhibit 35.

 7   You recognize it as being the residential lease agreement?

 8        A.   Yes.

 9        Q.   And you recognize this as being the agreement -- if

10   you turn to, within this document, the page that is Rothstein

11   or ROTH454, and if you look at ROTH454, you can see this is

12   dated -- you did it on the 17th of November, but we have a

13   signature, I believe, by Candy Torres, which is 11/23.

14             Do you see that, sir?

15        A.   Yes.

16        Q.   Okay.  Let's go to the next page, 455.  You

17   recognize the signature there of Ms. Torres, and that's

18   also 11/23/18; is that right?

19        A.   Yes.

20        Q.   Okay.  If we turn to the next page, 456, where

21   Ms. Torres has signed, we don't see a date.  There's no date

22   associated with that?

23        A.   Oh.  Okay.  She didn't --

24        Q.   Okay.

25        A.   -- put anything down.
```

1    intercourse and/or fellatio or cunnilingus, sir, would you

2    tell us, please, why is it that you asked Ms. Torres to sign

3    the document direct consent for sexual intercourse and/or

4    fellatio or cunnilingus, documents 463 and 464, as executed on

5    that same day the other papers were, 11/23/2018?

6            THE WITNESS:  Do I need to tell him?

7            MR. BARNABI:  Yes.

8            THE WITNESS:  Okay.  So when she came into the

9    house, I live by myself.  The house is about 6,000 square feet

10   with beamed ceilings and all kinds of features.  She said,

11   Wow, what a great house you have here, and she walked around,

12   said, Oh, I like this, Oh, I like that and all that stuff, and

13   she says, I'll do anything for you if you get me into my house

14   and get me approved for Section 8, so I was worried and scared

15   that, you know, bad things may happen, and it has been

16   happening a lot in the newspaper, all these people that come

17   back 20 years later and say that person did something that

18   wasn't nice.

19   BY MR. BRANCART:

20       Q.   Okay.  Sir, what was it about the statement that you

21   attribute to Ms. Torres that you just stated on the record

22   that in your mind caused you to present to her the document

23   direct consent for sexual intercourse, pages 463 and 464 of

24   the Exhibit 35?

25       A.   I don't know if I should be saying this with all

1    these people here.

2            MR. BARNABI:  Just answer the question.

3            THE WITNESS:  Okay.  So she said she'd like to give

4    me like a hand job or a blow job or something if I got her

5    this place.

6    BY MR. BRANCART:

7        Q.   Okay.

8        A.   And I can't do those kind of things.  You have the

9    letter from my doctor.

10       Q.   Okay.

11       A.   So it scared me.  After she told me what a beautiful

12   house I have, which is beautiful, okay, then she looks at the

13   house and says, Well, that's got to be a 3, 4, $5 million

14   house --

15       Q.   Did she say that --

16       A.   No.

17       Q.   -- those words?

18       A.   She just said what a wonderful house you have and

19   all that kind of stuff.

20       Q.   Okay.

21       A.   And that really scared me.  And I don't like to have

22   anybody come over to my house.  That's why I go to the Burger

23   King or one of those other places, and not only me, but almost

24   all the Realtors do the same thing.  Some of them have

25   offices, but most of them don't have an office anymore.  We

1  that you believed was appropriate to ask Ms. -- to ask

2  Ms. Torres to sign when you presented it to her?

3          MR. BARNABI:  Objection.  Asked and answered.  He's

4  already answered this multiple times, and I'm instructing him

5  not to answer further.

6  BY MR. BRANCART:

7      Q.  Sir, this particular document contains a variety of

8  different provisions in it or different words that appear in

9  it.  You're aware of that, correct?

10     A.  It's a document of words, yes.

11     Q.  Okay.  And the words -- did you review this document

12  before you asked her to sign it?

13     A.  I don't understand that statement.

14     Q.  Sure.  Before you asked --

15     A.  If you could be more explicit.

16     Q.  Sure.  Before you asked Ms. Torres to sign the

17  direct consent for sexual intercourse, did you yourself review

18  the document?

19     A.  I reviewed it when I looked at it on the computer.

20     Q.  Okay.  And based upon that review, you determined

21  that it would be appropriate to ask Ms. Torres to sign the

22  document; is that correct?

23         MR. BARNABI:  Objection --

24         THE WITNESS:  Yes.

25         MR. BARNABI:  -- asked and answered.

1    BY MR. BRANCART:

2        Q.   And sir, in this document, it talks about having a

3    direct consent for sexual intercourse or fellatio or

4    cunnilingus.  What is it about the terms, the words in this

5    document, that you believed were appropriate, appropriate to

6    have Ms. Torres sign?

7             MR. BARNABI:  Objection.  Asked and answered.

8    Document speaks for itself.

9             THE WITNESS:  Do I have to answer that one?

10            MR. BARNABI:  To the best of your ability.

11            THE WITNESS:  I don't understand your question, sir.

12   BY MR. BRANCART:

13       Q.   Sure.  You -- you -- after reviewing this document,

14   which is 463 and 464 of Exhibit 35, you made a determination

15   and presented it to Ms. Torres.  My question to you is:  What

16   is it about the content of this document, the words in this

17   document, that you -- that made you believe it was appropriate

18   to present to Ms. Torres for signature?

19       A.   Well --

20            MR. BARNABI:  Objection --

21            THE WITNESS:  -- I'm not an attorney to read the

22   document, but based on the words that were in there, I thought

23   it was appropriate.

24            THE COURT REPORTER:  Counsel, did you have an

25   objection in there?

```
 1              MR. BARNABI:  Same objection.  Thank you.

 2    BY MR. BRANCART:

 3        Q.   Okay.  And what were the words that were in here

 4    that you thought were appropriate?  Let me ask you this

 5    question:  If we turn to the document, which is -- 463 is the

 6    first page, in Exhibit 35, and I'll just go to paragraph 1

 7    that reads, quote, The respondent, who is here, I believe,

 8    looking at the signature page on the next page, is Candy

 9    Torres, That the respondent and the initiator, which if I look

10    at the second page, you're the initiator; is that right?

11        A.   Well, if she's the respondent, then I have to be the

12    initiator or vice versa.

13        Q.   Okay.  I'm just -- am I reading that right?  Am I

14    reading this page right?

15        A.   Well, I'm telling you I'm not an attorney.

16        Q.   Okay.  I'm just asking you.  I --

17        A.   I put in the words that were in the document.

18        Q.   Okay.  All right.  And initiator, so we have -- I

19    guess respondent is Torres and initiator is -- is Rothstein,

20    it reads, "That the respondent," Torres, "and the initiator,"

21    Rothstein, "do hereby freely and truthfully swear and state

22    that they are over the age of 18, a legal adult under the laws

23    of the state of Nevada, and not are mentally handicapped with

24    an intelligent quotient rating under 85."

25              What was it about that paragraph that you thought
```

1   was appropriate to present to Ms. Torres for signature?

2           MR. BARNABI:  Objection.  The question is vague and

3   ambiguous.  The document speaks for itself.

4           THE WITNESS:  Yeah.  Do I need to answer that one?

5           MR. BARNABI:  Yes, please.

6           THE WITNESS:  I believe that the whole paragraph,

7   number 1, that there's nothing wrong with that.  All the words

8   in there are the right words.

9   BY MR. BRANCART:

10      Q.   Okay.

11      A.   Maybe the words that you have that responded

12   initially aren't exactly what you like --

13      Q.   Okay.

14      A.   -- but all it says there is they're going to tell

15   the truth, that they're over 18, they're adults, and they're

16   under the state -- of the state of Nevada and they're not

17   mentally handicapped and they're not idiots.

18      Q.   Okay.  Turning to paragraph 3, "The respondent,"

19   here Ms. Torres, "has not been coerced into sexual activity by

20   the initiator," here Rothstein, "under the threat of force,

21   injury, threatening to leave the respondent," Ms. Torres, "any

22   financial inducement of any type or kind, to disparage her

23   socially, or by forcing her to engage in illegal activities or

24   by reporting illegal activities to the authorities."

25           Sir, what is it about that paragraph that you

1    thought was appropriate to submit to Ms. Torres for signature?

2        A.   Paragraph --

3             MR. BARNABI:  Objection --

4             THE WITNESS:  -- 3.  Oh.

5             MR. BARNABI:  Objection.  Same objection.

6             MR. FOLEY:  I'm going to object to the form of the

7    question.

8    BY MR. BRANCART:

9        Q.   You can answer.

10            THE WITNESS:  So now I can answer?

11            MR. BARNABI:  Yes.

12            THE WITNESS:  Same answer as for number 1.

13   BY MR. BRANCART:

14       Q.   And that answer is what, sir?

15       A.   What was the answer to 1?

16       Q.   Sir, actually I'm asking you a question.  Here you

17   present --

18       A.   And I'm trying to answer it for you.

19       Q.   And sir, paragraph 3 that you -- part of the

20   document submitted to Torres for signature states the language

21   here we just reviewed, and I'm asking you, what did you

22   believe was appropriate about that paragraph?

23       A.   The words in the paragraph.

24       Q.   Okay.  Paragraph 4, "The respondent," here Torres,

25   "has not been forced into sexual activities under the threat

1   of economic sanctions in a manner that negatively affects the

2   respondent," here Torres, "such as the refusal to provide

3   financial support, provide employment only if respondent

4   agrees to the terms of this agreement, or pay for dinner and

5   the movie, et cet, et cet, unless she complies with

6   initiator," here Rothstein's, "requirement or request for

7   sexual intercourse."

8           MR. BARNABI:  Same objection.

9   BY MR. BRANCART:

10      Q.   Sir, what is it that you believed was appropriate

11  about that paragraph to present it to Ms. Torres as part of

12  this document for her signature?

13          MR. BARNABI:  Same objection.

14          MR. FOLEY:  Object to the form.  Assumes facts not

15  in evidence.

16          THE WITNESS:  So now I answer or no?

17          The words that are in this paragraph 4 are

18  acceptable to me.

19  BY MR. BRANCART:

20      Q.   Okay.  Paragraph 5 reads, quote, The respondent,

21  here Ms. Torres, has not been treated as a sexual object,

22  servant, or chattel, subservient, or submissive, unless such

23  behavior is expressly desired by the respondent, here Torres.

24          Sir, what is it about the language in that

25  Paragraph No. 5 that you believed was appropriate for the

1    presentation to Ms. Torres for her signature?

2          MR. BARNABI:  Same objection.

3          MR. FOLEY:  Object to the form.  Assumes facts not

4    in evidence.

5          THE WITNESS:  Number one, I don't believe there's

6    anything that's illegal in here, and I don't believe there's

7    anything the matter with the words that are in here.

8    BY MR. BRANCART:

9       Q.   Number 6 on the page we've been reading from, 463 of

10   Exhibit 35, reads, "The respondent," here Torres, "has not

11   been intimidated into engaging in sexual activities by

12   displaying weapons, force, or creating an implied threat by

13   looks, actions, or gestures."

14         Sir, what is it about the language that appears in

15   paragraph 6 that you believed was appropriate for the

16   presentation to Ms. Torres in the form of this -- this

17   document, these two pages, the direct consent form, for her

18   signature?

19         MR. BARNABI:  Same objection.

20         MR. FOLEY:  Same objections.

21         THE WITNESS:  The -- it looks like a legal document

22   to me and I don't see anything the matter with the words and

23   I'm not an attorney.

24   BY MR. BRANCART:

25      Q.   Okay.  Turn to page 464.  At the top of the page,

1    paragraph 7 of the direct consent form, page 464 now, page 2

2    of the form appended to Exhibit 35 reads, "The respondent,"

3    here Torres, "has not been subject to emotional abuse by the

4    initiator," here Rothstein, "by making her feel bad about

5    herself, her emotional or physical status, playing mind games,

6    or making her feel guilty for not agreeing to sexual

7    intercourse, fellatio, and/or cunnilingus."

8           Mr. Rothstein, what was it about paragraph 7 that

9    you believed was appropriate to present as part of this

10   document, this consent form for Ms. Torres to sign?

11          MR. BARNABI:  Same objection.

12          MR. FOLEY:  Same objections.

13          THE WITNESS:  Yeah, the same answer.

14   BY MR. BRANCART:

15      Q.   Which is what?

16      A.   I'm not an attorney.  I did write this.  There's

17   nothing in here that's illegal.  She's waiving her rights by

18   signing this to these things.  She's stating that I'm not

19   holding a gun up to her head, I'm not -- I don't have a knife

20   to her throat, I'm not beating up her little kids, okay?  So

21   that's what it says.

22      Q.   Okay.

23      A.   And number 8, same thing.

24      Q.   Paragraph 8 of document 464 of Exhibit 35 reads,

25   "The respondent," here Torres, "is currently emotionally

1    distressed" -- strike that.

2           "The respondent," here Ms. Torres, "is not currently

3    emotionally distressed from the break-up of a previous

4    relationship nor clinically depressed nor possessing anorexic

5    tendencies which could lead to weakening of moral fortitude in

6    an effort to seek a temporary emotional crutch."

7           Sir, what is it about the language in paragraph 8

8    that you believed was appropriate for the presentation to

9    Ms. Torres to sign as part of this form, direct consent, that

10   appears at the end of Exhibit 35?

11          MR. BARNABI:  Same objections.

12          MR. FOLEY:  Same objections.

13          THE WITNESS:  I don't see anything the matter with

14   the words that are in there, I'm not an attorney, and I didn't

15   write this, but it's a legal document, I would assume.  You're

16   an attorney.  You should know.

17   BY MR. BRANCART:

18       Q.   Okay.  Anything else?

19          MR. BARNABI:  Same objections.

20          THE WITNESS:  That's it.

21   BY MR. BRANCART:

22       Q.   Okay.  The last paragraph, number 9, that appears on

23   page 464 of the direct consent form appended to Exhibit 35

24   reads, "The respondent," here Torres, "does not currently have

25   a boyfriend, girlfriend, parent who is larger, meaner, and

1    more physically aggressive, owns firearms, and/or is more

2    possessive than the initiator," here Rothstein.  "The hereby

3    undersigned respondent," here Torres, "agrees to the outlined

4    aforementioned requirements and acknowledges that they are

5    true and factual.  The respondent," here Torres, "hereby and

6    freely gives her total consent to the initiator," here

7    Rothstein, "to engage in sexual activities with the

8    respondent," here Torres, "with the understanding that sexual

9    intercourse, as defined by the State of Nevada, will occur.

10          "This consent and agreement is valid for the period

11   of five years and does hereby freely give implied consent to

12   consecutive or concurrent sexual encounters between the

13   respondent," here Torres, "and the initiator," here Rothstein.

14          "By signing this agreement, I/we state under penalty

15   of perjury that I/we have thoroughly read, understand, and

16   agree to it terms and conditions, both completely and freely.

17   I/we approve the content of this agreement.  I/we will acquire

18   the services of an attorney of my/our choosing if I/we decide

19   that I/we require legal representation.  All parties agree

20   that they have received a copy of this contract."

21          I've read that correctly, I think.

22      A.   Very good.

23          MR. FOLEY:  And dramatically.

24   BY MR. BRANCART:

25      Q.   And I guess my question to you, sir, is that of this

1    Paragraph No. 9, what is it that is the content of

2    Paragraph No. 9 that you believed was appropriate for the

3    presentation to Ms. Torres to sign as part of this Exhibit 35,

4    but specifically the form which is the direct consent for

5    sexual intercourse form, documents 463 and 464?

6              MR. BARNABI:  Same objections.

7              MR. FOLEY:  Same objection.

8              THE WITNESS:  Thank you for asking that question.

9    So if you look at paragraph 9, line 7, and it says for

10   five years, that's a typo.  It should be for one year.

11   BY MR. BRANCART:

12        Q.   Okay.

13        A.   Five years would be way too long.

14        Q.   Okay.

15             MR. PUNTNEY:  That would be absurd.

16   BY MR. BRANCART:

17        Q.   Okay.  But my question, sir, is when you say it's a

18   typo, that five years, and it should be one year, did you at

19   some point in time want to change that or try to change that

20   period of time?

21             MR. BARNABI:  Objection.  Vague as to reference of

22   time.

23             MR. BRANCART:  Well, let me withdraw it.

24

25   ///

1    BY MR. BRANCART:

2        Q.   You said it was a typo, and when you say it's a

3    typo, to me, that is shorthand for typographical error.

4        A.   Yeah.

5        Q.   And how is it that the five years is a typographical

6    error?  It should say one year, correct?

7        A.   (Witness nods head.)

8        Q.   Is that what you're saying?  Yes?

9        A.   Yes.

10       Q.   Okay.  And have you amended this form since it was

11   signed by Ms. Torres to only say one year?

12       A.   I thought that it did say one year.

13       Q.   Okay.

14       A.   I didn't see the five years.

15       Q.   Okay.  Sir, have you at any time presented a revised

16   copy of this form to Ms. Torres for her review and signature

17   changing the five years to one year?

18       A.   I didn't think it was necessary.

19       Q.   Okay.  Sir, going back to the -- the text of

20   Paragraph No. 9, there are several statements made in here,

21   and my question to you is:  What is it that you believed was

22   appropriate about the language in Paragraph No. 9, appropriate

23   for the presentation to Ms. Torres as part of this form,

24   direct consent for sexual intercourse, et cetera, to sign on

25   November 23rd, 2018?

```
 1              MR. BARNABI:  Objections.  Asked and answered.  He's
 2    already answered this.
 3              MR. FOLEY:  Same objections as before.
 4    BY MR. BRANCART:
 5         Q.   You can go ahead and --
 6              THE WITNESS:  You want me to answer here?
 7              MR. BARNABI:  Well, it's --
 8              THE WITNESS:  Okay.  So with the exception of the
 9    word "one" where you have the word "five."
10    BY MR. BRANCART:
11         Q.   Yes.
12         A.   And I'm not an attorney, so I don't know if all the
13    words are exactly as they should be, and I did not write this
14    contract either.
15         Q.   Understood.
16         A.   I want you to realize I did not write this contract.
17         Q.   Understood.
18         A.   I'm not taking credit for it, okay?  So other --
19    everything looks okay to me.  I don't see anything in there
20    that's illegal.
21         Q.   Okay.
22         A.   I don't see anything that's illegal in the whole
23    document --
24         Q.   Sir --
25         A.   -- other than possibly the five years versus one
```

```
 1    year.

 2         Q.   Understood.

 3              Sir, I'm going to show you Exhibit 75.

 4              (Exhibit 75 marked for identification.)

 5              THE WITNESS:  Do you need this back or should I hold

 6    on to it?

 7              MR. BRANCART:  Sure.  No, I'll take it back.

 8    BY MR. BRANCART:

 9         Q.   Exhibit 75 is a printout of NRS, Nevada Revised

10    Statutes, section 118A.200, rental agreements.

11              Do you see that?

12         A.   Yes.

13         Q.   Are you familiar with the Nevada Revised Statutes

14    governing landlord/tenant rental agreements?

15         A.   I've read them.

16         Q.   Okay.  You understand and agree, then, under

17    paragraph 1, that any written agreement would have to be

18    signed by both the landlord or the agent of the landlord, here

19    landlord being Puntney, you being the agent, and the tenant,

20    true?

21              MR. BARNABI:  Objection.  Statute speaks for itself.

22    Calls for a legal conclusion.

23    BY MR. BRANCART:

24         Q.   Do you understand that?

25         A.   Yes.
```

1    I didn't know.

2         Q.   Okay.  And my only question to you was, just so we

3    can globally close on this --

4         A.   Yeah.

5         Q.   -- do you recall you yourself providing at any time

6    notice to Ms. Torres about the notice of default associated

7    with the pendency of the foreclosure action on the Wedgebrook

8    house?

9              MR. BARNABI:  Same objections.

10             THE WITNESS:  I don't recall it and I don't think it

11   was required.

12             MR. BRANCART:  Okay.

13             MR. FOLEY:  It's pushing 10 after 5.  Can we go off

14   the record for just a sec?

15             MR. BRANCART:  Yeah.

16                  (Off-the-record discussion.)

17             MR. BRANCART:  We'll go back on the record.

18             THE WITNESS:  Can I ask a question?  How long is a

19   day?

20             MR. FOLEY:  That's for another --

21             MR. BARNABI:  Yeah.

22             MR. FOLEY:  -- conversation.

23             MR. BARNABI:  Right.

24             MR. BRANCART:  So back on the record, sir.

25                  (Exhibit 77 marked for identification.)

1                          CERTIFICATE OF REPORTER

2

STATE OF NEVADA    )
3                  )    ss:
COUNTY OF CLARK    )

4
            I, Sarah M. Winn-Boddie, a Certified Court Reporter
5   licensed by the State of Nevada, do hereby certify:  That I
reported the deposition of ALLAN ROTHSTEIN, VOLUME I,
6   commencing on Wednesday, January 15, 2020 at 10:46 a.m.

7           That prior to being deposed, the witness was duly
sworn by me to testify to the truth.  That I thereafter
8   transcribed my said shorthand notes into typewriting and that
the typewritten transcript is a complete, true and accurate
9   transcription of my said shorthand notes, and that a request
has been made to review the transcript.

10
            I further certify that I am not a relative, employee
11  or independent contractor of counsel, of any of the parties,
nor a relative, employee or independent contractor of the
12  parties involved in said action, nor a person financially
interested in the action, nor do I have any other relationship
13  with any of the parties or with counsel of any of the parties
involved in the action that may reasonably cause my
14  impartiality to be questioned.

15          IN WITNESS WHEREOF, I have set my hand in my office
in the County of Clark, State of Nevada, this 20th day of
16  January, 2020.

17

18          _____
             Sarah M. Winn-Boddie, CCR No. 868
19

20

21

22

23

24

25

**EXHIBIT 3**

Allan Rothstein Deposition (Vol. 2) (excerpts)

Allan Rothstein, Volume II                          Candy Torres v. Allan Rothstein, et al.

```
 1                  UNITED STATES DISTRICT COURT

 2                      DISTRICT OF NEVADA

 3
      CANDY TORRES,                     )
 4                                      )
                       Plaintiff,       )
 5                                      )
      vs.                               )Case No.
 6                                      )2:19-cv-00594-APG-EJY
      ALLAN ROTHSTEIN and KYLE          )
 7    PUNTNEY,                          )
                                        )
 8                     Defendants.      )
      _____)
 9                                      )
      AND ALL RELATED ACTIONS.          )
10    _____)

11

12

13

14              DEPOSITION OF ALLAN ROTHSTEIN

15                       VOLUME II

16         Taken on Wednesday, February 19, 2020

17              By a Certified Stenographer

18                     At 10:20 a.m.

19              At 530 South Sixth Street

20                   Las Vegas, Nevada

21

22

23

24    Reported by: HOLLY LARSEN, CCR 680, CA CSR 12170

25    Job No. 39175
```

```
 1    APPEARANCES:

 2    For the Plaintiff:

 3            NEVADA LEGAL SERVICES
              BY:  GREGORY L. PAUL, ESQ.
 4            530 South Sixth Street
              Las Vegas, Nevada 89101
 5            702.388.1641
              gpaul@nlslaw.net
 6

 7    For Kyle Puntney:

 8            FOLEY & OAKES
              BY:  DANIEL FOLEY, ESQ.
 9            1210 South Valley View Boulevard
              Suite 208
10            Las Vegas, Nevada 89102
              702.384.2070
11            dan@foleyoakes.com

12
      For Allan Rothstein:
13
              THE BARNABI LAW FIRM, PLLC
14            BY:  CHARLES BARNABI, ESQ.
              375 East Warm Springs Road
15            Suite 104
              Las Vegas, Nevada 89119
16            702.475.8903
              cj@barnabilaw.com
17

18
      Also Present:
19
              Kyle Puntney
20

21

22

23

24

25
```

1                           I N D E X

2     WITNESS                                      PAGE

3     ALLAN ROTHSTEIN

4         Examination by Mr. Paul              226
          Examination by Mr. Foley             277
5

6

7

8                         E X H I B I T S

9      NUMBER                                     PAGE

10     Exhibit 96      Rent Receipt Agreement and     242
                       Receipts
11
       Exhibit 97      NRS 118A.210                   248
12
       Exhibit 98      Emails                         250
13
       Exhibit 99      Email string                   251
14
       Exhibit 100     September 12, 2019, letter     262
15
       Exhibit 101     Five-Day Notice to Pay Rent    267
16                     or Quit

17     Exhibit 102     Landlord's                     268
                       Affidavit/Complaint for
18                     Summary Eviction for
                       Nonpayment of Rent
19
       Exhibit 103     Email with Attachments         272
20
       Exhibit 104     Duties Owed by a Nevada        288
21                     Real Estate Licensee

22

23

24

25

```
 1                    P R O C E E D I N G S

 2    Whereupon,

 3                       ALLAN ROTHSTEIN,

 4    having been first duly sworn to testify to the

 5    truth, was examined, and testified as follows:

 6

 7                         EXAMINATION

 8    BY MR. PAUL:

 9         Q.   Good morning, Mr. Rothstein.

10         A.   Good morning.

11         Q.   I'm not going to go back over everything

12    that Mr. Brancart did last time.  Just a reminder

13    that you're under oath.  If at any time you need a

14    break, please let me know, and we'll do that.

15              The other item is, if your attorney

16    objects, please still answer the question unless he

17    specifically tells you not to answer.  Any

18    questions?

19         A.   Not so far.

20         Q.   Sounds good.  You have a copy of the

21    exhibits; correct?

22              MR. BARNABI:  Yeah, they're right here.  If

23    you tell me the number, I'll get it out.

24    BY MR. PAUL:

25         Q.   Let's start with 34.  Mr. Rothstein, if you
```

 1      A.    No.   That's not correct.

 2      Q.    How is that not correct?

 3      A.    Well, trash has a T.  So T is tenant.

 4  That's what you told me.

 5      Q.    Are we looking at the same document?

 6      A.    I don't know.  I'm going to the page that

 7  you suggested.

 8            MR. PAUL:  Is he looking at Exhibit 34 or

 9  35?

10            MR. BARNABI:  It's 34, 383, right, on the

11  bottom?

12  BY MR. PAUL:

13      Q.    So what does it have next to trash?

14      A.    A T.

15      Q.    Not the trash can rental, the trash.

16      A.    Sorry.  An O.

17      Q.    Thank you.  Exhibit 35, looking at this

18  document, can you tell me what day it was signed by

19  Ms. Torres, the residential lease agreement?

20      A.    What page would that be on?

21      Q.    454.

22            MR. BARNABI:  Objection.  The document

23  speaks for itself.

24            THE WITNESS:  Okay.  So could you repeat

25  that question, please?

```
 1    BY MR. PAUL:

 2         Q.   When was this lease signed by Ms. Torres?

 3         A.   It looks like it was signed on 11/23 of

 4    '18.

 5         Q.   Did you ever send this residential lease

 6    agreement to the Housing Authority?

 7         A.   I sent a lease agreement to the Housing

 8    Authority.  As to exactly which one it was, I don't

 9    remember.  Probably both, but I don't remember.

10         Q.   You don't remember if you sent one or two?

11         A.   Whatever they required, that's what I sent.

12         Q.   Do you remember them requiring more than

13    one lease?

14         A.   Yes.

15         Q.   Two different leases?

16         A.   Originally you send them a lease that's

17    unsigned.  Then after they make their decision

18    whether they're going to approve it or not, then

19    they fill it in with the date, signatures, all that

20    stuff.  Read the HAP contract.  It's in there.

21         Q.   I have.  Thank you.

22         A.   Good.

23         Q.   Did you send the addendums that are

24    contained in this exhibit as well?

25         A.   Which addendums?
```

 1      Q.   Some training, all right.  Can you

 2  specifically tell me what training you received?  I

 3  know that's multiple parts, so let's start with

 4  when.

 5      A.   Don't remember.

 6      Q.   Do you remember if you received training

 7  while you were studying to take the test for those

 8  positions?

 9      A.   It could have been on the test.  I don't

10  remember.

11      Q.   Did you have any training on the Fair

12  Housing Act after you became licensed?

13      A.   I believe so.

14      Q.   Where did you receive that training?

15      A.   In class.

16      Q.   Do you remember where those classes were

17  held?

18      A.   I think at GLVAR.

19      Q.   And do you remember who taught that class?

20      A.   No.

21      Q.   Based on that training, you're fully aware

22  that sexual harassment of a tenant is unlawful;

23  correct?

24           MR. BARNABI:  Objection.  Calls for a legal

25  conclusion.

```
 1              THE WITNESS:  What's your question?
 2   BY MR. PAUL:
 3      Q.   Based on that training, you're fully aware
 4   that sexual harassment of a tenant is unlawful;
 5   correct?
 6              MR. BARNABI:  Objection.  Also vague.
 7              THE WITNESS:  I can answer?
 8   BY MR. PAUL:
 9      Q.   Yep.
10      A.   Give me the question one more time.
11      Q.   Sure.  Based on your training, you're fully
12   aware that sexual harassment of a tenant is
13   unlawful; correct?
14              MR. BARNABI:  Same objections.
15              THE WITNESS:  Yes.
16   BY MR. PAUL:
17      Q.   And you've known this since at least 2009;
18   correct?
19      A.   I wouldn't know what year it was.
20      Q.   When did you take your training to become
21   licensed?
22      A.   I'd have to look, but it was about 2009 or
23   2008.
24      Q.   So it's fair to say during that time period
25   you'd learned that sexual harassment of a tenant
```

1    would be unlawful; correct?

2              MR. BARNABI:  Same objections.

3              THE WITNESS:  Yes.

4    BY MR. PAUL:

5         Q.   From the date Ms. Torres moved into the

6    Wedge Brook property until the date she moved out,

7    you never visited the Wedge Brook house, did you?

8         A.   That's not true.

9         Q.   Okay.  When -- first, how many times did

10   you visit during her tenancy?

11        A.   Don't remember.

12        Q.   But you do remember visiting during that

13   time period?

14        A.   I remember being there.

15        Q.   And visiting with Ms. Torres at the

16   property?

17        A.   I didn't go there to visit.  If I went

18   there, I went there for an inspection.

19        Q.   I was using the term "visit" as going

20   there, whether it's for business -- I wasn't

21   implying for personal reasons.  So what was the

22   purpose of the visit?

23        A.   It would be for an inspection.

24        Q.   And when would this inspection have taken

25   place?

1   else, that she'd have to pay you $150?  Is that what

2   you're saying?

3       A.   I agree with paragraph B, what it says.

4       Q.   You agree with it, that she owed you a fee

5   of $150?

6       A.   It says, "This flat fee portion is assessed

7   by broker so its clients and customers in exchange

8   for real estate services provided and actually

9   performed and is not required by any state or

10  federal government to ensure that the real property

11  transactions comply with federal or state laws."

12  Okay.  So if she -- if I find her a place, then she

13  owes me $150.

14      Q.   Turn to Exhibit 93, please.  Are you there?

15      A.   Not yet.  Okay.

16      Q.   So this is an email from you to Wanesha

17  Thomas with the Housing Authority; correct?

18      A.   This is the first page; right?  Am I on the

19  right page?  This is from the Housing Authority to

20  me.

21      Q.   Maybe we're looking at a different

22  document.  The one I'm looking at starts at the top,

23  from Allan, your address, dated Tuesday,

24  October 30th at 10:05 a.m.

25          MR. BARNABI:  Did you say 93?

```
 1              MR. FOLEY:  Yes.

 2   BY MR. FOLEY:

 3        Q.   Wait a minute.  Let me see something.  My

 4   mistake.  Go to the second-to-the-last page on 93.

 5   It's an email from you to Wanesha dated October 30,

 6   2018, at 10:05 a.m.  Do you see that?

 7        A.   Yes.

 8        Q.   And it states in the second sentence, "My

 9   client, Candy Torres, stated that she believes that

10   her appointment is scheduled for about

11   November 8th."  You wrote that email to Wanesha and

12   stated that; correct?

13        A.   Yes.

14        Q.   Going down further in the email to about

15   the bottom one-third, there's a sentence that starts

16   on the left-hand column with "She is also your

17   client."  Do you see that?

18        A.   Yes.

19        Q.   So you stated to Wanesha, "She, meaning

20   Candy, is also your client and is such your

21   responsibility as well"; correct?

22        A.   No.  This is stating that Wanesha Thomas'

23   client is Candy Torres.

24        Q.   When she says -- when you say "she," you

25   mean Candy; correct?
```

1      Q.   Did you ever meet with Candy Torres

2   anywhere else other than your home?  I know you

3   talked about meeting clients at a Starbucks and a

4   Burger King.  Did you ever meet with her anywhere

5   else other than your home?

6      A.   No.

7      Q.   Did you ever meet with her at the Wedge

8   Brook house when you went out to inspect it?

9      A.   I don't remember it.

10     Q.   You were present for Candy Torres'

11  deposition where she discussed -- I don't even

12  remember the number -- six to ten times that she

13  came over and met with you at your home during the

14  course of the negotiations and before she actually

15  moved into the house.  Do you remember her

16  testifying to that?

17     A.   That's very possible.  I don't remember.

18     Q.   It's very possible.  Does that sound right

19  to you approximately how many times Candy would have

20  come to your house?

21     A.   Sounds like too many.

22     Q.   Okay.  How many do you recall?

23     A.   Three or four.

24     Q.   Continuing on in this paragraph number 18,

25  it states on the top of page 6, "But Rothstein

1    Suites, or was there some other --

2        A.   No.

3        Q.   Royal Hill address?

4        A.   It's very difficult to get any information

5    from the Budget Suites.

6        Q.   Who did you check with?

7        A.   I checked with the one that was on

8    St. Louis.

9        Q.   And do you have any -- how did you check?

10   Did you do it by email?  By phone call?

11       A.   Phone call.

12       Q.   Are there any notes about that reference

13   that you took?

14       A.   I don't remember any, but they said she

15   wasn't a problem.

16       Q.   Do you remember who you talked to?

17       A.   No.

18       Q.   Did you ever ask her if she was single or

19   married?

20       A.   No.

21       Q.   Did she ever tell you she was married?

22       A.   She said she was living by herself with her

23   five kids.

24       Q.   Your office that you have is over on

25   Sunset; right?

1    A.   Yes.

2    Q.   How often during 2018-2019 would you

3    typically go to that office?

4    A.   I'd go to that office only if I was in the

5    area to visit.

6    Q.   Typically how often was that on a monthly

7    basis?

8    A.   Whenever I went to the doctors by St. Rose,

9    about once a month.

10   Q.   Would you work out of that office when you

11   were there, or did you just stop in to check email

12   or --

13   A.   No, no.  My ex and my son are there.  So

14   I -- if I'm in the area, I go by and say hello.

15   Q.   Not go there to do real estate work?

16   A.   No.  That's correct.

17   Q.   You have a real estate office in that

18   office space or no?

19   A.   Yes.  I hang my license there.

20   Q.   Ever meet with any clients there?

21   A.   No.

22   Q.   The inspection that you went to, to the

23   house with Candy in September of 2018, did you take

24   any photographs at that time?

25   A.   I would think so.

1                    CERTIFICATE OF REPORTER

2    STATE OF NEVADA  )
                      )SS
3    COUNTY OF CLARK  )

4        I, Holly Larsen, a duly commissioned and

5    licensed Court Reporter, Clark County, State of

6    Nevada, do hereby certify:  That I reported the

7    taking of the deposition of the witness, Allan

8    Rothstein, commencing on Wednesday, February 19,

9    2020, at 10:20 a.m.

10       That prior to being examined, the witness was,

11   by me, duly sworn to testify to the truth.  That I

12   thereafter transcribed my said shorthand notes into

13   typewriting and that the typewritten transcript of

14   said deposition is a complete, true, and accurate

15   transcription of said shorthand notes.

16       I further certify that I am not a relative or

17   employee of an attorney or counsel of any of the

18   parties, nor a relative or employee of an attorney

19   or counsel involved in said action, nor a person

20   financially interested in the action.

21       IN WITNESS HEREOF, I have hereunto set my hand,

22   in my office, in the County of Clark, State of

23   Nevada, this 28th day of February, 2020.

24
                        _____
25                      HOLLY LARSEN, CCR NO. 680

**EXHIBIT 4**

Kyle Puntney Deposition (excerpts)

```
 1                  UNITED STATES DISTRICT COURT

 2                      DISTRICT OF NEVADA

 3

 4   CANDY TORRES,                    )
                                      )
 5              Plaintiff,            )
                                      )
 6         vs.                        )   No.:
                                      )   2:19-cv-00594-APG-EJY
 7   ALLAN ROTHSTEIN and KYLE PUNTNEY, )
                                      )
 8              Defendants.           )
     _____)
 9                                    )
     RELATED CROSS COMPLAINT          )
10   _____)

11

12              DEPOSITION OF KYLE PUNTNEY

13

14              Taken at the Offices of
                Oasis Reporting Services
15              400 South Seventh Street
                     Suite 400
16              Las Vegas, Nevada 89101

17

                On Tuesday, January 14, 2020
18                   At 9:42 a.m.

19

20

21

22

23

24
     Reported by:  Sarah M. Winn-Boddie, CCR No. 868
25   Job No. 38498
```

Kyle Puntney                                              Candy Torres v. Allan Rothstein, et al.

```
 1     APPEARANCES:

 2        For the Plaintiff:          CHRISTOPHER BRANCART, ESQ.
                                      Brancart & Brancart
 3                                    Post Office Box 686
                                      Pescadero, CA 94060
 4                                    (650) 879-0141

 5                                    AND

 6                                    GREGORY PAUL, ESQ.
                                      Nevada Legal Services
 7                                    530 South Sixth Street
                                      Las Vegas, Nevada 89101
 8                                    (702) 386-0404

 9
          For Defendant Kyle Puntney: DANIEL T. FOLEY, ESQ.
10                                    Foley & Oakes
                                      1210 South Valley View
11                                      Boulevard
                                      Suite 208
12                                    Las Vegas, Nevada 89102
                                      (702) 384-2070
13
          For Defendant Allan Rothstein:
14
                                      CHARLES E. BARNABI, JR.,
15                                      ESQ.
                                      The Barnabi Law Firm
16                                    375 East Warm Springs Road
                                      Suite 104
17                                    Las Vegas, Nevada 89119
                                      (702) 475-8903
18
          Also Present:              Allan Rothstein
19

20                                    *****

21

22

23

24

25
```

1      TUESDAY, JANUARY 14, 2020; LAS VEGAS, NEVADA

2                      9:42 a.m.

3                       -oOo-

4  (In an off-the-record discussion held prior to the

5  commencement of the proceedings, counsel agreed to waive the

6  court reporter's requirements under Nevada Rules of Civil

7  Procedure, Rule 30(b)(4), or Federal Rules of Civil Procedure,

8  Rule 30(b)(5), as applicable.)

9  Whereupon,

10                   KYLE PUNTNEY,

11  having been first duly sworn to testify to the truth, the

12  whole truth, and nothing but the truth, was examined and

13  testified as follows:

14                   EXAMINATION

15  BY MR. BRANCART:

16      Q.   Good morning, sir.  Would you state your full name

17  and spell it?

18      A.   Kyle Puntney, K-y-l-e, P-u-n-t-n-e-y.

19      Q.   Mr. Puntney, what is your current business address?

20      A.   Current business address is 7211 Northeast Drive,

21  Apartment 121, Austin, Texas 78723.

22      Q.   Sir, is that the address in which you receive

23  correspondence or mail associated with the rental of the

24  dwelling known as Wedgebrook?

25      A.   Yes.

1          But you understood that as of the date you hired

2    him, that he was and held himself out to be a licensed real

3    estate agent, broker, or salesperson licensed by the State of

4    Nevada, true?

5          A.   Yes.  Correct.

6          Q.   In fact, he's perpetually in communications with you

7    held himself out as a licensed real estate professional, true?

8          A.   Yes.

9          Q.   And if you turn to -- back to paragraph 5, it was

10   Mr. Rothstein who was the property manager pursuant to an

11   agreement between you as the owner and him as the property

12   manager to manage the rental and management of the Wedgebrook

13   dwelling for the period starting in 2010 until 2019, true?

14         A.   Correct.

15         Q.   And he -- he held that position as the property

16   manager of the Wedgebrook property for that entire period of

17   time, true?

18         A.   Correct.

19         Q.   During that same period of time, you were the sole

20   owner of the Wedgebrook property, correct?

21         A.   Correct.

22         Q.   You understood that Ms. Torres was renting the

23   Wedgebrook house while she was an occupant there pursuant to a

24   Housing Assistance Program or HAP, H-A-P, contract to

25   subsidize the rent known as -- the program known as Section 8,

1       A.    Correct.

2       Q.    Okay.  And who is it, if you know, that is your

3   mortgage servicer?  Who do you send the checks to?

4       A.    Yeah.  It's CMG Mortgage, Charlie, Michael, Golf,

5   CMG Mortgage.

6       Q.    And who is it that you obtained the loan from to

7   purchase the home?

8       A.    I believe it was originally purchased through ASC,

9   America's Servicing Corporation, and I believe they

10  transferred it to CMG.

11      Q.    I know it's a matter of public record, but if you

12  recall, what was the purchase price of the home?

13      A.    I don't recall off the top of my head.

14      Q.    During the period of time 2010 to today, have you

15  ever listed the home for sale?

16      A.    No.

17      Q.    Sir, do you have any recollection of ever speaking

18  with any person, any of the individuals who rented the

19  Wedgebrook home, that is, the tenants?

20      A.    Did I ever speak with them in person?

21      Q.    Yeah.

22      A.    I don't recall.  No.

23      Q.    How about telephonically, that is, verbal telephonic

24  communications?

25      A.    I don't believe so.  No.

1    Q.   And how about electronic?

2    A.   I was -- I was copied on emails, but I never had any

3    direct communication with the tenants.  I always left that up

4    to Mr. Rothstein, because I was several states away and I was

5    traveling for work and I didn't -- I -- it was -- I was paying

6    him to handle that.  I didn't want to get involved.

7    Q.   Understood.

8         And sir, in the year 2019, did you ever visit and

9    conduct a physical inspection of the home?

10   A.   No.

11   Q.   In the year 2018, did you ever visit or conduct a

12   physical inspection of the home?

13   A.   No.

14   Q.   In the year 2017, did you ever visit or conduct a

15   physical inspection of the home?

16   A.   No.

17   Q.   I should say -- I said "visit or conduct."  It's

18   actually visit and conduct, visit and conduct a physical --

19   A.   No, I did not, because at the time, I believe those

20   were Mr. Rothstein's responsibilities.  I didn't feel like I

21   needed to, and if there's a tenant in there, I'm not going to

22   try and coordinate to knock on the door and say, Hey, can I

23   come look at the house?

24   Q.   Okay.  All right.  Sir, prior to January 1, 2020,

25   what was the date that you last physically visited and

1    inspected the Wedgebrook home?

2        A.   The last date that I would have been inside to see

3    the inside of the house?

4        Q.   Yes.

5        A.   I don't know for certain.  I'm guessing it would

6    have been probably back in 2010 when I moved out of the house.

7        Q.   Other than Mr. Rothstein, have you asked anyone else

8    to conduct a physical inspection of the home?

9        A.   No.

10       Q.   Other than Mr. Rothstein, have you asked anyone else

11   to speak to the tenants regarding the conditions of the home

12   or the management of the home as a rental dwelling?

13       A.   No.

14            MR. BRANCART:  Okay.  Let's go off the record.

15            (Recess taken from 10:31 a.m. to 10:41 a.m.)

16            MR. BRANCART:  Let's go back on the record.

17   BY MR. BRANCART:

18       Q.   Sir, are you still utilizing Mr. Rothstein's

19   services as a property manager?

20       A.   No.

21       Q.   And when did you terminate your relationship?

22       A.   At the end of the lease with Torres.

23       Q.   So in November of 2019?

24       A.   Correct.

25       Q.   Have you made any statement or complaint to any

 1      A.    What was that?  I don't understand your question.

 2      Q.    Sure.  Absolutely.  Let me withdraw it.

 3            And while he was your property manager, he would

 4   from time to time send information regarding the rules

 5   promulgated by the State and state statutes governing the

 6   rental of property, true?

 7      A.    I still don't understand your question.

 8      Q.    Sure.  The State of Nevada has enacted in a statute

 9   some rules that govern the rental of property.

10      A.    Okay.

11      Q.    And my question to you is:  Isn't it true that

12   Mr. Rothstein would from time to time provide you with emails

13   or information as attachments about the state law governing

14   the rental of property?

15      A.    I don't believe he ever did.  Most of the time if he

16   would email me, there was a -- it seemed like there was some

17   kind of ads or some kind of junk mail at the bottom or in the

18   signature of the file, so a lot of times, honestly, I mean,

19   I -- and I never asked for any information like that, so as

20   long as it -- I mean, I was looking for the monthly statement,

21   how much the rent was, what the expenses were, and other than

22   that, I honestly didn't read the emails because it was all

23   unsolicited, unwanted information.  I didn't ask for it.

24      Q.    Okay.  Sir, from your understanding, when you hired

25   Mr. Rothstein starting in 2010 as your property manager, what

 1   relationship, the mutual obligations were, and my question is:

 2   Did that understanding of that about your mutual obligations

 3   change during the course of your tenure, your relationship

 4   with Mr. Rothstein as property manager?

 5       A.   From my perspective, from my point of view, no, it

 6   did not.

 7       Q.   Do you know if it did from his?

 8       A.   I have no -- I have no -- I don't know.  I can't --

 9   I can't answer that question.

10       Q.   Sir, did you ever provide Mr. Rothstein with any

11   guidance or direction regarding the management of the

12   Wedgebrook house?

13       A.   The only guidance was, you know, I -- I -- whenever

14   there was a tenant there, in order to reduce my expenses, I --

15   I suggested that they offer an 18- or a 24-month lease.

16   Getting somebody else in there every 12 months was expensive,

17   and it seemed like it was just a waste of effort, so the only

18   guidance I gave him was to, you know, try and offer an 18-

19   or 24-month lease to try and, you know, stop the constant

20   churning of tenants in the house, but other than that, no, I

21   did not give him any guidance --

22       Q.   Okay.

23       A.   -- because it was my understanding he would do the

24   screening as far as like financial background, credit check,

25   he would screen the candidates and come to me with his best --

1    I don't know, best candidate, I guess.

2        Q.    Mm-hmm.  Sir, within your relationship with

3    Mr. Rothstein, regarding the authority to make final

4    decisions, who had the authority to determine what the rental

5    rate was?

6        A.    I went off of basically his guidance.  He knew the

7    market and he knew -- you know, he knew what the -- what the

8    best idea was, and so I let him make that decision, and he --

9    you know, I basically let him make that decision, because

10   again, at the time I was working, I was living several states

11   away, I didn't have time to get involved with the daily nuts

12   and bolts of it.

13       Q.    Okay.  Regarding making the decision to file an

14   eviction to terminate an occupant's tenancy, who had the

15   authority to do that?

16       A.    That would have been something he would have

17   handled.  To my knowledge, that was never -- that was never

18   done with my -- with my express knowledge.  In the ten years,

19   I don't believe we ever had anybody that had to be evicted.

20       Q.    During the period of time that Mr. Rothstein served

21   as property manager, who had the authority to approve or

22   authorize repairs or maintenance on the house?

23       A.    If it was below a -- like a -- if it was below a

24   set -- like a -- if it was below, I believe, a threshold

25   of $250 or something, he made the repairs and just took them

1    out of the rent, so he had the authority.

2        Q.   All right.  Regarding setting rental rates, it was

3    your expectation that Mr. Rothstein would advise you as to

4    what he was going to propose to do; you deferred to his

5    expertise or knowledge of the market, true?

6        A.   Yes.

7        Q.   Regarding evictions, as far as you know, there were

8    no evictions.  Did you have any understanding that if someone

9    was to be evicted, that he would advise you?

10       A.   Yes.  That was something that we'd originally

11   discussed back in 2010, and he advised me that if anything

12   came up on that, that he would handle it because, again, you

13   know, I wasn't living there anymore, and so it was my

14   understanding that, you know, if something like that were to

15   happen, he would handle it, but I would assume that he would

16   let me know about it in advance, because something like that

17   would be a result of somebody not paying rent for one or two

18   months.

19       Q.   And sir, regarding -- regarding any possible

20   complaints or concerns expressed by occupants about the

21   Wedgebrook house, whether it be the condition of the house or

22   the management of the house as a rental, did you have any

23   understanding or provide any direction to Mr. Rothstein as to

24   what he was supposed to advise you of regarding complaints or

25   concerns?

Kyle Puntney                                          Candy Torres v. Allan Rothstein, et al.

```
 1        A.   Can you restate the question, please?

 2        Q.   Sure.  Did you give Mr. Rothstein any direction as

 3   to whether or not he was to advise you if a tenant complained

 4   or expressed concern about the condition of the dwelling on

 5   Wedgebrook or about the management, Mr. Rothstein's management

 6   of that dwelling?

 7        A.   Can you repeat that one more time?

 8        Q.   Sure.

 9        A.   I'm having a hard time following your question.

10        Q.   No worries.  No worries.  Let me -- I'll withdraw

11   it.

12             So if a -- did you give any direction to

13   Mr. Rothstein to the effect that if he received a complaint

14   from a tenant about either the condition of the house on

15   Wedgebrook or about the management of that house, your

16   management, Mr. Rothstein, I want you to alert me to that

17   complaint?

18        A.   I -- I don't believe -- I don't believe I gave him

19   any guidance on that.  It was just -- yeah, no.  I don't

20   believe I gave him any specific guidance on that.

21        Q.   Okay.

22        A.   Again, he was the property manager.  He handled most

23   of the stuff.

24        Q.   Was the fact that Mr. Rothstein was -- strike that.

25             You understood that Mr. Rothstein during this entire
```

1    Bellevue?

2         A.   No.  To my knowledge, no.

3         Q.   Did you have any familiarity with the Section 8

4    program?

5         A.   No.

6         Q.   During your relationship with Mr. Rothstein as your

7    property manager, what was the practice that you followed

8    within that relationship to communicate with each other back

9    and forth?

10        A.   Can you restate that, please?

11        Q.   Sure.  While Mr. Rothstein was your property

12   manager, were there any regular or routine reports that you

13   expected him to provide you about the property?

14        A.   No.  There were no routine reports.

15        Q.   While Mr. Rothstein was your property manager, was

16   there any regular communication that he provided to you about

17   the receipt of the rental or the disbursement of rental funds?

18        A.   Not consistently, no.  I would say about every other

19   month, maybe -- I would say four -- for four months -- you

20   know, I would say maybe every other month, he would send a

21   report saying this is the rent I collected, this is how much I

22   kept out, and this is what the repairs were --

23        Q.   Okay.

24        A.   -- but it was not consistent every month.

25        Q.   Did you have an expectation or request that he

1    was not able to contact me during that time frame.

2         Q.   Was it your understanding that if a tenant didn't

3    leave them on or put them in the tenant's name, that you were

4    supposed to put them in your name?

5         A.   Again, we never discussed it because it had never

6    come up before.

7         Q.   Okay.

8              (Exhibit 23 marked for identification.)

9              MR. FOLEY:  Chris, we've been at it about another

10   hour, when you get a chance for a break.

11             MR. BRANCART:  Yeah.  Yeah.  Let's go off the

12   record, get up and stretch.

13             (Recess taken from 11:40 a.m. to 11:53 a.m.)

14             MR. BRANCART:  Back on the record.

15   BY MR. BRANCART:

16        Q.   I want to show you Exhibit 23.  Exhibit 23 is a

17   multiple listing information posting regarding the Wedgebrook

18   house.

19             The question to you is:  Did you ever receive or see

20   this information that was posted my Mr. Rothstein on the MLS

21   listing?

22        A.   No, I did not.

23        Q.   Did you ever see or did he ever provide you with any

24   of the postings that were on Zillow or any of the other real

25   estate websites?

 1        A.   I don't believe so, no.  Hmm.  Why -- I've got a

 2   question about this.

 3             MR. FOLEY:  It's all right.

 4   BY MR. BRANCART:

 5        Q.   What's your question?

 6             MR. FOLEY:  (Inaudible.)

 7             THE COURT REPORTER:  Sir, I can't hear you.

 8             THE WITNESS:  I'm sorry.  Okay.

 9   BY MR. BRANCART:

10        Q.   Yeah.  Well, you -- in the interest of time, I had

11   actually marked it, but it does say here "Public remarks" in

12   the center of the page, something that you identified, that

13   there is a -- it makes reference to a "Pre-foreclosure balance

14   will be paid October 1st when owner is released from medical

15   facility."

16        A.   Who would have typed that in there?  Because I don't

17   believe that I consented to anybody to post my private medical

18   information on a public website.

19        Q.   And I don't even know if that's true of you or not.

20        A.   Okay.

21        Q.   I -- this is something that was produced by

22   Mr. Rothstein and is, if you look at the bottom of the page, a

23   posting by Mr. Rothstein.

24        A.   Okay.

25        Q.   So my question to you, though, is this:  The

1   reference here to the pre-foreclosure balance, do you see

2   that?

3        A.   I see that.

4        Q.   "Will be paid by October 1st," was that a

5   discussion or an agreement that you had with Mr. Rothstein?

6        A.   I don't recall having a discussion or a conversation

7   about that, no.

8        Q.   All right.  And not getting into your personal

9   information, but at that point in time, were you in a medical

10  facility?

11       A.   I -- I -- I don't recall this, no, and that's why

12  I'm just --

13       Q.   I mean, in other words, in this period of time,

14  which was September of 2018, were you hospitalized in a

15  facility?

16       A.   No.

17       Q.   Okay.

18            (Exhibit 24 marked for identification.)

19  BY MR. BRANCART:

20       Q.   Show you Exhibit 24.  Exhibit 24 is an email from

21  Rothstein, between Rothstein and you regarding the notice of

22  default in connection with the foreclosure.

23            Do you see that?

24       A.   I see that.

25       Q.   Sir, do you know -- this is dated here

Kyle Puntney                                           Candy Torres v. Allan Rothstein, et al.

1                         CERTIFICATE OF REPORTER

2

STATE OF NEVADA   )
3                  )   ss:
COUNTY OF CLARK   )

4

5              I, Sarah M. Winn-Boddie, a Certified Court Reporter
   licensed by the State of Nevada, do hereby certify:  That I
   reported the deposition of KYLE PUNTNEY, commencing on
6  Tuesday, January 14, 2020 at 9:42 a.m.

7              That prior to being deposed, the witness was duly
   sworn by me to testify to the truth.  That I thereafter
8  transcribed my said shorthand notes into typewriting and that
   the typewritten transcript is a complete, true and accurate
9  transcription of my said shorthand notes, and that a request
   has been made to review the transcript.

10

11             I further certify that I am not a relative, employee
   or independent contractor of counsel, of any of the parties,
   nor a relative, employee or independent contractor of the
12 parties involved in said action, nor a person financially
   interested in the action, nor do I have any other relationship
13 with any of the parties or with counsel of any of the parties
   involved in the action that may reasonably cause my
14 impartiality to be questioned.

15             IN WITNESS WHEREOF, I have set my hand in my office
   in the County of Clark, State of Nevada, this 17th day of
16 January, 2020.

17

18

19                        _____
                              Sarah M. Winn-Boddie, CCR No. 868
20

21

22

23

24

25