1

NEVADA LEGAL SERVICES
  Gregory Paul (NV 9645)
  gpaul@nlslaw.net
530 South 6th Street
Las Vegas, NV 89101
Tel:    (702) 388-1641, Ext 130
Fax:    (702) 386-0404

2

3

4

5

BRANCART & BRANCART
  Christopher Brancart (NV 8969)
  cbrancart@brancart.com
Post Office Box 686
Pescadero, CA  94060
Tel:    (650) 879-0141
Fax:    (650) 879-1103

6

7

8

9

Attorneys for Plaintiff

10

11

**UNITED STATES DISTRICT COURT**

12

**DISTRICT OF NEVADA**

13

14

**CANDY TORRES,**

**No. 2:19-CV-00594-APG-EJY**

15

　　　　　　**Plaintiff,**
**vs.**

**APPENDIX OF EXHIBITS IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Volume 2, Exhibits 7-19)**

16

**ALLAN ROTHSTEIN and KYLE PUNTNEY,**

17

18

　　　　　　**Defendants.**

19

20

　　　Dated: April 17, 2020.

21

Respectfully submitted,

22

NEVADA LEGAL SERVICES
  Gregory Paul (NV 9645)
  gpaul@nlslaw.net
530 South 6th Street
Las Vegas, NV 89101
Tel:    (702) 388-1641, Ext 130
Fax:    (702) 386-0404

BRANCART & BRANCART

23

24

*/s/ Christopher Brancart*
Christopher Brancart (NV 8969)
cbrancart@brancart.com
Post Office Box 686
Pescadero, CA  94060
Tel:    (650) 879-0141
Fax:    (650) 879-1103

25

26

27

Attorneys for Plaintiff

28

# EXHIBIT 7

Deposition Exh. 34 - Lease Packet dated 11/17/2018

TO:

SOUTHERN NEVADA
REGIONAL HOUSING AUTHORITY
Section 8 Department
P.O. BOX 1897
LAS VEGAS, NEVADA 89125-1897

ALLAN ROTHSTEIN
755 SUNSET ROAD
HENDERSON, NV 89011

EXHIBIT
3 4
Purman 1/14/20

ROTH00497



SNRHA

**SOUTHERN NEVADA REGIONAL HOUSING AUTHORITY**
Housing Choice Voucher Department, P.O. Box 1897, Las Vegas, NV 89125-1897
Phone (702) 477-3100   FAX (702) 922-6529   TDD (702) 387-1898

## NOTICE OF RENT PAYMENT AND PROGRAM ABUSE WARNING INFORMATION

Owner: KYLE PUNTNEY
Name:

Participant
Name:     CANDY TORRES

Contract Unit 11883 WEDGEBROOK ST
Address:     LAS VEGAS, NV 89163

Contract/
Lease Start Date:

11/17/18

| Rent to Owner: $ 1475.00 | | | Security Deposit: $ 1475.00 | |
|---|---|---|---|---|
| Housing Assistance Payment: $ 1330.00 | Tenant Rent: $ 145.00 | Pro-Rate HAP Payment: $ 621.00 | | Pro-Rate Tenant Payment: $ 68.00 |

Dear Owner and Housing Choice Voucher Participant:

As of the effective date shown above, the Housing Assistance Payments (HAP) contract between the Southern Nevada Regional Housing Authority (SNRHA) and the owner and the Lease between the tenant and the owner will begin.

The portion of rent paid to the owner by the family is due at lease signing or on the date established by the owner and the family.

The first payment (HAP check) paid to the owner by the SNRHA will be paid within 30 days from the date the unit passes inspection, contingent upon receipt and execution of all necessary documents. SNRHA processes payments twice a month and payment cannot be processed until the SNRHA has received a signed lease and contract. Payments are processed on the 15th and the 30th of each month. The first HAP check to the owner will include any prorated amounts from the start date. After the initial HAP check is released, the owner will begin to receive their monthly HAP payment from SNRHA on the first working day of each month via direct deposit. The tenant is responsible for paying his or her own portion directly to the owner each month.

The owner may not accept any other monies from the client. Requiring extra ('side') payments in excess of the family's share of rent as listed above is considered program fraud. In the event that SNRHA determines that the family has made side payments to the owner, SNRHA will require the owner to repay the excess monies to the family; and both the owner and the family will be terminated from the Housing Choice Voucher Program participation.

If the owner does require additional rent, the request must be submitted to SNRHA in writing. The owner may not request a rent increase during the initial one-year lease term. The owner must submit a request for increase 60 days in advance of the effective date of the anniversary of the lease. The request must be addressed to the family with a copy to SNRHA along with a completed Request for Rent Adjustment Form.

We value your participation in our program.
Please feel free to contact me at (702) 477-3443    if you have any questions.

---     WAYNEISHA THOMAS     ---

**This form to be used for SNRHA purposes only.**

Please be advised we are here to serve you. Housing Choice Voucher (HCV) Regulations authorize a public housing authority to WARNING: Section 1001 of Title 18 of the U.S. Code makes it a criminal offense to make willful false statements or misrepresentations to any department or agency of the United States as to any matter within its jurisdiction.

Southern Nevada Regional Housing Authority will not discriminate because of race, color, religion, sex, national origin, disability, familial status or sexual orientation. If you have a disability and require reasonable accommodations to fully utilize our programs and services are accessible. If you need a reasonable accommodation, please submit your request in writing to SNRHA, P.O. Box 1897, Las Vegas, NV 89125, Attention: 504 Officer.



SOUTHERN NEVADA REGIONAL HOUSING AUTHORITY

P.O. Box 1897 • Las Vegas, Nevada 89125

**SNRHA**
Southern Nevada Regional Housing Authority

## U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

## WATCH OUT FOR LEAD-BASED PAINT POISONING NOTIFICATION

**TO:**  **TENANTS OF HOUSING CONSTRUCTED BEFORE 1978**

This building was constructed before 1978. There is a possibility that it may contain lead-based paint.

## PLEASE READ THE FOLLOWING INFORMATION CONCERNING LEAD PAINT POISONING

The interiors of older apartments often have layers of lead-based paint on the walls, ceilings, window sills and door frames. Lead-based and primers may also have been used on outside porches, railings, garages, fire escapes and lamp posts. When the paint chips, flakes or peels off, there may be a real danger for babies and young children.

Children may eat paint chips or chew on painted railings, window sills or other items when parents are not around. Children can also ingest lead even if they do not specifically eat paint chips. For example, when children play in an area where there are loose paint or dust particles containing lead, they may get these particles on their hands, put their hands into their mouths, and ingest a dangerous amount of lead.

Has your child been especially cranky or irritable? Is he or she eating normally? Does your child have stomach aches and vomiting? Does he or she complain about headaches? Is your child unwilling to play? Those may be signs of lead poisoning, although many times there are no symptoms at all. Lead poisoning can eventually cause mental retardation, blindness and even death.

If you suspect that your child has eaten chips of paint or someone told you this, you should take your child to the doctor or clinic for testing. If the test shows that your child has an elevated blood lead level, treatment is available. Contact your doctor or local health department for help or more information. Lead screening and treatment are available through Medicaid Program for those who are eligible.

Inform other family members and baby-sitters of the dangers of lead poisoning. You can safeguard your child from lead poisoning by preventing him or her from eating paint that may contain lead.

Look at your walls, ceilings, door frames and window sills. Are there places where the paint is peeling, flaking or chipping? If so, there are some things you can do immediately to protect your child:

Over ⇨

1) Cover all furniture and appliances;

2) Get a broom or stiff brush and remove all loose pieces of paint from walls, woodwork and ceilings.

3) Sweep up all pieces of paint and plaster and put them in a paper bag or wrap them in newspaper. Put these packages in the trash can. **DO NOT BURN THEM.**

4) Do not leave paint chips on the floor. Damp mop floors in and around the work area to remove all dust and paint particles. Keeping the floor clean of paint chips, dust and dirt is easy and very important.

5) Do not allow loose paint to remain within your children's reach since children may pick loose paint off the lower part of the walls.

## IF YOUR CHILD HAS AN ELEVATED BLOOD LEVEL:

If your child is tested and the test confirms a concentration of lead in whole blood equivalent to 25 ug/dl or greater, you should present test evidence to your management office or the landlord <u>immediately.</u>

## IF YOU FIND FLAKING, CHIPPING OR PEELING PAINT:

If the unit in which you live has flaking, chipping or peeling paint, water leaks from faulty plumbing, or defective roofs, you should notify the management office or the landlord <u>immediately.</u>

You should cooperate with the management office's or landlord's efforts to repair any deficiencies and keep your unit in good shape. When lead-based paint is removed by scraping, a hazardous dust is created which can enter the body either by breathing or swallowing the dust. The use of heat or paint removers could create a vapor or fume which may cause poisoning if inhaled over a long period of time. Whenever possible, the removal of lead-based paint should take place when there are no children and pregnant women on the premises.

Remember that you, as a parent, play a major role in the prevention of lead poisoning. Your actions and awareness about lead problem can make a big difference.

Signatures:

1. _____   Date signed  8/30/18
   Head(s) of Household

2. _____   Date signed  11/7/18

11893 Wedgewick St LV, NV 89183
(Property)

By: _____
   Agent

ROTH00378

1)   Cover all furniture and appliances;

2)   Get a broom or stiff brush and remove all loose pieces of paint from walls, woodwork and ceilings.

3)   Sweep up all pieces of paint and plaster and put them in a paper bag or wrap them in newspaper. Put these packages in the trash can. DO NOT BURN THEM.

4)   Do not leave paint chips on the floor. Damp mop floors in and around the work area to remove all dust and paint particles. Keeping the floor clean of paint chips, dust and dirt is easy and very important.

5)   Do not allow loose paint to remain within your children's reach since children may pick loose paint off the lower part of the walls.

## IF YOUR CHILD HAS AN ELEVATED BLOOD LEVEL:

If your child is tested and the test confirms a concentration of lead in whole blood equivalent to 25 ug/dl or greater, you should present test evidence to your management office or the landlord immediately.

## IF YOU FIND FLAKING, CHIPPING OR PEELING PAINT:

If the unit in which you live has flaking, chipping or peeling paint, water leaks from faulty plumbing, or defective roofs, you should notify the management office or the landlord immediately.

You should cooperate with the management office's or landlord's efforts to repair any deficiencies and keep your unit in good shape. When lead-based paint is removed by scraping, a hazardous dust is created which can enter the body either by breathing or swallowing the dust. The use of heat or paint removers could create a vapor or fume which may cause poisoning if inhaled over a long period of time. Whenever possible, the removal of lead-based paint should take place when there are no children and pregnant women on the premises.

Remember that you, as a parent, play a major role in the prevention of lead poisoning. Your actions and awareness about lead problem can make a big difference.

Signatures:

1. _____     Date signed ___8/30/18___
          Head(s) of Household

2. _____     Date signed ___11/7/18___

   11893 Wedgebrook St LV, NV 89183
                    (Property)

By: _____
              Agent

ROTH00379



**SOUTHERN NEVADA REGIONAL HOUSING AUTHORITY**
Housing Choice Voucher Department, P.O. Box 1897, Las Vegas, NV 89125-1897
Phone (702) 477-3100   FAX (702) 922-6929   TDD (702) 387-1898



## LEASE ADDENDUM FOR DRUG-FREE HOUSING

In consideration of the execution or renewal of a Lease of the dwelling unit identified in the Lease, Owner and Tenant agree as follows:

1. Tenant, any members of the tenant's household, or a guest or other person under the tenant's control shall not engage in criminal activity, including drug-related criminal activity, on or near leased premises. "Drug-related criminal activity" means the illegal manufacture, sale, distribution, use, or possession with intent to manufacture, sell, distribute, or use of a controlled substance (as defined in Section 102 of the Controlled Substance Act [21 U.S.C. 802].)

2. Tenant, any member of the tenant's household, or a guest or other person under the tenant's control shall not engage in any act intended to facilitate criminal activity, including drug-related criminal activity, on or near leased premises.

3. Tenant or members of the household, will not permit the dwelling unit to be used for, or to facilitate criminal activity, including drug-related criminal activity, regardless of whether the individual engaging in such activity is a member of the household or a guest.

4. Tenant or members of the household will not engage in the manufacture, sale, or distribution of illegal drugs at any location, whether on or near the leased premises or otherwise.

5. Tenant or any member of the tenant's household or a guest or other person under the tenant's control shall not engage in acts of violence or threats of violence, including, but not limited to, the unlawful discharge of firearms, on or near the premises.

6. VIOLATION OF THE ABOVE PROVISIONS SHALL BE A MATERIAL VIOLATION OF THE LEASE AND GOOD CAUSE FOR TERMINATION OF TENANCY. A single violation of any of the provisions of this addendum shall be deemed a serious violation and a material non-compliance with the Lease. Unless otherwise provided by law, proof of violation shall not require criminal conviction, but shall be based upon a preponderance of the evidence.

7. In case of a conflict between the provisions of this addendum and any other provisions of the Lease, the provisions of the Addendum shall govern.

8. This Lease Addendum is incorporated into the Lease executed or renewed this day between the Owner and Tenant.

Date: 11/17/18     Date: 8/20/18

OWNER     TENANT

---

### This form to be used for SNRHA purposes only.

Please be advised while we are here to serve you, Housing Choice Voucher (HCV) Regulations authorize a public housing authority to terminate benefits when a family engages in or threatens abusive or violent behavior toward the authority's personnel [24 CFR § 982.552(c)(1)(ix.)]

WARNING: Section 1001 of Title 18 of the U.S. Code makes it a criminal offense to make willful false statements or misrepresentations to any department or Agency of the United States as to any matter within its jurisdiction.

Our agency provides reasonable accommodations to elderly or disabled applicants and participants to ensure programs and services are accessible. If you need a reasonable accommodation, please submit your request in writing to: SNRHA, P.O. Box 1897, Las Vegas, NV 89125, Attention: 504 Officer.

Southern Nevada Regional Housing Authority will not discriminate because of race, color, religion, age, national origin, disability, familial status or sexual orientation. If you feel you have a Fair Housing Complaint, please contact HUD at 1-800-669-9777 or TTY 1-800-927-9275. The Equal Access to Housing in HUD Program Regardless of actual or perceived Sexual Orientation, Gender Identity, or Marital Status in compliance with Final Rule, published in the Federal Register August 2014. SNRHA will comply with 24 CFR Parts 5, 91, 880, et al. Violence Against Women Act Conforming Amendments.

Si usted no puede leer este documento por favor pida la asistencia de nuestro personal bilingüe. La Vivienda Regional del Sur de Nevada, proporciona servicios de traducción para participantes y clientes que califican. Si usted necesita esta forma en Español, por favor contacte a nuestra oficial.

*Lease Addendum for Drug-Free Housing*     *Rev.-11-2016*



# RESIDENTIAL LEASE AGREEMENT
### for



**11893  WEDGEBROOK ST**                          **LAS VEGAS    NV    89183**
(Property Address)

1. **This AGREEMENT** is entered into this **17th** day of **November**, 20**18** between
OWNER'S Name: **KYLE PUNTNEY** , OWNER'S Name:
(collectively hereinafter, "OWNER" and/or "LANDLORD") legal owner(s) of the property and
TENANT's Name: **CANDY TORRES** TENANT's Name:
TENANT's Name: TENANT's Name:
(collectively, "TENANT"), which parties hereby agree to as follows:

2. **PREMISES:** LANDLORD hereby leases to TENANT and TENANT hereby leases from LANDLORD, subject to
the terms and conditions of the lease, the Premises known and designated as **11893  WEDGEBROOK ST**
**LAS VEGAS          NV     89183** ("the Premises"). Premises Mail Box # ,
Parking Space # , Storage Unit # , Other

3. **TERM:** The term hereof shall commence on **NOV. 17. 2018** and continue until **NOV. 30, 2019**, with
a total rent of $ **18984.00** , then on a month-to-month basis thereafter, until either party shall terminate
the same by giving the other party thirty (30) days written notice delivered by US mail or electronic mail. (All
calculation based on 30 day month), as governed by paragraph 23 herein

4. **RENT:** TENANT agrees to pay, without demand, to LANDLORD as rent for the Premises the total sum of
**1,475.00** per month on the first day of each calendar month,
at **755 SUNSET RD, HENDERSON, NV 89011 OR CHASE BANK** or at such other place as
LANDLORD may designate in writing.

5. **SUMMARY:** The initial rents, charges and deposits are as follows:

| | Total | Received | Balance Due |
|---|---|---|---|
| Rent: From: **11/17/18** To **11/30/18** | $ ~~1475~~ 689.00 | $ | $ ~~1475.00~~ 689.00 |
| Security Deposit | $ 1475 | $ 550 | $ 925.00 |
| Key Deposit | $ 75 | $ | $ 75.00 |
| Admin/Credit App Fee (non-refundable) | $ 125 | $ | $ 125.00 |
| Pet Deposit | $ 0 | $ | $ |
| Cleaning Deposit | $ 0 | $ | $ |
| Cleaning Fee (non-refundable) | $ 275 | $ | $ 275.00 |
| Additional Security | $ | $ | $ |
| Utility Proration | $ | $ | $ |
| Sewer/Trash Proration | $ 22.50 | $ | $ 22.50 |
| Pre-Paid Rent | $ | $ | $ |
| Pro-Rated Rent for | $ | $ | $ |
| Other **APPLICATION FEE (NON-REFUNDABLE)** | $ 85 | $ 85 | $ |
| Other **PROCESSING (NON-REFUNDABLE)** | $ 125 | $ | $ 125.00 |
| Other **BROKER FEE (NON-REFUNDABLE)** | $ 350 | $ | $ 350.00 |
| **TOTAL** | $ 4007.50 | $ 635.00 | $ 3372.50 |

6. **ADDITIONAL MONIES DUE:**

Property **11893  WEDGEBROOK ST**                          **LAS VEGAS    NV    89183**
Owner's Name **KYLE PUNTNEY** Owner's Name
Tenant **CANDY TORRES** Initials Tenant Initials
Tenant Initials Tenant Initials

Residential Lease Agreement Rev. 10.16          © 2016 Greater Las Vegas Association of REALTORS®          Page 1 of 13

This form presented by Allan Rothstein | Allan Rothstein | 7023536878 |
allanindianoil@yahoo.com

ROTH00381

 

7.  **ADDITIONAL FEES:**

   A. **LATE FEES:** In the event TENANT fails to pay rent when due, TENANT shall pay a late fee of $ __85__ plus $ __75__ per day for each day after __0__ days that the sum was due. Such amounts shall be considered to be rent.

   B. **DISHONORED CHECKS:** A charge of $ __97__ shall be imposed for each dishonored check made by TENANT to LANDLORD. TENANT agrees to pay all rents, all late fees, all notice fees and all costs to honor a returned check with certified funds. After TENANT has tendered a check which is dishonored, TENANT hereby agrees to pay all remaining payments including rent due under this Agreement by certified funds. Any payments tendered to LANDLORD thereafter, which are not in the form of certified funds, shall be treated as if TENANT failed to make said payment until certified funds are received. LANDLORD presumes that TENANT is aware of the criminal sanctions and penalties for issuance of a check which TENANT knows is drawn upon insufficient funds and which is tendered for the purpose of committing a fraud upon a creditor.

   C. **ADDITIONAL RENT:** All late fees and dishonored check charges shall be due when incurred and shall become additional rent. Payments will be applied to charges which become rent in the order accumulated. All unpaid charges or any fees owed by TENANT, including but not limited to notice fees, attorney's fees, repair bills, utility bills, landscape/pool repair and maintenance bills and CIC fines will become additional rent at the beginning of the month after TENANT is billed. TENANT'S failure to pay the full amount for a period may result in the initiation of eviction proceedings. LANDLORD'S acceptance of any late fee or dishonored check fee shall not act as a waiver of any default of TENANT, or as an extension of the date on which rent is due. LANDLORD reserves the right to exercise any other rights and remedies under this Agreement or as provided by law.

8.  **SECURITY DEPOSITS:** Upon execution of this Agreement,
   TENANT's Name: ___CANDY TORRES___ TENANT's Name: _____
   TENANT's Name: _____ TENANT's Name: : _____
   shall deposit with LANDLORD as a Security Deposit the sum stated in paragraph 5. **TENANT shall not apply the Security Deposit to, or in lieu of, rent.** At any time during the term of this Agreement and upon termination of the tenancy by either party for any reason, the LANDLORD may claim, from the Security Deposit, such amounts due LANDLORD under this Agreement. Any termination prior to the initial term set forth in paragraph 3, or failure of TENANT to provide proper notice of termination, is a default in the payment of rent for the remainder of the lease term, which may be offset by the Security Deposit. Pursuant to NRS 118A.242, LANDLORD shall provide TENANT with a written, itemized accounting of the disposition of the Security Deposit within thirty (30) days of surrender of premises. TENANT agrees, upon termination of the tenancy, to provide LANDLORD with a forwarding address to prevent a delay in receiving the accounting and any refund. At the termination of this agreement, the TENANT identified in this paragraph will be refunded the remaining security deposit (if any). In the event of damage to the Premises caused by TENANT or TENANT's family, agents or visitors, LANDLORD may use funds from the deposit to repair, but is not limited to this fund and TENANT remains liable for any remaining costs. (In addition to the above, to be refundable, property must be professionally cleaned to include carpets and all hard surface flooring including tile and grout.) Upon request by Landlord, Tenant must furnish receipts for professional cleaning services.

9.  **CONDITION OF PREMISES:** TENANT agrees that TENANT has examined the Premises, including the grounds and all buildings and improvements, and that they are, at the time of this Lease, in good order, good repair, safe, clean, and rentable condition.

| Property | 11893 | WEDGEBROOK ST | | LAS VEGAS | NV | 89183 |
|---|---|---|---|---|---|---|
| Owner's Name | KYLE PUNTNEY | | Owner's Name | | | |
| Tenant | CANDY TORRES | Initials _____ | Tenant | | Initials _____ | |
| Tenant | | Initials _____ | Tenant | | Initials _____ | |

This form presented by Allan Rothstein | Allan Rothstein | 7023536878 | allanindianoil@yahoo.com

ROTH00382

10. **TRUST ACCOUNTS:** BROKER shall retain all interest earned, if any, on security deposits to offset administration and bookkeeping fees.

11. **EVICTION COSTS:** TENANT shall be charged an administrative fee of $ 750+ATTORNEY FEE per eviction attempt to offset the costs of eviction notices and proceedings. TENANT shall be charged for service of legal notices and all related fees according to actual costs incurred.

12. **CARDS AND KEYS:** Upon execution of the Agreement, TENANT shall receive the following:

| | | |
|---|---|---|
| __2__ Door key(s) | __1__ Garage Transmitter/Fob(s) | _____ Pool Key(s) |
| _____ Mailbox key(s) | __0__ Gate Card/Fob(s) | _____ Other(s) __TBD__ |
| _____ Laundry Room key(s) | __0__ Gate Transmitter/Fob(s) | _____ Other(s) _____ |

TENANT shall make a key deposit (if any) in the amount set forth in paragraph 2 upon execution of this Agreement. The key deposit shall be refunded within 30 days of TENANT's return of all cards and/or keys to LANDLORD or LANDLORD's BROKER/DESIGNATED PROPERTY MANAGER.

13. **CONVEYANCES AND USES:** TENANT shall not assign, sublet or transfer TENANT'S interest, nor any part thereof, without prior written consent of LANDLORD. The Premises shall be used and occupied by TENANT exclusively as a private single-family residence. Neither the Premises nor any part of the Premises or yard shall be used at any time during the term of this Lease for any purpose of carrying on any business, profession, or trade of any kind, or for any purpose other than as a private single-family residence. TENANT shall comply with all the health and sanitary laws, ordinances, rules and orders of appropriate governmental authorities and homeowners associations, if any, with respect to the Premises. TENANT understands and acknowledges that they are not permitted to access the attic crawl space, roof or under the home or any other area of the property that is not considered living space. TENANT shall not commit waste, cause excessive noise, create a nuisance or disturb others.

14. **OCCUPANTS:** Occupants of the Premises shall be limited to ____6____ persons and shall be used solely for housing accommodations and for no other purpose. TENANT represents that the following person(s) will live in the Premises:

CANDY TORRES, Σ   A1   O G          3, A          R     , A     I R
T   3, Я          R
AND A      R        S.

15. **GUESTS:** The TENANT agrees to pay the sum of $ ____45.00____ per day for each guest remaining on the Premises more than __1__ days. Notwithstanding the foregoing, in no event shall any guest remain on the Premises for more than __45__ days.

16. **UTILITIES:** TENANT shall immediately connect all utilities and services of premises upon commencement of lease. TENANT is to pay when due all utilities and other charges in connection with TENANT's individual rented premises. Responsibility is described as (T) for TENANT and (O) for Owner:

| | | | |
|---|---|---|---|
| Electricity __T__ | Trash __o__ | Trash Can Rental: __T__ | Phone __T__ |
| Gas __o__ | Sewer __o__ | Cable __T__ | Other _____ __T__ |
| Water __o__ | Septic __NA__ | Association Fees __0__ | Other _____ |

a. TENANT is responsible to connect the following utilities in TENANT'S name: __power__

Property  11893  WEDGEBROOK ST                                    LAS VEGAS        NV    89183

| Owner's Name : | KYLE PUNTNEY | | Owner's Name | | |
|---|---|---|---|---|---|
| Tenant | CANDY TORRES | Initials _____ | Tenant | | Initials _____ |
| Tenant | | Initials _____ | Tenant | | Initials _____ |

This form presented by Allan Rothstein | Allan Rothstein | 7023536878 |
allanindianoil@yahoo.com

ROTH000383

b.  LANDLORD will maintain the connection of the following utilities in LANDLORD's name and bill TENANT for connection fees and use accordingly for the entire term of the lease: **SEWER & TRASH**

c.  No additional phone or cable lines or outlets or satellite dishes shall be obtained for the Premises without the LANDLORD's written consent. In the event of LANDLORD's consent, TENANT shall be responsible for all costs associated with the additional lines, outlets or dishes. TENANT shall also remove any satellite dishes and restore the subject property to its original condition at the termination of this Agreement.

d.  If an alarm system exists on the Premises, TENANT may obtain the services of an alarm services company and shall pay all costs associated therewith.

e.  TENANT shall not default on any obligation to a utility provider for utility services at the Property. Owner does not pay for any utilities, excluding any such UTILITIES THAT ARE INCLUDED IN HOME OWNER'S ASSOCIATION DUES. TENANT must show all utilities giving service to said property have a zero balance upon move out.

f.  Other: **IF TENANT DOES NOT COMPLETE LEASE CONTRACT THEN TENANT MUST REFUND THEIR REALTORS COMMISSION ($500) TO PROPERTY MANAGER.**

**17. PEST NOTICE:** TENANT understands that various pest, rodent and insect species (collectively, "pests") exist in Southern Nevada. Pests may include, but are not limited to, scorpions (approximately 23 species, including bark scorpions), spiders (including black widow and brown recluse), bees, snakes, ants, termites, rats, mice and pigeons. The existence of pests may vary by season and location. Within thirty (30) days of occupancy, if the Premises has pests, LANDLORD, at TENANT's written request, will arrange for and pay for the initial pest control spraying. TENANT agrees to pay for the monthly pest control spraying fees. For more information on pests and pest control providers, TENANT should contact the State of Nevada Division of Agriculture.

**18. PETS:** No pet shall be on or about the Premises at any time without written permission of LANDLORD. In the event TENANT wishes to have a pet, TENANT will complete an Application for Pet Approval. Should written permission be granted for occupancy of the designated pet, an additional security deposit in the amount of $ __475__ will be required and paid by TENANT in advance subject to deposit terms and conditions aforementioned. In the event written permission shall be granted, TENANT shall be required to procure and provide to LANDLORD written evidence that TENANT has obtained such insurance as may be available against property damage to the Premises and liability to third party injury. Said policy shall name LANDLORD and LANDLORD'S AGENT as additional insureds.  A copy of said policy shall be provided to LANDLORD or LANDLORD's BROKER/DESIGNATED PROPERTY MANAGER prior to any pets being allowed within the Premises.  If TENANT obtains a pet without written permission of LANDLORD, such will be an event of default under paragraph 21. TENANT further agrees to pay an immediate fine of $ __500__ , TENANT agrees to indemnify LANDLORD for any and all liability, loss and damages which LANDLORD may suffer as a result of any animal in the Premises, whether or not written permission was granted.

*(This Space Intentionally Left Blank)*

| Property | 11893 WEDGEBROOK ST | | | LAS VEGAS | NV | 89183 |
|---|---|---|---|---|---|---|
| Owner's Name | KYLE PUNTNEY | | Owner's Name | | | |
| Tenant | CANDY TORRES | Initials | Tenant | | Initials | |
| Tenant | | Initials | Tenant | | Initials | |

Residential Lease Agreement Rev. 10.16            © 2016 Greater Las Vegas Association of REALTORS®            Page 4 of 13

19. **RESTRICTIONS:** TENANT shall not keep or permit to be kept in, on, or about the Premises: waterbeds, boats, campers, trailers, mobile homes, recreational or commercial vehicles or any non-operative vehicles except as follows:
**NONE WITHOUT WRITTEN PERMISSION FROM PROPERTY MANAGER AND HOA**

**TENANT shall not conduct nor permit any work on vehicles on the premises without the express written consent of the Owner.**

20. **ALTERATIONS:** TENANT shall make no alterations to the Premises without LANDLORD's written consent. Unless otherwise agreed in writing between TENANT and LANDLORD, all alterations or improvements to the Premises become the property of LANDLORD, shall remain upon the Premises, and shall constitute a fixture permanently affixed to the Premises. Unless otherwise agreed in writing between TENANT and LANDLORD, TENANT shall be responsible for restoring the Premises to its original condition and removing any alterations or improvements if requested by LANDLORD or LANDLORD's BROKER/DESIGNATED PROPERTY MANAGER.

21. **DEFAULT:** Failure by TENANT to pay rent, perform any obligation under this Agreement, or comply with any Association Governing Documents (if any), or TENANT's engagement in activity prohibited by this Agreement, or TENANT's failure to comply with any and all applicable laws, shall be considered a default hereunder. Upon default, LANDLORD may, at its option, terminate this tenancy upon giving proper notice. Upon default, LANDLORD shall issue a proper itemized statement to TENANT noting the amount owed by TENANT, including any and all fees related to eviction and reletting of the subject property. LANDLORD may pursue any and all legal and equitable remedies available.

   a. FORFEITURE OF SECURITY DEPOSIT - DEFAULT. It is understood and agreed that TENANT shall not attempt to apply or deduct any portion of any security deposit from the last or any month's rent or use or apply any such security deposit at any time in lieu of payment of rent. If TENANT fails to comply, such security deposit shall be forfeited and LANDLORD may recover the rent due as if any such deposit had not been applied or deducted from the rent due. For the purpose of this paragraph, it shall be conclusively presumed that a TENANT leaving the premises while owing rent is making an attempted deduction of deposits. Furthermore, any deposit shall be held as a guarantee that TENANT shall perform the obligations of the Lease and shall be forfeited by the TENANT should TENANT breach any of the terms and conditions of this Lease. In the event of default, by TENANT, of any obligation in this Lease which is not cured by TENANT within five (5) days' notice from LANDLORD, then in addition to forfeiture of the Security Deposit, LANDLORD may pursue any other remedy available by law, equity or otherwise.

   b. TENANT PERSONAL INFORMATION UPON DEFAULT. TENANT understands and acknowledges that if TENANT defaults on lease, LANDLORD or Owner may engage the services of an Attorney or a Collection Agency. TENANT understands and acknowledges that LANDLORD/Owner may give an Attorney or a Collection Agency, TENANT's personal information, including but not limited to, TENANT's social security number or any other information to aid in collection efforts and holds LANDLORD, Broker, and Owner harmless from any liability in relation to the release of any personal information to these entities.

22. **ENFORCEMENT:** Any failure by LANDLORD to enforce the terms of this Agreement shall not constitute a waiver of said terms by LANDLORD. Acceptance of rent due by LANDLORD after any default shall not be construed to waive any right of LANDLORD or affect any notice of termination or eviction.

| Property | 11893 WEDGEBROOK ST | | | LAS VEGAS | NV | 89183 |
|---|---|---|---|---|---|---|
| Owner's Name | KYLE PUNTNEY | | Owner's Name | | | |
| Tenant | CANDY TORRES | Initials _____ | Tenant _____ | | Initials _____ | |
| Tenant _____ | | Initials _____ | Tenant _____ | | Initials _____ | |

This form presented by Allan Rothstein | Allan Rothstein | 7023536878 |
allanindianoil@yahoo.com                                    **ROTH00085**FORMS




1    a.  ABANDONMENT. LANDLORD is entitled to presume per NRS 118A.450 that TENANT has abandoned the
2        Premises if the TENANT is absent from the premises for a period of time equal to one-half the time for periodic
3        rental payments, unless the rent is current or the TENANT has in writing notified the landlord of an intended
4        absence.

6    b.  If at any time during the term of this Lease, TENANT abandons the Premises, LANDLORD shall have the
7        following rights: LANDLORD may, at LANDLORD's option, enter the Premises by any means without liability
8        to TENANT for damages and may relet the Premises, for the whole or any part of the then unexpired term, and
9        may receive and collect all rent payable by virtue of such reletting. At LANDLORD's option, LANDLORD
10       may hold TENANT liable for any difference between the rent that would have been payable under this Lease
11      during the balance of the unexpired term, if this Lease had continued in force, and the net rent for such period
12      realized by LANDLORD by means of such reletting.
13      LANDLORD also may dispose of any of TENANTs abandoned personal property, pursuant to Nevada law as
14      LANDLORD deems appropriate, without liability to TENANT.

16  **23. NOTICE OF INTENT TO VACATE:** TENANT shall provide notice of TENANT's intention to vacate the
17      Premises. **Such notice shall be in writing and shall be provided to LANDLORD prior to the first day of the**
18      **last month of the lease term set forth in Section 3 of this Agreement. In no event shall notice be less than 30**
19      **days prior to the expiration of the term of this Agreement.** In the event TENANT fails to provide such notice,
20      TENANT shall be deemed to be holding-over on a month-to-month basis until 30 days after such notice. During a
21      holdover not authorized by LANDLORD, rent shall increase by    15   %.

23  **24. TERMINATION:** Upon termination of the tenancy, TENANT shall surrender and vacate the Premises and shall
24      remove any and all of TENANT'S property. TENANT shall return keys, personal property and Premises to the
25      LANDLORD in good, clean and sanitary condition, normal wear excepted.

27  **25. EMERGENCIES:** The name, address and phone number of the party who will handle maintenance or essential
28      services emergencies on behalf of the LANDLORD is as follows: _____
29      **ALLAN ROTHSTEIN 702-353-    755 SUNSET RD.,HENDERSON, NV 89011**

32  **26. MAINTENANCE:** TENANT shall keep the Premises in a clean and good condition. TENANT shall immediately
33      report to the LANDLORD any defect or problem on the Premises. TENANT agrees to notify LANDLORD of any
34      water leakage and/or damage within 24 hours of the occurrence. TENANT understands that TENANT may be held
35      responsible for any water and/or mold damage, including the costs of remediation of such damage. TENANT shall
36      be responsible for any **MINOR** repairs necessary to the Premises up to and including the cost of $   225  .
37      TENANT agrees to pay for all repairs, replacements and maintenance required by TENANT's misconduct or
38      negligence or that of TENANT's family, pets, licensees and guests, including but not limited to any damage done by
39      wind or rain caused by leaving windows open and/or by overflow of water, or stoppage of waste pipes, or any other
40      damage to appliances, carpeting or the Premises in general. At LANDLORD's option, such charges shall be paid
41      immediately or be regarded as additional rent to be paid no later than the next monthly payment date following such
42      repairs. TENANT acknowledges any minor repairs made to the Property must be done by an active, licensed and
43      insured contractor.

45    a.  TENANT shall change filters in the heating and air conditioning systems at least once every month, at
46        TENANT's own expense. LANDLORD shall maintain the heating and air conditioning systems and provide for
47        major repairs. However, any repairs to the heating or cooling system caused by dirty filters due to TENANT
48        neglect will be the responsibility of TENANT.

| Property | 11893 WEDGEBROOK ST | | LAS VEGAS | NV | 89183 |
|---|---|---|---|---|---|
| Owner's Name | KYLE PUNTNEY | | Owner's Name | | |
| Tenant | CANDY TORRES | Initials ____ | Tenant | | Initials ____ |
| Tenant | | Initials ____ | Tenant | | Initials ____ |

This form presented by Allan Rothstein | Allan Rothstein | 7023536878 |
allanindianoil@yahoo.com

**ROTH003386**FORMS





b. TENANT shall replace all broken glass, regardless of cause of damage, at TENANT's expense.

c. LANDLORD shall be responsible for all systems including heating, cooling, electrical, plumbing and sewer lines. LANDLORD shall be responsible for all major heating, cooling electrical, plumbing and sewer problems that are not caused by TENANT.

d. There _____ is –OR– _____ is not a landscape contractor whose name and phone number are as follows:
ALLAN ROTHSTEIN PROPERTY SERVICES 702-353-        $100 MONTH

In the case of landscaping being maintained by a contractor, TENANT agrees to cooperate with the landscape contractor in a satisfactory manner. LANDLORD-provided landscaping is not to be construed as a waiver of any responsibility of the TENANT to keep and maintain landscaping and/or shrubs, trees and sprinkler system in good condition.

In the event the landscaping is not being maintained by a contractor, TENANT shall maintain lawns, shrubs and trees. TENANT shall water all lawns, shrubs and trees, mow the lawns on a regular basis, trim the trees and fertilize lawns, shrubs and trees. If TENANT fails to maintain the landscaping in a satisfactory manner, LANDLORD may have the landscaping maintained by a landscaping contractor and charge TENANT with the actual cost. Said costs shall immediately become additional rent.

e. There _____ is –OR– ✗ is not a pool contractor whose name and phone number are as follows:
_____

In the case of pool maintenance being maintained by a contractor, TENANT agrees to cooperate with the pool maintenance contractor in a satisfactory manner. LANDLORD-provided pool maintenance is not to be construed as a waiver of any responsibility of the TENANT to keep and maintain the pool in good condition.

In the event the pool is not being maintained by a Contractor, TENANT agrees to maintain the pool, if any. TENANT agrees to maintain the water level, sweep, clean and keep in good condition. If TENANT fails to maintain the pool in a satisfactory manner, LANDLORD may have the pool maintained by a licensed pool service and charge TENANT with the actual cost. Said costs shall become additional rent.

f. Smoking _____ will or ✗ will not be permitted in or about the Premises. TENANT will be charged any costs incurred for the abatement of any damages by unauthorized smoking in the Premises.

27. **ACCESS:** TENANT agrees to grant LANDLORD the right to enter the Premises at all reasonable times and for all reasonable purposes including showing to prospective lessees, buyers, appraisers, insurance agents, periodic maintenance reviews and business therein as requested by LANDLORD. If TENANT fails to keep scheduled appointments with vendors to make necessary/required repairs, TENANT shall pay for any additional charges incurred which will then become part of the next month's rent and be considered additional rent. TENANT shall not deny LANDLORD his/her rights of reasonable entry to the Premises. LANDLORD shall have the right to enter in case of emergency and other situations as specifically allowed by law. LANDLORD agrees to give TENANT twenty-four (24) hours notification for entry, except in case of emergency.

| Property | 11893 WEDGEBROOK ST | | | LAS VEGAS | NV | 89183 |
|---|---|---|---|---|---|---|
| Owner's Name | KYLE PUNTNEY | | Owner's Name | | | |
| Tenant | CANDY TORRES | Initials _____ | Tenant | | Initials _____ | |
| Tenant | | Initials _____ | Tenant | | Initials _____ | |

This form presented by Allan Rothstein | Allan Rothstein | 7023536878 |
allanindianoil@yahoo.com                                              ROTH00888

1  a. **DISPLAY OF SIGNS.** During the last thirty (30) days of this Lease, LANDLORD or LANDLORD's agent
2  may display For Sale or For Rent or similar signs on or about the Premises and enter to show the Premises to
3  prospective purchasers or tenants. TENANT also authorizes Broker to use an electronic keybox to show the
4  Premises during the last 30 days of lease. TENANT further agrees to execute any and all documentation
5  necessary to facilitate the use of a lockbox.
6
7  28. **ASSOCIATIONS:** Should the Premises described herein be a part of a common interest community, homeowners
8  association planned unit development, condominium development ("the Association") or such, TENANT hereby
9  agrees to abide by the Governing Documents (INCLUDING Declarations, Bylaws, Articles, Rules and Regulations)
10 of such community and further agrees to be responsible for any fines or penalties levied as a result of failure to do so
11 by TENANT, TENANT's family, licensees or guests. Noncompliance with the Governing Documents shall
12 constitute a violation of this Agreement. Unless billed directly to TENANT by the Association, such fines shall be
13 considered as additional rent and shall be due along with the next monthly payment of rent. By initialing this
14 paragraph, TENANT acknowledges receipt of a copy of the applicable Governing Documents. LANDLORD, at
15 LANDLORD's expense, shall provide TENANT with any additions to such Governing Documents as they become
16 available. LANDLORD may, at its option, with 30 days' notice to TENANT, adopt additional reasonable rules and
17 regulations governing use of the Premises and of the common areas (if any). [        ] [        ] [        ]
18 [        ]
19
20 29. **INVENTORY:** It is agreed that the following inventory is now on said premises.  (Check if present; cross out if
21 absent.)
22

23  **X** Refrigerator        ___ Intercom System        ___ Spa Equipment
24  **X** Stove               **X** Alarm System          **X** Auto Sprinklers
25  **X** Microwave           ___ Trash Compactor         **X** Auto Garage Openers
26  **X** Disposal            **X** Ceiling Fans          **X** BBQ
27  **X** Dishwasher          ___ Water Conditioner Equip. ___ Solar Screens
28  **X** Washer              **X** Dryer                 ___ Pool Equipment
29  **X** Garage Opener       ___ Gate Remotes            **X** Carpet
30  **X** Trash Can(s) (circle one) owner provided / trash service provided
31  ___ Floor Coverings (specify type) CARPETS TILE
32  **X** Window Coverings (specify type) BLINDS

| **X** | ONE ADDITIONAL | **X** | TRASH CAN | **X** | |
| **X** | TOTAL OF 2 | ___ | TRASH CANS WITH | **X** | REPUBLIC SERVICES |

36  TENANT acknowledges that any appliances that are on the premises are for TENANTs use and convenience;
37  however, in the event of a breakdown of said appliance(s) TENANT acknowledges that property manager,
38  LANDLORD and or the owners are not responsible for any damages caused to TENANTs personal property, to
39  include spoilage of food, beverage or clothing etc. as a result of said appliance break down.



*(This Space Intentionally Left Blank)*

| Property | 11893 WEDGEBROOK ST | | LAS VEGAS | NV | 89183 |
| Owner's Name | KYLE PUNTNEY | | Owner's Name | | |
| Tenant | CANDY TORRES | Initials | Tenant | Initials | |
| Tenant | | Initials | Tenant | Initials | |

This form presented by Allan Rothstein | Allan Rothstein | 7023536878 |
allanindianoil@yahoo.com

ROTH003288

1   **30. INSURANCE:** TENANT __x__ is –OR– _____ . is **not** required to purchase renter's insurance. LANDLORD
2   BROKERAGE, and DESIGNATED PROPERTY MANAGER shall be named as additional insureds on any such
3   policy. LANDLORD shall not be liable for any damage or injury to TENANT, or any other person, to any property
4   occurring on the Premises or any part thereof, or in common areas thereof. TENANT agrees to indemnify, defend
5   and hold LANDLORD harmless from any claims for damages.   TENANT understands that LANDLORD's
6   insurance does not cover TENANT's personal property. If the Premises, or any part of the Premises, shall be
7   partially damaged by fire or other casualty not due to TENANTs negligence or willful act, or that of TENANT's
8   family, agent, or visitor, there shall be an abatement of rent corresponding with the time during which, and the
9   extent to which, the Premises is uninhabitable. If LANDLORD shall decide not to rebuild or repair, the term of this
10   Lease shall end and the rent shall be prorated up to the time of the damage.

12   TENANT hereby acknowledges that the OWNER of the subject property does __x__ or does not ___ have
13   homeowner's insurance. TENANT agrees to cooperate with homeowner and homeowner's insurance company in all
14   relevant matters. TENANT further agrees, upon written notice, to cease any and all actions that may adversely
15   impact OWNER's insurance coverage under said policy.

17   **31. ILLEGAL ACTIVITIES PROHIBITED:** TENANT is aware of the following: It is a misdemeanor to commit or
18   maintain a public nuisance as defined in NRS 202.450 or to allow any building or boat to be used for a public
19   nuisance. Any person, who willfully refuses to remove such a nuisance when there is a legal duty to do so, is guilty
20   of a misdemeanor. A public nuisance may be reported to the local sheriff's department. A violation of building,
21   health or safety codes or regulations may be reported to the government entity in our local area such as the code
22   enforcement division of the county/city government or the local health or building departments. In addition
23   continuing violations of HOA rules and regulations will be considered a public nuisance and TENANT hereby
24   agrees that such continuing HOA violations shall be grounds for eviction.

26   **32. ADDITIONAL RESPONSIBILITIES:**

28   a. TENANT may install or replace screens at TENANT's own expense. Solar screen installation requires
29   written permission from LANDLORD. LANDLORD is not responsible for maintaining screens.

31   b. With the exception of electric cooking devices, outdoor cooking with portable barbecuing equipment is
32   prohibited within ten (10) feet of any overhang, balcony or opening, unless the Premises is a detached single
33   family home. The storage and/or use of any barbecuing equipment is prohibited indoors, above the first floor
34   and within five (5) feet of any exterior building wall. Adult supervision is required at all times the barbecue
35   equipment is generating heat.

37   c. The Premises _____ will –OR– __x__ will **not** be freshly painted before occupancy. If not freshly painted,
38   the Premises _____ will –OR– __x__ will **not** be touched up before occupancy. TENANT will be responsible
39   for the costs for any holes or excessive dirt or smudges that will require repainting.

41   d.   TENANT agrees to coordinate transfer of utilities to LANDLORD or BROKER/DESIGNATED
42   PROPERTY MANAGER no less than ___1___ business days of vacating the Premises.

44   e. Locks may be replaced or re-keyed at the TENANT'S expense provided TENANT informs LANDLORD
45   and provides LANDLORD with a workable key for each new or changed lock. TENANT further agrees to be
46   responsible for any and all such rekey expenses should TENANT fail to notify LANDLORD in advance of any
47   such replacement.

| Property | 11893 WEDGEBROOK ST | | | LAS VEGAS | NV | 89183 |
|---|---|---|---|---|---|---|
| Owner's Name | KYLE PUNTNEY | | Owner's Name | | | |
| Tenant | CANDY TORRES | Initials | Tenant | | Initials | |
| Tenant | | Initials | Tenant | | Initials | |

This form presented by Allan Rothstein | Allan Rothstein | 7023536878 |          ROTH00389
allanindianoil@yahoo.com

f. TENANT may conduct a risk assessment or inspection of the Premise for the presence of lead-based paint and/or lead-based paint hazards at the TENANT's expense for a period of ten days after execution of this agreement. Such assessment or inspection shall be conducted by a certified lead based paint professional. If TENANT for any reason fails to conduct such an assessment or inspection, then TENANT shall be deemed to have elected to lease the Premises "as is" and to have waived this contingency. If TENANT conducts such an assessment or inspection and determines that lead-based paint deficiencies and/or hazards exist, TENANT will notify LANDLORD in writing and provide a copy of the assessment/inspection report. LANDLORD will then have ten days to elect to correct such deficiencies and/or hazards or to terminate this agreement. In the event of termination under this paragraph, the security deposit will be refunded to TENANT. (If the property was constructed prior to 1978, refer to the attached Lead-Based Paint Disclosure.)

g. TENANT may display the flag of the United States, made of cloth, fabric or paper, from a pole, staff or in a window, and in accordance with 4 USC Chapter 1. LANDLORD may, at its option, with 30 days' notice to TENANT, adopt additional reasonable rules and regulations governing the display of the flag of the United States.

h. TENANT may display political signs subject to any applicable provisions of law governing the posting of political signs, and, if the Premises are located within a CIC, the provisions of NRS 116 and any governing documents related to the posting of political signs. All political signs exhibited must not be larger than 24 inches by 36 inches. LANDLORD may not exhibit any political sign on the Premises unless the TENANT consents, in writing, to the exhibition of the political sign. TENANT may exhibit as many political signs as desired, but may not exhibit more than one political sign for each candidate, political party or ballot question.

i. DANGEROUS MATERIALS. TENANT shall not keep or have on or around the Premises any article or thing of a dangerous, flammable, or explosive character that might unreasonably increase the danger of fire on or around the Premises or that might be considered hazardous.

**33. CHANGES MUST BE IN WRITING:** No changes, modifications or amendment of this Agreement shall be valid or binding unless such changes, modifications or amendment are in writing and signed by each party. Such changes shall take effect after thirty days' notice to TENANT. This Agreement constitutes the entire agreement between the Parties and supersedes any prior understanding or representation of any kind preceding the date of this Agreement. There are no other promises, conditions, understandings or other agreements, whether oral or written, relating to the subject matter of this Agreement.

**34. CONFLICTS BETWEEN LEASE AND ADDENDUM:** In case of conflict between the provisions of an addendum and any other provisions of this Agreement, the provisions of the addendum shall govern.

**35. ATTORNEY'S FEES:** In the event of any court action, the prevailing party shall be entitled to be awarded against the losing party all costs and expenses incurred thereby, including, but not limited to, reasonable attorney's fees and costs.

**36. NEVADA LAW GOVERNS:** This Agreement is executed and intended to be performed in the State of Nevada in the county where the Premises are located and the laws of the State of Nevada shall govern its interpretation and effect.

**37. WAIVER:** Nothing contained in this Agreement shall be construed as waiving any of the LANDLORD's or TENANT's rights under the laws of the State of Nevada.

| Property 11893 WEDGEBROOK ST | | | LAS VEGAS | NV | 89183 |
|---|---|---|---|---|---|
| Owner's Name KYLE PUNTNEY | | | Owner's Name | | |
| Tenant CANDY TORRES | | Initials | Tenant | | Initials |
| Tenant | | Initials | Tenant | | Initials |

This form presented by Allan Rothstein | Allan Rothstein | 7023536878 | allanindianoil@yahoo.com

ROTH000390 FORMS



38. **PARTIAL INVALIDITY:** In the event that any provision of this Agreement shall be held invalid or unenforceable, such ruling shall not affect in any respect whatsoever the validity or enforceability of the remainder of this Agreement.

39. **VIOLATIONS OF PROVISIONS:** A single violation by TENANT of any of the provisions of this Agreement shall be deemed a material breach and shall be cause for termination of this Agreement. Unless otherwise provided by the law, proof of any violation of this Agreement shall not require criminal conviction but shall be by a preponderance of the evidence.

40. **SIGNATURES:** The Agreement is accepted and agreed to jointly and severally. The undersigned have read this Agreement and understand and agree to all provisions thereof and further acknowledge that they have received a copy of this Agreement, This Agreement may be executed in any number of counterparts, electronically pursuant to NRS Chapter 719, and by facsimile copies with the same effect as if all parties to this agreement had signed the same document and all counterparts and copies will be construed together and will constitute one and the same instrument.

41. **LICENSEE   DISCLOSURE   OF   INTEREST:** Pursuant   to   NAC   645.640, ALLAN ROTHSTEIN   is   a   licensed   real   estate   agent   in   the   State(s)   of NEVADA _____; and has the following interest, direct or indirect, in this transaction: ☐ Principal (LANDLORD or TENANT) –OR– ☐ family relationship or business interest: PROPERTY MANAGER

42. **CONFIRMATION OF REPRESENTATION:** The Agents in this transaction are:

TENANT's Brokerage: ___ALLAN ROTHSTEIN REALTY___ Broker's Name: ___ALLAN ROTHSTEIN___
DESIGNATED PROPERTY MANAGER ALLAN ROTHSTEIN
Agent's Name: _____Allan Rothstein_____ Agent's License # _____
Address: 755 Sunset Rd _____ Henderson ___ NV  89011
_____ allanindianoil@yahoo.com

LANDLORD's Brokerage: ALLAN ROTHSTEIN REALTY Broker's Name: ___ALLAN ROTHSTEIN___
DESIGNATED PROPERTY MANAGER ALLAN ROTHSTEIN
Agent's Name: _____Allan Rothstein_____ Agent's License # ___B.1001142___
Address: 755 Sunset Rd _____ Henderson ___ NV  89011
Phone: ___702-353___ Fax: ___702-243-6___ Email: _____

43. **NOTICES:** Unless otherwise required by law, any notice to be given or served upon any party hereto in connection with this Agreement must be in writing and mailed by certificate of mailing to the following addresses:

BROKERAGE: _____ ALLAN ROTHSTEIN REALTY _____ BROKER ___ALLAN ROTHSTEIN___
DESIGNATED PROPERTY MANAGER ALLAN ROTHSTEIN
Address: 755 SUNSET RD _____
Phone: ___702353___ Fax: ___702243___ Email: ___

TENANT: _CANDY TORRES_____
Address: 11893 WEDGEBROOK ST _____ LAS VEGAS ___ NV  89183
Phone: ___702-350-0___ Fax: _____ Email: ___

| Property 11893 WEDGEBROOK ST | | LAS VEGAS | NV | 89183 |
|---|---|---|---|---|
| Owner's Name KYLE PUNTNEY | | Owner's Name | | |
| Tenant CANDY TORRES | Initials | Tenant | Initials | |
| Tenant | Initials | Tenant | Initials | |

This form presented by Allan Rothstein | Allan Rothstein | 7023536878 | allanindianoil@yahoo.com     ROTH00391 InstanetFORMS



44. **MILITARY PROVISION**: IN THE EVENT the TENANT is, or hereafter becomes, a member of the United States Armed Forces on extended active duty and hereafter the TENANT receives permanent change of station orders to depart from the area where the Premises are located, or is relieved from active duty, retires or separates from the military, or is ordered into military housing, then in any of these events, the TENANT may terminate this lease upon giving thirty (30) days written notice to the LANDLORD. The TENANT shall also provide to the LANDLORD a copy of the official orders or a letter signed by the TENANT's commanding officer, reflecting the change, which warrants termination under this clause. The TENANT will pay prorated rent for any days (he/she) occupy the premises past the first day of the month. The security deposit will be promptly returned to the TENANT, provided there are no damages to the premises, as described by law.

45. **ADDENDA ATTACHED:** Incorporated into this Agreement are the following addenda, exhibits and other information:

A. ☒  Lease Addendum for Drug Free Housing
B. ☒  Lease Addendum for Illegal Activity
C. ☒  Smoke Detector Agreement
D. ☒  HOA Rules and Regulations
E. ☒  Other: _____ DUTIES OWED
F. ☒  Other: _____ RESIDENTIAL DATA FORM ___
G. ☒  Other: _____ CONSENT TO ACT
H. ☒  Other: WALK THROUGH INSPECTION AND RELEASE

46.   **ADDITIONAL TERMS AND CONDITIONS:**
ALL PAYMENTS SHALL BE BY MONEY ORDER, CHASE OR WELLS FARGO BANK CERTIFIED CHECKS OR CASH. RENT IS DUE ON THE 1ST OF EACH MONTH AND SHALL NOT HAVE A GRACE PERIOD. NO OUT OF TOWN CHECKS. NO PAINTING, IMPROVEMENTS OR REMODELING WITHOUT LANDLORDS OR PM WRITTEN PERMISSION, NO SMOKING IN HOME. TENANTS ARE RESPONSIBLE FOR ALL FINES AND FEES AND ARE PAID TO THE PROPERTY MANAGER. OWNER/PROPERTY MANAGER MAY CO-MINGLE FUNDS. ILLEGAL DRUGS NOT PERMITTED TO BE SOLD ON PROPERTY. TENANTS ARE RESPONSIBLE FOR NOT CHANGING AIR FILTERS MONTHLY. VERY DIRTY AIR FILTERS REQUIRE CLEANING EVAPORATOR $250 CHARGE PER UNIT PAID BY TENANT. DO NOT PUT HOLES IN WALLS OR DOORS. DO NOT USE ANY CLEANERS THAT MAY SCRATCH OR DAMAGE FAUCETS, SINKS, FIXTURES, APPLIANCES, TILE OR MARBLE, ETC. EVICTION ATTEMPTS ARE $750 PLUS ALL ATTORNEY FEES AND COURT COSTS. TENANTS ARE RESPONSIBLE FOR LANDSCAPING & UTILITIES. LATE FEES EVICTION FEES AND FINES SHALL BE CONSIDERED IMMEDIATE ADDITIONAL RENTS & ARE NOT A PENALTY. PLEASE EMAIL PROPERTY MANAGER WITH ANY CONCERNS OR PROBLEMS. RENTERS INSURANCE IS REQUIRED. IF PROPERTY IS SOLD THE OWNER MAY GIVE TENANTS 60 DAY NOTICE TO VACATE. PET FEE IS (NOT REFUNDABLE). THE INSURANCE SHALL NAME THE LANDLORD AND PROPERTY MANAGER AS ADDITIONAL INSURED'S. TENANTS WAIVE ALL RIGHTS, AND HOLD OWNER & PROPERTY MANAGER HARMLESS FOR ALL INJURIES OR ACCIDENTS OCCURRING ON OR NEAR PREMISES. TENANTS DEPOSITS MAY BE USED AS PAYMENT FOR ANY LATE FEES, EVICTION FEES OR FINES THAT ARE NOT PAID WITHIN 7 DAYS BY TENANT. I/WE HAVE READ AND UNDERSTAND AND FREELY AGREE TO ALL THE TERMS, CONTENTS & CONDITIONS OF THIS CONTRACT AND ALL FORMS THAT I/WE HAVE SIGNED.

| Property | 11893 WEDGEBROOK ST | | | | LAS VEGAS | NV | 89183 |
|---|---|---|---|---|---|---|---|
| Owner's Name | KYLE PUNTNEY | | | Owner's Name | | | |
| Tenant | CANDY TORRES | Initials | | Tenant | | Initials | |
| Tenant | | Initials | | Tenant | | Initials | |

This form presented by Allan Rothstein | Allan Rothstein | 7023536878 |
allanindianoil@yahoo.com

ROTH00392

1
2
3
4
5
6
7
8
9
10
11
12   Landlord agrees to rent the Premises on the above terms and conditions.
13
14
15
16   LANDLORD/OWNER                 DATE          LANDLORD/OWNER                 DATE
17   OR Authorized Signatory                     OR Authorized Signatory
18   ALLAN ROTHSTEIN
19   PRINT NAME                                  PRINT NAME
20
21
22   Tenant agrees to rent the Premises on the above terms and conditions.
23
24
25
26   TENANT'S SIGNATURE              DATE          TENANT'S SIGNATURE             DATE
27                   CANDY TORRES
28   PRINT NAME                                  PRINT NAME
29
30
31   TENANT'S SIGNATURE             DATE          TENANT'S SIGNATURE             DATE
32
33   PRINT NAME                                  PRINT NAME
34
35
36   **Real Estate Brokers and Designated Property Managers:**
37        A. Real estate brokers, licensees, agents, and Designated Property Managers who are not also disclosed as
38           a party to the transaction under paragraph 41 are not parties to this Agreement between Landlord and
39           Tenant.
40        B. Agency relationships are confirmed in paragraph 42.
41
42

| Property  11893  WEDGEBROOK ST | | LAS VEGAS | NV | 89183 |
|---|---|---|---|---|
| Owner's Name     KYLE PUNTNEY | | Owner's Name | | |
| Tenant     CANDY TORRES | Initials | Tenant | | Initials |
| Tenant | Initials | Tenant | | Initials |

Residential Lease Agreement Rev. 10.16        © 2016 Greater Las Vegas Association of REALTORS®                        Page 13 of 13

ROTH00393

# Housing Assistance Payment Contract (HAP Contract)
## Section 8 Tenant-Based Assistance
## Housing Choice Voucher Program

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing
OMB Approval No. 2577-0169 (exp. 04/30/2018)

**Privacy Act Statement.** The Department of Housing and Urban Development (HUD) is authorized to collect the information required on this form by Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f). Collection of family members' names and unit address, and owner's name and payment address is mandatory. The information is used to provide Section 8 tenant-based assistance under the Housing Choice Voucher program in the form of housing assistance payments. The information also specifies what utilities and appliances are to be supplied by the owner, and what utilities and appliances are to be supplied by the tenant. HUD may disclose this information to Federal, State and local agencies when relevant to civil, criminal, or regulatory investigations and prosecutions. It will not be otherwise disclosed or released outside of HUD, except as permitted or required by law. Failure to provide any of the information may result in delay or rejection of family or owner participation in the program.

## Instructions for use of HAP Contract

This form of Housing Assistance Payments Contract (HAP contract) is used to provide Section 8 tenant-based assistance under the housing choice voucher program (voucher program) of the U.S. Department of Housing and Urban Development (HUD). The main regulation for this program is 24 Code of Federal Regulations Part 982.

The local voucher program is administered by a public housing agency (PHA). The HAP contract is an agreement between the PHA and the owner of a unit occupied by an assisted family. The HAP contract has three parts:

Part A Contract information (fill-ins).
See section by section instructions.
Part B Body of contract
Part C Tenancy addendum

### Use of this form

Use of this HAP contract is required by HUD. Modification of the HAP contract is not permitted. The HAP contract must be word-for-word in the form prescribed by HUD.
However, the PHA may choose to add the following:

> Language that prohibits the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Such a prohibition must be added to Part A of the HAP contract.

> Language that defines when the housing assistance payment by the PHA is deemed received by the owner (e.g., upon mailing by the PHA or actual receipt by the owner). Such language must be added to Part A of the HAP contract.

To prepare the HAP contract, fill in all contract information in Part A of the contract. Part A must then be executed by the owner and the PHA.

### Use for special housing types

In addition to use for the basic Section 8 voucher program, this form must also be used for the following "special housing types" which are voucher program variants for special needs (see 24 CFR Part 982, Subpart M): (1) single room occupancy (SRO) housing; (2) congregate housing; (3) group home; (4) shared housing; and (5) manufactured home rental by a family that leases the manufactured home and space. When this form is used for a special housing type, the special housing type shall be specified in Part A of the HAP contract, as follows: "This HAP contract is used for the following special housing type under HUD regulations for the Section 8 voucher program: (Insert Name of Special Housing type)."

However, this form may not be used for the following special housing types: (1) manufactured home space rental by a family that owns the manufactured home and leases only the space; (2) cooperative housing; and (3) the homeownership option under Section 8(y) of the United States Housing Act of 1937 (42 U.S.C. 1437f(y)).

### How to fill in Part A
Section by Section Instructions

#### Section 2: Tenant
Enter full name of tenant.

#### Section 3. Contract Unit
Enter address of unit, including apartment number, if any.

#### Section 4. Household Members
Enter full names of all PHA-approved household members. Specify if any such person is a live-in aide, which is a person approved by the PHA to reside in the unit to provide supportive services to a family member who is a person with disabilities.

#### Section 5. Initial Lease Term
Enter first date and last date of initial lease term.
The initial lease term must be for at least one year. However, the PHA may approve a shorter initial lease term if the PHA determines that:
- Such shorter term would improve housing opportunities for the tenant, **and**
- Such shorter term is the prevailing local market practice.

#### Section 6. Initial Rent to Owner
Enter the amount of the monthly rent to owner during the initial lease term. The PHA must determine that the rent to owner is reasonable in comparison to rent for other comparable unassisted units. During the initial lease term, the owner may not raise the rent to owner.

### Section 7. Housing Assistance Payment
Enter the initial amount of the monthly housing assistance payment.

### Section 8. Utilities and Appliances.
The lease and the HAP contract must specify what utilities and appliances are to be supplied by the owner, and what utilities and appliances are to be supplied by the tenant. Fill in section 8 to show who is responsible to provide or pay for utilities and appliances.

**Housing Assistance Payment Contract
(HAP Contract)
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program**

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing
OMB Approval No. 2577-0169 (exp. 04/30/2018)

## Part A of the HAP Contract : Contract Information

(To prepare the contract, fill out all contract information in Part A.)

1. **Contents of Contract**
   This HAP contract has three parts:
   Part A: Contract Information
   Part B: Body of Contract
   Part C: Tenancy Addendum

2. **Tenant**

   CANDY TORRES

3. **Contract Unit**

   11893 Wedgebrook St
   Las Vegas, NV 89183

4. **Household**
   The following persons may reside in the unit. Other persons may not be added to the household without prior written approval of the owner and the PHA.

   CANDY D TORRES

5. **Initial Lease Term**
   The initial lease term begins on (mm/dd/yyyy): **11/17/2018**
   The initial lease term ends on (mm/dd/yyyy): **11/30/2019**

6. **Initial Rent to Owner**
   The initial rent to owner is: $1475
   During the initial lease term, the owner may not raise the rent to owner.

7. **Initial Housing Assistance Payment**
   The HAP contract term commences on the first day of the initial lease term. At the beginning of the HAP contract term, the amount of the housing assistance payment by the PHA to the owner is $1,330 per month.

   The amount of the monthly housing assistance payment by the PHA to the owner is subject to change during the HAP contract term in accordance with HUD requirements.

form HUD-52641 (8/2015)
ref Handbook 7420.8

## 8.  Utilities and Appliances

The owner shall provide or pay for the utilities and appliances indicated below by an "O". The tenant shall provide or pay for the utilities or appliances indicated below by a "T". Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Provided By | | Paid By | |
|------|-------------|--------|-------|--------|
|      | Owner | Tenant | Owner | Tenant |
| Heating Natural Gas | O | | | |
| Cooling Air Conditioning | | T | | |
| Cooking Natural Gas | O | | | |
| Other Electric | | T | | |
| Water Heating Gas | O | | | |
| Water | O | | | |
| Sewer | O | | | |
| Trash Collection | O | | | |
| Refrigerator | O | | | |
| Range | O | | | |

## Signatures

**Public Housing Agency: Southern Nevada Regional HA**

Print or Type Name of PHA

Signature

**Angela Yenchek**

Print or Type Name and Title of Signatory

*12-18-18*

Date (mm/dd/yyyy)

**Owner:  ALLAN ROTHSTEIN**

Print or Type Name of Owner

Signature

Print or Type Name and Title of Signatory

Date (mm/dd/yyyy)

**Mail Payments to:**

**ALLAN ROTHSTEIN**

Name

755 SUNSET ROAD
HENDERSON, NV  89011

Address (Street, City, State, Zip)

ROTH000396

ref Handbook 7420.8

**Housing Assistance Payments Contract
(HAP Contract)
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program**

**U.S. Department of Housing
and Urban Development**
Office of Public and Indian Housing
OMB Approval No. 2577-0169 (exp. 04/30/2018)

---

**Part B of HAP Contract: Body of Contract**

1. **Purpose**

   a. This is a HAP contract between the PHA and the Owner. The HAP contract is entered to provide assistance to the family under the Section 8 voucher program (see HUD program regulations at 24 Code of Federal Regulations Part 982).

   b. The HAP contract only applies to the household and contract unit specified in Part A of the HAP contract.

   c. During the HAP contract term, the PHA will pay housing assistance payments to the owner in accordance with the HAP contract.

   d. The family will reside in the contract unit with asssistance under the Section 8 voucher program. The housing assistance payments by the PHA assist the tenant to lease the contract unit from the owner for occupancy by the family.

2. **Lease of Contract Unit**

   a. The owner has leased the contract unit to the tenant for occupancy by the family with assistance under the Section 8 voucher program.

   b. The PHA has approved leasing of the unit in accordance with requirements of the Section 8 voucher program.

   c. The lease for the contract unit must include word-for-word all provisions of the tenancy addendum required by HUD (Part C of the HAP contract).

   d. The owner certifies that:

       (1) The owner and the tenant have entered into a lease of the contract unit that includes all provisions of the tenancy addendum.

       (2) The lease is in a standard form that is used in the locality by the owner and that is generally used for other unassisted tenants in the premises.

       (3) The lease is consistent with State and local law.

   e. The owner is responsible for screening the family's behavior or suitability for tenancy. The PHA is not responsible for such screening. The PHA has no liability or responsibility to the owner or other persons for the family's behavior or the family's conduct in tenancy.

3. **Maintenance, Utilities, and Other Services**

   a. The owner must maintain the contract unit and premises in accordance with the housing quality standards (HQS).

   b. The owner must provide all utilities needed to comply with the HQS.

   c. If the owner does not maintain the contract unit in accordance with the HQS, or fails to provide all utilities needed to comply with the HQS, the PHA may exercise any available remedies. PHA remedies for such breach

include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract. The PHA may not exercise such remedies against the owner because of an HQS breach for which the family is responsible, and that is not caused by the owner.

   d. The PHA shall not make any housing assistance payments if the contract unit does not meet the HQS, unless the owner corrects the defect within the period specified by the PHA and the PHA verifies the correction. If a defect is life threatening, the owner must correct the defect within no more than 24 hours. For other defects, the owner must correct the defect within the period specified by the PHA.

   e. The PHA may inspect the contract unit and premises at such times as the PHA determines necessary, to ensure that the unit is in accordance with the HQS.

   f. The PHA must notify the owner of any HQS defects shown by the inspection.

   g. The owner must provide all housing services as agreed to in the lease.

4. **Term of HAP Contract**

   a. **Relation to lease term.** The term of the HAP contract begins on the first day of the initial term of the lease, and terminates on the last day of the term of the lease (including the initial lease term and any extensions).

   b. **When HAP contract terminates.**

       (1) The HAP contract terminates automatically if the lease is terminated by the owner or the tenant.

       (2) The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the HAP contract terminates automatically.

       (3) If the family moves from the contract unit, the HAP contract terminates automatically.

       (4) The HAP contract terminates automatically 180 calendar days after the last housing assistance payment to the owner.

       (5) The PHA may terminate the HAP contract if the PHA determines, in accordance with HUD requirements, that available program funding is not sufficient to support continued assistance for families in the program.

       (6) The HAP contract terminates automatically upon the death of a single member household, including single member households with a live-in-aide.

---

ROLPH0039 form HUD-52641 (12/2015)
ref Handbook 7420.8

(7) · The PHA may terminate the HAP contract if the PHA determines that the contract unit does not provide adequate space in accordance with the HQS because of an increase in family size or a change in family composition.

(8) If the family breaks up, the PHA may terminate the HAP contract, or may continue housing assistance payments on behalf of family members who remain in the contract unit.

(9) The PHA may terminate the HAP contract if the PHA determines that the unit does not meet all requirements of the HQS, or determines that the owner has otherwise breached the HAP contract.

5. **Provision and Payment for Utilities and Appliances**

a. The lease must specify what utilities are to be provided or paid by the owner or the tenant.

b. The lease must specify what appliances are to be provided or paid by the owner or the tenant.

c. Part A of the HAP contract specifies what utilities and appliances are to be provided or paid by the owner or the tenant. The lease shall be consistent with the HAP contract.

6. **Rent to Owner: Reasonable Rent**

a. During the HAP contract term, the rent to owner may at no time exceed the reasonable rent for the contract unit as most recently determined or re-determined by the PHA in accordance with HUD requirements.

b. The PHA must determine whether the rent to owner is reasonable in comparison to rent for other comparable unassisted units. To make this determination, the PHA must consider:

(1) The location, quality, size, unit type, and age of the contract unit; and

(2) Any amenities, housing services, maintenance and utilities provided and paid by the owner.

c. The PHA must re-determine the reasonable rent when required in accordance with HUD requirements. The PHA may re-determine the reasonable rent at any time.

d. During the HAP contract term, the rent to owner may not exceed rent charged by the owner for comparable unassisted units in the premises. The owner must give the PHA any information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere.

7. **PHA Payment to Owner**

a. **When paid**

(1) During the term of the HAP contract, the PHA must make monthly housing assistance payments to the owner on behalf of the family at the beginning of each month.

(2) The PHA must pay housing assistance payments promptly when due to the owner.

(3) If housing assistance payments are not paid promptly when due after the first two calendar months of the HAP contract term, the PHA shall pay the owner penalties if all of the following circumstances apply: (i) Such penalties are in accordance with generally accepted practices and law, as applicable in the local housing market, governing penalties for late payment of rent by a tenant; (ii) It is the owner's practice to charge

such penalties for assisted and unassisted tenants; and (iii) The owner also charges such penalties against the tenant for late payment of family rent to owner. However, the PHA shall not be obligated to pay any late payment penalty if HUD determines that late payment by the PHA is due to factors beyond the PHA's control. Moreover, the PHA shall not be obligated to pay any late payment penalty if housing assistance payments by the PHA are delayed or denied as a remedy for owner breach of the HAP contract (including any of the following PHA remedies: recovery of overpayments, suspension of housing assistance payments, abatement or reduction of housing assistance payments, termination of housing assistance payments and termination of the contract).

(4) Housing assistance payments shall only be paid to the owner while the family is residing in the contract unit during the term of the HAP contract. The PHA shall not pay a housing assistance payment to the owner for any month after the month when the family moves out.

b. **Owner compliance with HAP contract.** Unless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract.

c. **Amount of PHA payment to owner**

(1) The amount of the monthly PHA housing assistance payment to the owner shall be determined by the PHA in accordance with HUD requirements for a tenancy under the voucher program.

(2) The amount of the PHA housing assistance payment is subject to change during the HAP contract term in accordance with HUD requirements. The PHA must notify the family and the owner of any changes in the amount of the housing assistance payment.

(3) The housing assistance payment for the first month of the HAP contract term shall be pro-rated for a partial month.

d. **Application of payment.** The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

e. **Limit of PHA responsibility.**

(1) The PHA is only responsible for making housing assistance payments to the owner in accordance with the HAP contract and HUD requirements for a tenancy under the voucher program.

(2) The PHA shall not pay any portion of the rent to owner in excess of the housing assistance payment. The PHA shall not pay any other claim by the owner against the family.

f. **Overpayment to owner.** If the PHA determines that the owner is not entitled to the housing assistance payment or any part of it, the PHA, in addition to other remedies, may deduct the amount of the overpayment from any amounts due the owner (including amounts due under any other Section 8 assistance contract).

8. **Owner Certification**

During the term of this contract, the owner certifies that:

a. The owner is maintaining the contract unit and premises in accordance with the HQS.

ROUTE00398
form HUD-52641 (8/2015)
ref Handbook 7420.8

b. The contract unit is leased to the tenant. The lease includes the tenancy addendum (Part C of the HAP contract), and is in accordance with the HAP contract and program requirements. The owner has provided the lease to the PHA, including any revisions of the lease.

c. The rent to owner does not exceed rents charged by the owner for rental of comparable unassisted units in the premises.

d. Except for the rent to owner, the owner has not received and will not receive any payments or other consideration (from the family, the PHA, HUD, or any other public or private source) for rental of the contract unit during the HAP contract term.

e. The family does not own or have any interest in the contract unit.

f. To the best of the owner's knowledge, the members of the family reside in the contract unit, and the unit is the family's only residence.

g. The owner (including a principal or other interested party) is not the parent, child, grandparent, grandchild, sister, or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving rental of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

**9. Prohibition of Discrimination.** In accordance with applicable equal opportunity statutes, Executive Orders, and regulations:

a. The owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status, or disability in connection with the HAP contract.

b. The owner must cooperate with the PHA and HUD in conducting equal opportunity compliance reviews and complaint investigations in connection with the HAP contract.

**10. Owner's Breach of HAP Contract**

a. Any of the following actions by the owner (including a principal or other interested party) is a breach of the HAP contract by the owner:

(1) If the owner has violated any obligation under the HAP contract, including the owner's obligation to maintain the unit in accordance with the HQS.

(2) If the owner has violated any obligation under any other housing assistance payments contract under Section 8.

(3) If the owner has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing assistance program.

(4) For projects with mortgages insured by HUD or loans made by HUD, if the owner has failed to comply with the regulations for the applicable mortgage insurance or loan program, with the mortgage or mortgage note, or with the regulatory agreement; or if the owner has committed fraud, bribery or any other corrupt or criminal act in connection with the mortgage or loan.

(5) If the owner was engaged in any drug-related criminal activity or any violent criminal activity.

b. If the PHA determines that a breach has occurred, the PHA may exercise any of its rights and remedies under the HAP contract, or any other available rights and remedies for such breach. The PHA shall notify the owner of such determination, including a brief statement of the reasons for the determination. The notice by the PHA to the owner may require the owner to take corrective action, as verified or determined by the PHA, by a deadline prescribed in the notice.

c. The PHA's rights and remedies for owner breach of the HAP contract include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract.

d. The PHA may seek and obtain additional relief by judicial order or action, including specific performance, other injunctive relief or order for damages.

e. Even if the family continues to live in the contract unit, the PHA may exercise any rights and remedies for owner breach of the HAP contract.

f. The PHA's exercise or non-exercise of any right or remedy for owner breach of the HAP contract is not a waiver of the right to exercise that or any other right or remedy at any time.

**11. PHA and HUD Access to Premises and Owner's Records**

a. The owner must provide any information pertinent to the HAP contract that the PHA or HUD may reasonably require.

b. The PHA, HUD and the Comptroller General of the United States shall have full and free access to the contract unit and the premises, and to all accounts and other records of the owner that are relevant to the HAP contract, including the right to examine or audit the records and to make copies.

c. The owner must grant such access to computerized or other electronic records, and to any computers, equipment or facilities containing such records, and must provide any information or assistance needed to access the records.

**12. Exclusion of Third Party Rights**

a. The family is not a party to or third party beneficiary of Part B of the HAP contract. The family may not enforce any provision of Part B, and may not exercise any right or remedy against the owner or PHA under Part B.

b. The tenant or the PHA may enforce the tenancy addendum (Part C of the HAP contract) against the owner, and may exercise any right or remedy against the owner under the tenancy addendum.

c. The PHA does not assume any responsibility for injury to, or any liability to, any person injured as a result of the owner's action or failure to act in connection with management of the contract unit or the premises or with implementation of the HAP contract, or as a result of any other action or failure to act by the owner.

d. The owner is not the agent of the PHA, and the HAP contract does not create or affect any relationship between the PHA and any lender to the owner or any suppliers, employees, contractors or subcontractors used by the owner in connection with management of the contract unit or the premises or with implementation of the HAP contract.

 

13. **Conflict of Interest**
   a. "Covered individual" means a person or entity who is a member of any of the following classes:
      (1) Any present or former member or officer of the PHA (except a PHA commissioner who is a participant in the program);
      (2) Any employee of the PHA, or any contractor, sub-contractor or agent of the PHA, who formulates policy or who influences decisions with respect to the program;
      (3) Any public official, member of a governing body, or State or local legislator, who exercises functions or responsibilities with respect to the program; or
      (4) Any member of the Congress of the United States.
   b. A covered individual may not have any direct or indirect interest in the HAP contract or in any benefits or payments under the contract (including the interest of an immediate family member of such covered individual) while such person is a covered individual or during one year thereafter.
   c. "Immediate family member" means the spouse, parent (including a stepparent), child (including a stepchild), grandparent, grandchild, sister or brother (including a stepsister or stepbrother) of any covered individual.
   d. The owner certifies and is responsible for assuring that no person or entity has or will have a prohibited interest, at execution of the HAP contract, or at any time during the HAP contract term.
   e. If a prohibited interest occurs, the owner shall promptly and fully disclose such interest to the PHA and HUD.
   f. The conflict of interest prohibition under this section may be waived by the HUD field office for good cause.
   g. No member of or delegate to the Congress of the United States or resident commissioner shall be admitted to any share or part of the HAP contract or to any benefits which may arise from it.

14. **Assignment of the HAP Contract**
   a. The owner may not assign the HAP contract to a new owner without the prior written consent of the PHA.
   b. If the owner requests PHA consent to assign the HAP contract to a new owner, the owner shall supply any information as required by the PHA pertinent to the proposed assignment.
   c. The HAP contract may not be assigned to a new owner that is debarred, suspended or subject to a limited denial of participation under HUD regulations (see 24 Code of Federal Regulations Part 24).
   d. The HAP contract may not be assigned to a new owner if HUD has prohibited such assignment because:
      (1) The Federal government has instituted an administrative or judicial action against the owner or proposed new owner for violation of the Fair Housing Act or other Federal equal opportunity requirements, and such action is pending; or
      (2) A court or administrative agency has determined that the owner or proposed new owner violated the Fair Housing Act or other Federal equal opportunity requirements.

   e. The HAP contract may not be assigned to a new owner if the new owner (including a principal or other interested party) is the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the family of such determination) that approving the assignment, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.
   f. The PHA may deny approval to assign the HAP contract if the owner or proposed new owner (including a principal or other interested party):
      (1) Has violated obligations under a housing assistance payments contract under Section 8;
      (2) Has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing program;
      (3) Has engaged in any drug-related criminal activity or any violent criminal activity;
      (4) Has a history or practice of non-compliance with the HQS for units leased under the Section 8 tenant-based programs, or non-compliance with applicable housing standards for units leased with project-based Section 8 assistance or for units leased under any other Federal housing program;
      (5) Has a history or practice of failing to terminate tenancy of tenants assisted under any Federally assisted housing program for activity engaged in by the tenant, any member of the household, a guest or another person under the control of any member of the household that:
      (a) Threatens the right to peaceful enjoyment of the premises by other residents;
      (b) Threatens the health or safety of other residents, of employees of the PHA, or of owner employees or other persons engaged in management of the housing;
      (c) Threatens the health or safety of, or the right to peaceful enjoyment of their residents by, persons residing in the immediate vicinity of the premises; or
      (d) Is drug-related criminal activity or violent criminal activity;
      (6) Has a history or practice of renting units that fail to meet State or local housing codes; or
      (7) Has not paid State or local real estate taxes, fines or assessments.
   g. The new owner must agree to be bound by and comply with the HAP contract. The agreement must be in writing, and in a form acceptable to the PHA. The new owner must give the PHA a copy of the executed agreement.

15. **Foreclosure.** In the case of any for any foreclosure, the immediate successor in interest in the property pursuant to the foreclosure shall assume such interest subject to the lease between the prior owner and the tenant and to the HAP contract between the prior owner and the PHA for the occupied unit. This provision does affect any State or local law that provides longer time periods or other additional protections for tenants. **This provision will sunset on December 31, 2012 unless extended by law.**

16. **Written Notices.** Any notice by the PHA or the owner in connection with this contract must be in writing.

17. **Entire Agreement: Interpretation**

    a.  The HAP contract contains the entire agreement between the owner and the PHA.

    b.  The HAP contract shall be interpreted and implemented in accordance with all statutory requirements, and with all HUD requirements, including the HUD program regulations at 24 Code of Federal Regulations Part 982.

ROTH000401

Housing Assistance Payment Contract
(HAP Contract)
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing
OMB Approval No. 2577-0169 (exp. 04/30/2018)

## Part C of HAP Contract: Tenancy Addendum

**1.   Section 8 Voucher Program**

a.   The owner is leasing the contract unit to the tenant for occupancy by the tenant's family with assistance for a tenancy under the Section 8 housing choice voucher program (voucher program) of the United States Department of Housing and Urban Development (HUD).

b.   The owner has entered into a Housing Assistance Payments Contract (HAP contract) with the PHA under the voucher program. Under the HAP contract, the PHA will make housing assistance payments to the owner to assist the tenant in leasing the unit from the owner.

**2.   Lease**

a.   The owner has given the PHA a copy of the lease, including any revisions agreed by the owner and the tenant. The owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum.

b.   The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.

**3.   Use of Contract Unit**

a.   During the lease term, the family will reside in the contract unit with assistance under the voucher program.

b.   The composition of the household must be approved by the PHA. The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child. Other persons may not be added to the household without prior written approval of the owner and the PHA.

c.   The contract unit may only be used for residence by the PHA-approved household members. The unit must be the family's only residence. Members of the household may engage in legal profit-making activities incidental to primary use of the unit for residence by members of the family.

d.   The tenant may not sublease or let the unit.

e.   The tenant may not assign the lease or transfer the unit.

**4.   Rent to Owner**

a.   The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.

b.   Changes in the rent to owner shall be determined by the provisions of the lease. However, the owner may not raise the rent during the initial term of the lease.

c.   During the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed:

(1)   The reasonable rent for the unit as most recently determined or re-determined by the PHA in accordance with HUD requirements, or

(2)   Rent charged by the owner for comparable unassisted units in the premises.

**5.   Family Payment to Owner**

a.   The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment.

b.   Each month, the PHA will make a housing assistance payment to the owner on behalf of the family in accordance with the HAP contract. The amount of the monthly housing assistance payment will be determined by the PHA in accordance with HUD requirements for a tenancy under the Section 8 voucher program.

c.   The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

d.   The tenant is not responsible for paying the portion of rent to owner covered by the PHA housing assistance payment under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.

e.   The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.

f.   The owner must immediately return any excess rent payment to the tenant.

**6.   Other Fees and Charges**

a.   Rent to owner does not include cost of any meals or supportive services or furniture which may be provided by the owner.

b.   The owner may not require the tenant or family members to pay charges for any meals or supportive services or furniture which may be provided by the owner. Nonpayment of any such charges is not grounds for termination of tenancy.

c.   The owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality, or provided at no additional cost to unsubsidized tenants in the premises.

**7.   Maintenance, Utilities, and Other Services**

**a.   Maintenance**

(1)   The owner must maintain the unit and premises in accordance with the HQS.

(2)   Maintenance and replacement (including redecoration) must be in accordance with the standard practice for the building concerned as established by the owner.

form HUD-52641 (2015)
ref Handbook 7420.8



b. Utilities and appliances
(1) The owner must provide all utilities needed to comply with the HQS.
(2) The owner is not responsible for a breach of the HQS caused by the tenant's failure to:
   (a) Pay for any utilities that are to be paid by the tenant.
   (b) Provide and maintain any appliances that are to be provided by the tenant.

c. Family damage. The owner is not responsible for a breach of the HQS because of damages beyond normal wear and tear caused by any member of the household or by a guest.

d. Housing services. The owner must provide all housing services as agreed to in the lease.

8. Termination of Tenancy by Owner
   a. Requirements. The owner may only terminate the tenancy in accordance with the lease and HUD requirements.
   b. Grounds. During the term of the lease (the initial term of the lease or any extension term), the owner may only terminate the tenancy because of:
      (1) Serious or repeated violation of the lease;
      (2) Violation of Federal, State, or local law that imposes obligations on the tenant in connection with the occupancy or use of the unit and the premises;
      (3) Criminal activity or alcohol abuse (as provided in paragraph c); or
      (4) Other good cause (as provided in paragraph d).

   c. Criminal activity or alcohol abuse.
      (1) The owner may terminate the tenancy during the term of the lease if any member of the household, a guest or another person under a resident's control commits any of the following types of criminal activity:
         (a) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of the premises by, other residents (including property management staff residing on the premises);
         (b) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of their residences by, persons residing in the immediate vicinity of the premises;
         (c) Any violent criminal activity on or near the premises; or
         (d) Any drug-related criminal activity on or near the premises.
      (2) The owner may terminate the tenancy during the term of the lease if any member of the household is:
         (a) Fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees, or that, in the case of the State of New Jersey, is a high misdemeanor; or
         (b) Violating a condition of probation or parole under Federal or State law.

(3) The owner may terminate the tenancy for criminal activity by a household member in accordance with this section if the owner determines that the household member has committed the criminal activity, regardless of whether the household member has been arrested or convicted for such activity.
(4) The owner may terminate the tenancy during the term of the lease if any member of the household has engaged in abuse of alcohol that threatens the health, safety or right to peaceful enjoyment of the premises by other residents.

d. Other good cause for termination of tenancy
   (1) During the initial lease term, other good cause for termination of tenancy must be something the family did or failed to do.
   (2) During the initial lease term or during any extension term, other good cause may include:
      (a) Disturbance of neighbors,
      (b) Destruction of property, or
      (c) Living or housekeeping habits that cause damage to the unit or premises.
   (3) After the initial lease term, such good cause may include:
      (a) The tenant's failure to accept the owner's offer of a new lease or revision;
      (b) The owner's desire to use the unit for personal or family use or for a purpose other than use as a residential rental unit; or
      (c) A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, the owner's desire to rent the unit for a higher rent).
   (4) The examples of other good cause in this paragraph do not preempt any State or local laws to the contrary.
   (5) In the case of an owner who is an immediate successor in interest pursuant to foreclosure during the term of the lease, requiring the tenant to vacate the property prior to sale shall not constitute other good cause, except that the owner may terminate the tenancy effective on the date of transfer of the unit to the owner if the owner: (a) will occupy the unit as a primary residence; and (b) has provided the tenant a notice to vacate at least 90 days before the effective date of such notice. This provision shall not affect any State or local law that provides for longer time periods or addition protections for tenants. This provision will sunset on December 31, 2012 unless extended by law.

e. Protections for Victims of Abuse.
   (1) An incident or incidents of actual or threatened domestic violence, dating violence, or stalking will not be construed as serious or repeated violations of the lease or other "good cause" for termination of the assistance, tenancy, or occupancy rights of such a victim.
   (2) Criminal activity directly relating to abuse, engaged in by a member of a tenant's household or any guest or other person under the tenant's control, shall not be cause for termination of assistance, tenancy, or occupancy rights if the tenant or an immediate member of the tenant's family is the victim or threatened victim of domestic violence, dating violence, or stalking.

ROU300403

(3) Notwithstanding any restrictions on admission, occupancy, or terminations of occupancy or assistance, or any Federal, State or local law to the contrary, a PHA, owner or manager may "bifurcate" a lease, or otherwise remove a household member from a lease, without regard to whether a household member is a signatory to the lease, in order to evict, remove, terminate occupancy rights, or terminate assistance to any individual who is a tenant or lawful occupant and who engages in criminal acts of physical violence against family members or others. This action may be taken without evicting, removing, terminating assistance to, or otherwise penalizing the victim of the violence who is also a tenant or lawful occupant. Such eviction, removal, termination of occupancy rights, or termination of assistance shall be effected in accordance with the procedures prescribed by Federal, State, and local law for the termination of leases or assistance under the housing choice voucher program.

(4) Nothing in this section may be construed to limit the authority of a public housing agency, owner, or manager, when notified, to honor court orders addressing rights of access or control of the property, including civil protection orders issued to protect the victim and issued to address the distribution or possession of property among the household members in cases where a family breaks up.

(5) Nothing in this section limits any otherwise available authority of an owner or manager to evict or the public housing agency to terminate assistance to a tenant for any violation of a lease not premised on the act or acts of violence in question against the tenant or a member of the tenant's household, provided that the owner, manager, or public housing agency does not subject an individual who is or has been a victim of domestic violence, dating violence, or stalking to a more demanding standard than other tenants in determining whether to evict or terminate.

(6) Nothing in this section may be construed to limit the authority of an owner or manager to evict, or the public housing agency to terminate assistance, to any tenant if the owner, manager, or public housing agency can demonstrate an actual and imminent threat to other tenants or those employed at or providing service to the property if the tenant is not evicted or terminated from assistance.

(7) Nothing in this section shall be construed to supersede any provision of any Federal, State, or local law that provides greater protection than this section for victims of domestic violence, dating violence, or stalking.

f. **Eviction by court action.** The owner may only evict the tenant by a court action.

g. **Owner notice of grounds**

(1) At or before the beginning of a court action to evict the tenant, the owner must give the tenant a notice that specifies the grounds for termination of tenancy. The notice may be included in or combined with any owner eviction notice.

(2) The owner must give the PHA a copy of any owner eviction notice at the same time the owner notifies the tenant.

(3) Eviction notice means a notice to vacate, or a complaint or other initial pleading used to begin an eviction action under State or local law.

### 9. Lease: Relation to HAP Contract

If the HAP contract terminates for any reason, the lease terminates automatically.

### 10. PHA Termination of Assistance

The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the lease terminates automatically.

### 11. Family Move Out

The tenant must notify the PHA and the owner before the family moves out of the unit.

### 12. Security Deposit

a. The owner may collect a security deposit from the tenant. (However, the PHA may prohibit the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Any such PHA-required restriction must be specified in the HAP contract.)

b. When the family moves out of the contract unit, the owner, subject to State and local law, may use the security deposit, including any interest on the deposit, as reimbursement for any unpaid rent payable by the tenant, any damages to the unit or any other amounts that the tenant owes under the lease.

c. The owner must give the tenant a list of all items charged against the security deposit, and the amount of each item. After deducting the amount, if any, used to reimburse the owner, the owner must promptly refund the full amount of the unused balance to the tenant.

d. If the security deposit is not sufficient to cover amounts the tenant owes under the lease, the owner may collect the balance from the tenant.

### 13. Prohibition of Discrimination

In accordance with applicable equal opportunity statutes, Executive Orders, and regulations, the owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status or disability in connection with the lease.

## 14. Conflict with Other Provisions of Lease

a. The terms of the tenancy addendum are prescribed by HUD in accordance with Federal law and regulation, as a condition for Federal assistance to the tenant and tenant's family under the Section 8 voucher program.

b. In case of any conflict between the provisions of the tenancy addendum as required by HUD, and any other provisions of the lease or any other agreement between the owner and the tenant, the requirements of the HUD-required tenancy addendum shall control.

## 15. Changes in Lease or Rent

a. The tenant and the owner may not make any change in the tenancy addendum. However, if the tenant and the owner agree to any other changes in the lease, such changes must be in writing, and the owner must immediately give the PHA a copy of such changes. The lease, including any changes, must be in accordance with the requirements of the tenancy addendum.

b. In the following cases, tenant-based assistance shall not be continued unless the PHA has approved a new tenancy in accordance with program requirements and has executed a new HAP contract with the owner:

   (1) If there are any changes in lease requirements governing tenant or owner responsibilities for utilities or appliances;

   (2) If there are any changes in lease provisions governing the term of the lease;

   (3) If the family moves to a new unit, even if the unit is in the same building or complex.

c. PHA approval of the tenancy, and execution of a new HAP contract, are not required for agreed changes in the lease other than as specified in paragraph b.

d. The owner must notify the PHA of any changes in the amount of the rent to owner at least sixty days before any such changes go into effect, and the amount of the rent to owner following any such agreed change may not exceed the reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

## 16. Notices

Any notice under the lease by the tenant to the owner or by the owner to the tenant must be in writing.

## 17. Definitions

**Contract unit.** The housing unit rented by the tenant with assistance under the program.

**Family.** The persons who may reside in the unit with assistance under the program.

**HAP contract.** The housing assistance payments contract between the PHA and the owner. The PHA pays housing assistance payments to the owner in accordance with the HAP contract.

**Household.** The persons who may reside in the contract unit. The household consists of the family and any PHA-approved live-in aide. (A live-in aide is a person who resides in the unit to provide necessary supportive services for a member of the family who is a person with disabilities.)

**Housing quality standards (HQS).** The HUD minimum quality standards for housing assisted under the Section 8 tenant-based programs.

**HUD.** The U.S. Department of Housing and Urban Development.

**HUD requirements.** HUD requirements for the Section 8 program. HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program directives.

**Lease.** The written agreement between the owner and the tenant for the lease of the contract unit to the tenant. The lease includes the tenancy addendum prescribed by HUD.

**PHA.** Public Housing Agency.

**Premises.** The building or complex in which the contract unit is located, including common areas and grounds.

**Program.** The Section 8 housing choice voucher program.

**Rent to owner.** The total monthly rent payable to the owner for the contract unit. The rent to owner is the sum of the portion of rent payable by the tenant plus the PHA housing assistance payment to the owner.

**Section 8.** Section 8 of the United States Housing Act of 1937 (42 United States Code 1437f).

**Tenant.** The family member (or members) who leases the unit from the owner.

**Voucher program.** The Section 8 housing choice voucher program. Under this program, HUD provides funds to an PHA for rent subsidy on behalf of eligible families. The tenancy under the lease will be assisted with rent subsidy for a tenancy under the voucher program.



**SOUTHERN NEVADA REGIONAL HOUSING AUTHORITY**
Housing Choice Voucher Department, P.O. Box 1897, Las Vegas, NV 89125-1897
Phone (702) 477-3100   FAX (702) 922-6929   TDD (702) 387-1898



## NOTICE OF RENT PAYMENT AND PROGRAM ABUSE WARNING INFORMATION

Owner Name: KYLE PUNTNEY

Participant Name: CANDY TORRES

Contract Unit Address: 11893 WEDGEBROOK ST
LAS VEGAS, NV 89183

Contract/
Lease Start Date:

11/17/18

| | | | |
|---|---|---|---|
| Rent to Owner: $ 1475.00 | | Security Deposit: $ 1475.00 | |
| Housing Assistance Payment: $ 1330.00 | Tenant Rent: $ 145.00 | Pro-Rate HAP Payment: $ 621.00 | Pro-Rate Tenant Payment: $ 68.00 |

Dear Owner and Housing Choice Voucher Participant:

As of the effective date shown above, the Housing Assistance Payments (HAP) contract between the Southern Nevada Regional Housing Authority (SNRHA) and the owner and the Lease between the tenant and the owner will begin.

The portion of rent paid to the owner by the family is due at lease signing or on the date established by the owner and the family.

The first payment (HAP check) paid to the owner by the SNRHA will be paid within 30 days from the date the unit passes inspection, contingent upon receipt and execution of all necessary documents. SNRHA processes payments twice a month and payment cannot be processed until the SNRHA has received a signed lease and contract. Payments are processed on the 15th and the 30th of each month. The first HAP check to the owner will include any prorated amounts from the start date. After the initial HAP check is released, the owner will begin to receive their monthly HAP payment from SNRHA on the first working day of each month via direct deposit. The tenant is responsible for paying his or her own portion directly to the owner each month.

The owner may not accept any other monies from the client. Requiring extra ('side') payments in excess of the family's share of rent as listed above is considered program fraud. In the event that SNRHA determines that the family has made side payments to the owner, SNRHA will require the owner to repay the excess monies to the family; and both the owner and the family will be terminated from the Housing Choice Voucher Program participation.

If the owner does require additional rent, the request must be submitted to SNRHA in writing. The owner may not request a rent increase during the initial one-year lease term. The owner must submit a request for increase 60 days in advance of the effective date of the anniversary of the lease. The request must be addressed to the family with a copy to SNRHA along with a completed Request for Rent Adjustment Form.

ROTH00406

We value your participation in our program.
Please feel free to contact me at (702) 477-3443   if you have any questions.

**TABLE OF CONTENTS**

**VOLUME 1**

**Exhibit** | **Description**

1    Deposition of Candy Torres (excerpts)

2    Deposition of Allan Rothstein Vol. I (excerpts)

3    Deposition of Allan Rothstein Vol. II (excerpts)

4    Deposition of Kyle Puntney (excerpts)

5    Defendant Allan Rothstein's Response to Plaintiff's First Request for Admissions to Defendant Allan Rothstein (Nos. 1-38)

6    Defendant Kyle Puntney's Answers to First Request for Admissions

**VOLUME 2**

7    Deposition Exhibit 34 – 11/17/2018 Lease to SNRHA

8    Deposition Exhibit 35 – 11/23/2018 Lease not sent to SNRHA

9    Deposition Exhibit 36 – 11/23/2018 Release of Liability

10   Notice of Default recorded 8/14/2018 (certified copy)

11   Notice of Rescission recorded 11/2/2018 (certified copy)

12   Defendant Allan Rothstein's FRCP 26.1(a)(1) Disclosure Statement

13   Deposition Exhibit 23 – Wedgebrook house MLS listing

14   Deposition Exhibit 24 – Emails between Rothstein and Puntney dated 9/4 and 9/6/2018

15   Deposition Exhibit 25 – Email from Rothstein to Puntney dated 9/19/2018

16   Deposition Exhibit 93 – Emails between Rothstein and SNRHA re Torres voucher

17   "To Whom It May Concern" dated 9/27/2018

18   Rent Receipt Agreement dated 10/1/2018

19   Deposition of Francisca Torres (excerpts)

1

**CERTIFICATE OF SERVICE**

2

3       1.      Pursuant to Rule 5 of the Federal Rules of Civil Procedure, on April 17,
2020,  I served email via ECF a copy of the attached document – **APPENDIX OF**
**EXHIBITS IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL**
4  **SUMMARY JUDGMENT (Volume 2, Exhibits 7-19)** – on the following persons:

5

6   Daniel Foley                              Gregory Paul
    Foley & Oakes                             Nevada Legal Services
7   1210 S. Valley View Blvd., Ste. 208       530 South 6th Street
    Las Vegas, Nevada 89102                   Las Vegas, NV 89101
8   Fax: (702) 384-2128                       Fax:    (702) 386-0404
    *dan@foleyoakes.com*                      gpaul@nlslaw.net

9

10

11       2.      Pursuant to Rule 5 of the Federal Rules of Civil Procedure and the Court's
    order (ECF 66, 65), on April 17, 2020,  I also served by email and U.S. MAIL a copy of
12  the attached document – **APPENDIX OF EXHIBITS IN SUPPORT OF**
    **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Volume 2,**
13  **Exhibits 7-19)** – on the following persons:

14   Allan Rothstein
     8616 Canyon View Drive
15   Las Vegas, NV 89117
     Telephone: (702) 353-6878
16   *allanindianoil@yahoo.com*
     *allanindianoil1@gmail.com*

17

18

19

20                          */s/ Christopher Brancart*

21

22

23

24

25

26

27

28