NEVADA LEGAL SERVICES
  Kristopher Pre ((NV 14106)
  *kpre@nevadalegalservices.org*
530 South 6th Street
Las Vegas, NV 89101
Tel:   (702) 388-1641, Ext 130
Fax:   (702) 386-0404

BRANCART & BRANCART
  Christopher Brancart (NV 8969)
  *cbrancart@brancart.com*
Post Office Box 686
Pescadero, CA  94060
Tel:   (650) 879-0141
Fax:   (650) 879-1103

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| CANDY TORRES,                    ) | No. 2:19-cv-00594-APG-EJY |
|          **Plaintiff,**          ) | **PLAINTIFF'S TRIAL BRIEF** |
|     **vs.**                      ) | <u>Trial:</u> |
| **ALLAN ROTHSTEIN,**             ) | |
|                                  ) | **Date:     August 8, 2022** |
|          **Defendants.**         ) | **Time:     9:00 am** |

Plaintiff Candy Torres submits this trial brief in anticipation of trial scheduled for August 8, 2022 at 9:00 a.m.

## I. PROCEDURAL HISTORY

Candy Torres filed this case on April 8, 2019, alleging that Allan Rothstein, in his capacity as rental agent and property manager of a dwelling in Las Vegas, violated the federal Fair Housing Act and related state laws by discriminating against and harassing Torres on the basis of sex and that Kyle Puntney, the owner of that dwelling, was vicariously liable for Rothstein's misconduct.  (ECF No. 1.)  On May 22, 2019, defendant Allan Rothstein, appearing pro se on behalf of himself and purportedly on behalf of defendant Kyle Puntney, filed an answer to the complaint.  (ECF No. 10.)  On August 27, 2019, through counsel and with the permission of the Court, Rothstein filed an amended answer (ECF No.

27) along with a motion to dismiss the entire complaint pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted (ECF No. 8).  On October 4, 2019, defendant Puntney, through counsel, answered the complaint and filed a cross-complaint against Rothstein. (ECF No. 34.)  Rothstein moved to strike the cross-complaint as untimely. (ECF No. 38.)  Puntney opposed that motion and sought leave to file an amended answer asserting affirmative defenses. (ECF Nos. 42, 44.)  The Court granted those motions in part and denied them in part as set forth below.  (ECF No. 74.)  While those motions were pending, discovery continued and was completed as of early 2020.  Magistrate Judge Youchah then granted Rothstein's counsel's motion to withdraw.[1]  (ECF No. 66.)  She extended the deadline for filing dispositive motions in order to enable Rothstein time to find new counsel.  (ECF No. 67.)

Thereafter, on April 17, 2020, plaintiff filed a narrow summary judgment motion, seeking an order granting partial summary judgment on liability on her claims against Rothstein for, *inter alia*, violations of the Fair Housing Act, ruling that Puntney was vicariously liable for Rothstein's misconduct, and seeking judgment in her favor on several of defendants' affirmative defenses.  (ECF No. 68.)  Puntney responded to the motion but Rothstein did not. (ECF No. 70.)  Plaintiff also filed a motion seeking to compel Rothstein to provide discovery promised by his counsel before he withdrew.  (ECF No. 71.)

On May 20, 2020, while plaintiff's motion for partial summary judgment was pending, the Court denied Rothstein's motion to dismiss Torres's fair housing claims, dismissed Torres's defamation and negligence claims with prejudice, and granted her leave to amend her remaining state claims.  (ECF No. 74.)  The Court denied Rothstein's motion to strike Puntney's cross-complaint and granted Puntney leave to file an amended answer.  (Id.)

On June 20, 2020, Torres filed her first amended complaint asserting claims for

---

[1]That counsel subsequently sued Rothstein for failure to pay his attorney's fees and reached a settlement obtaining payment.  (ECF Nos. 135-2, 135-3.  See also Court order at ECF No. 149.))

1    violation of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601 *et seq.*, commission of
2    consumer fraud by committing deceptive trade practices in violation of NRS § 41.600 and
3    the Nevada Deceptive Trade Practices Act ("NDTPA"), and for wrongful eviction. (ECF No.
4    76.) As in the original complaint, Torres based her claims against Rothstein on his unlawful
5    conduct and her claims against Puntney on vicarious liability.

6         In July 2020, Magistrate Judge Youchah granted plaintiff's motion to compel
7    Rothstein to provide discovery and denied Rothstein's motion to quash subpoenas or for a
8    protective order filed by his prior counsel. (ECF No. 81.) When Rothstein failed to respond
9    to plaintiff's counsel's efforts to seek his compliance with Magistrate Judge Youchah's
10   order, plaintiff moved for sanctions against Rothstein for failure to comply with that order.
11   (ECF No. 89.) Plaintiff sought an order striking Rothstein's answer or, in the alternative,
12   precluding him from presenting certain evidence at trial. In November 2020, Magistrate
13   Judge Youchah issued an order to show cause as to why Rothstein should not be sanctioned
14   and ordered plaintiff to submit billing records for purposes of setting an amount of attorneys'
15   fees and costs to be awarded to plaintiff. (ECF No. 91.)

16        In December, Andrew Wasielewski appeared as Rothstein's new counsel. (ECF No.
17   98.) He sought and was granted additional time to respond to the order to show cause and
18   fee memorandum. (ECF No. 105.) He also filed a motion to set aside the original discovery
19   order leading to the order to show cause and award of fees. (ECF No. 113.) In January 2021,
20   Magistrate Judge discharged the order to show cause but denied Rothstein's motion to set
21   aside the original discovery order. (ECF No. 124.) The Court gave Rothstein "one final
22   opportunity" to provide the discovery, and awarded plaintiff attorneys' fees in the amount
23   of $4,670. (Id. at 12-13.) Rothstein has refused to make payment. (ECF No. 143.)

24        Meanwhile, on December 26, 2020, the Court denied plaintiff's motion for partial
25   summary judgment on her Fair Housing Act claim and Puntney's vicarious liability because
26   of disputed issued of fact. (ECF No. 115.) The Court granted plaintiff's motion with respect
27   to several affirmative defenses. (ECF No. 115 at 1-2.) Thereafter, plaintiff attempted for
28   several months to obtain Rothstein's cooperation in filing the joint pretrial documents. (See

ECF No. 131, detailing efforts; see also ECF 138 [further efforts].)  This Court eventually issued an order to show cause as to why Rothstein should not be sanctioned for failing to comply with the Local Rules and the Court's orders regarding the proposed joint pretrial order. (ECF No. 134.)  After a hearing, the Court ordered the parties to submit a joint pretrial order by September 17, 2021. (ECF No. 149.)  Plaintiff obtained several extensions of that deadline due to Rothstein's continued failure to provide his portion of the pretrial order. (ECF Nos. 151-156.)

On October 22, 2021, plaintiff filed a motion to strike Rothstein's answer for failure to cooperate in preparation of the pretrial order.  (ECF No. 157.)  Defense counsel opposed that motion, citing significant medical and personal issues that had interfered with the ability to prepare the joint pretrial document.  (ECF No. 158.)  The Court denied plaintiff's motion to strike.  (ECF No. 160.)  Based on defense counsel's representations, the Court stated that it would "give Rothstein one final extension to contribute to the preparation of the joint pretrial order." (Id.)  A joint pretrial order was finally filed on January 7, 2022, and issued by the Court on January 12. (ECF No. 164, 167.)

Meanwhile, in early January 2022, plaintiff settled her claims against Puntney.  On March 2, 2022, this Court approved Puntney's request for a good faith settlement declaration pursuant to NRS § 17.245, and later dismissed him from the case.  (ECF Nos. 177, 180.)  The parties stipulated to and this Court issued an order dismissing Puntney's counterclaim against Rothstein.  (ECF No. 181.)

## II. CLAIMS

Plaintiff alleges that defendant Allan Rothstein violated the federal Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, engaged in consumer fraud by committing deceptive trade practices in violation of NRS § 41.600, and attempted to wrongly evict Torres from her home.

### A. The Fair Housing Act

The Fair Housing Act ("FHA") prohibits discrimination in connection with the sale or rental of a dwelling.  42 U.S.C. § 3604.  Plaintiff claims that Rothstein committed three separate violations of the FHA against her because of sex – (1) engaging in harassment that

-4-

affected the terms and conditions of her housing (42 U.S.C. § 3604(b)), (2) engaging in harassment that interfered with her rights to enjoy her home free from unlawful discrimination (42 U.S.C. § 3617), and (3) making discriminatory statements (42 U.S.C. § 3604(c).  Each of those violations involves different elements of proof.

The FHA provides that an "aggrieved person" – any person who "claims to have been injured by a discriminatory housing practice" – may bring suit seeking compensatory and punitive damages, declaratory and equitable relief, and an award of attorneys' fees and costs as prevailing party.  42 U.S.C. §§ 3602(i), 3613(a)(1)(A) and (c). The "discriminatory housing practices" prohibited by FHA are acts made unlawful, including violations of 42 U.S.C. §§ 3604(b), (c) and 3617.  42 U.S.C. § 3602(b).  Section 3604(b) prohibits discrimination "in the terms, conditions, and privileges of the rental of a dwelling, or in the provision of services or facilities in connection therewith," because of sex.  Section 3617 makes it unlawful to "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed . . . any right granted or protected by section [3604] of this title."  42 U.S.C. § 3617.  Section 3604(c) makes it unlawful "[t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on . . . sex . . . or an intention to make any such preference, limitation, or discrimination." 42 U.S.C. § 3604(c).

As this Court has already recognized in its summary judgment order, sexual harassment is a form of sex discrimination recognized under the FHA. (ECF No. 115 at 6-8.) Sexual harassment may violate both 42 U.S.C. § 3604(b)'s prohibition on discriminatory terms or conditions and § 3617's prohibition on interference with the enjoyment of a dwelling, as well as § 3604(c)'s prohibition on discriminatory statements. *See, e.g.*, *Beliveau v. Caras*, 873 F. Supp. 1393, 1394-97 (C.D. Cal. 1995) (§ 3604(b)); *People of State of N.Y. by Abrams v. Merlino*, 694 F. Supp. 1101 (S.D.N.Y. 1988) (§ 3617); *Noah v. Assor*, 379 F. Supp. 3d 1284, 1297 (S.D. Fla. 2019) (finding statement by landlord that he would not renew the plaintiff's lease if she refused to be his girlfriend stated a claim for violation of Florida's

1  fair housing law analog to § 3604(c)).

2  ### *1.  42 U.S.C. § 3604(b)*

3  Regulations promulgated by the Department of Housing and Urban Development

4  ("HUD") implementing the FHA make unlawful:

5  (5) Denying or limiting services or facilities in connection with the sale or rental of
   a dwelling, because a person failed or refused to provide sexual favors.

6

7  (6) Conditioning the terms, conditions, or privileges relating to the sale or rental of
   a dwelling, or denying or limiting the services or facilities in connection therewith,
   on a person's response to harassment because of . . . sex . . . .

8

9  (7) Subjecting a person to harassment because of . . . sex . . . that has the effect of
   imposing different terms, conditions, or privileges relating to the sale or rental of a
   dwelling or denying or limiting services or facilities in connection with the sale or

10  rental of a dwelling.

11  24 C.F.R. § 100.65(b)(5), (6), (7).  HUD's regulations implementing the Fair Housing Act

12  are entitled to deference.  *Meyer v. Holley*, 537 U.S. 280, 287 (2003).

13  HUD's regulations identify two types of sexual harassment that may violate the FHA

14  – "quid pro quo" and "hostile environment harassment." 24 C.F.R. § 100.600(a). Quid pro

15  quo harassment refers to

16  an unwelcome request or demand to engage in conduct where submission to
   the request or demand, either explicitly or implicitly, is made a condition

17  related to: The sale, rental or availability of a dwelling; the terms, conditions,
   or privileges of the sale or rental, or the provision of services or facilities in

18  connection therewith; or the availability, terms, or conditions of a residential
   real estate-related transaction. An unwelcome request or demand may

19  constitute quid pro quo harassment even if a person acquiesces in the
   unwelcome request or demand.

20

21  24 C.F.R. § 100.600(a)(1). Hostile environment harassment refers to

22  unwelcome conduct that is sufficiently severe or pervasive as to interfere with:
   The availability, sale, rental, or use or enjoyment of a dwelling; the terms,
   conditions, or privileges of the sale or rental, or the provision or enjoyment of

23  services or facilities in connection therewith; or the availability, terms, or
   conditions of a residential real estate-related transaction. Hostile environment

24  harassment does not require a change in the economic benefits, terms, or
   conditions of the dwelling or housing-related services or facilities, or of the

25  residential real-estate transaction.

26  24 C.F.R. § 100.600(a)(2).  Harassment can be written, verbal, or another type of conduct

27  and does not require physical contact.  *Id.*, § 100.600(b).  A single incident of harassment

28  because of sex may constitute a discriminatory housing practice where the incident evidences

-6-

1   a quid pro quo or is sufficiently severe to create a hostile environment.  *Id.*, § 100.600(c).

2        Here, the sex contract that Rothstein required Torres to sign in order to lease the

3   Wedgebrook house violates § 3604(b)'s prohibition on discriminatory terms and conditions

4   because, on its face, it required Torres to agree to a quid pro quo arrangement with Rothstein

5   in order for her to complete the transaction to rent the Wedgebrook house.  (See Exh. 35 at

6   22-23.)  And, both separately and together with the sex contract,  Rothstein's request for a

7   hand job in the course of negotiating the rental deposit was sufficiently severe to create a

8   hostile environment in the terms and conditions of Torres's rental of the Wedgebrook house.

9                          **2.  *42 U.S.C. § 3617***

10        HUD regulations implementing § 3617 prohibit "[t]hreatening, intimidating or

11   interfering with persons in their enjoyment of a dwelling because  of the ... sex ... of such

12   persons."  24 C.F.R. § 100.400(c)(2).  In this case, the same conduct that violates § 3604(b)

13   also violates § 3617 because Rothstein's conduct – the sex contract and the hand job request

14   – interfered with Torres's enjoyment of her dwelling.   The evidence also shows that

15   Rothstein's treatment after she rebuffed his request for a hand job was designed to harass and

16   punish her for refusing to cooperate in his suggestion that she engage in a quid pro quo

17   arrangement to reduce amounts owed.  Torres was engaging in protected conduct by seeking

18   to rent and enjoy housing, Rothstein engaged in conduct that was calculated to intimidate or

19   interfere with Torres's in her exercise of those rights, and there was a causal connection

20   between the two. *Walker v. City of Lakewood*, 272 F.3d 1114, 1128 (9th Cir. 2001).  As soon

21   as Torres rejected Rothstein's sexual advances his attitude towards her "changed" and he

22   began aggressively imposing unlawful fees and changes on her.  (Exh. 49, RJN Exh. 5.)

23                          **3.  *42 U.S.C. § 3604(c)***

24        Section 3604(c) makes it unlawful "[t]o make, print, or publish, or cause to be made,

25   printed, or published any notice, statement, or advertisement, with respect to the sale or rental

26   of a dwelling that indicates any preference, limitation, or discrimination based on . . . sex .

27   . . or an intention to make any such preference, limitation, or discrimination." 42 U.S.C. §

28   3604(c). The FHA's prohibition on discriminatory statements applies to all written notices

1   or statements by a person engaged in the sale or rental of a dwelling, including "documents

2   used with respect to the sale or rental of a dwelling." 24 C.F.R. § 100.75(b).  Proof of an

3   FHA violation based on discriminatory statements requires no evidence of discriminatory

4   intent. Instead, the test is whether an "ordinary listener" would understand that a preference

5   is being communicated. *Fair Hous. Cong. v. Weber*, 993 F. Supp. 1286, 1293 (C.D. Cal.

6   1997); *U.S. v. Grishman*, 818 F. Supp. 21 (D. Me.1993) (landlord's oral statement to rental

7   agent that property was "less suitable" for families with children is a statement indicating a

8   preference based on familial status in violation of § 3604(c).)

9        Here, an ordinary person would understand that either or both of Rothstein's

10  statements – the request for a hand job in connection with negotiating the remaining rental

11  deposit and the demand that Torres sign the sex contract, presented in connection with

12  signing lease documents – were discriminatory statements.  Their plain import was either

13  agree to their terms or potentially lose the right to finalize the rental transaction. *See, e.g.,*

14  *United States v. Wygul*, No. 1:14-CV- 2880-JDB-EGB, 2016 WL 4126583, at *9 (W.D.

15  Tenn. Aug. 2, 2016) (landlord's statement that he would be sending tenant an eviction notice

16  after she refused to pose nude for him could be found to violate § 3604(c)).  That Rothstein

17  claims he had no discriminatory intent in requiring Torres to sign the contract does not

18  insulate him from liability where he admits that he had Torres sign it.

19              ### 4. *Compensatory damages under the FHA*

20       The largest component of compensatory damages in most housing discrimination

21  cases is emotional distress.  Damages for emotional distress may be inferred from the

22  circumstances as well as proved by the plaintiff's own testimony. *Marable v. Walker*, 704

23  F.2d 1219, 1220 (11th Cir. 1983); *Krueger v. Cuomo*, 115 F.3d 487, 492 (7th Cir. 1997).

24  Here, Torres was embarrassed and humiliated by Rothstein's request for a sexual favor

25  during the course of negotiating the deposit she would owe and shocked and degraded by the

26  sex contract Rothstein required her to sign.  She felt extremely anxious to get her children

27  into a house and to provide them with a stable living environment.  She was not in a position

28  to terminate the rental negotiations or walk away from the lease and her Section 8 voucher

to escape Rothstein's harassment.  Torres also suffered from physical manifestations of her emotional distress, including hair loss, sleep loss, memory loss, and weight loss.

Torres also incurred out-of-pocket expenses when she cleaned and repaired the Wedgebrook home, including cleaning and replacing carpet, repairing holes in the walls, replacing toilet, purchasing paint in order to repaint, and purchasing and installing smoke detectors.  She also paid fees to Rothstein that were prohibited by the HAP contract, including for utility costs, fees to Rothstein for paying the utility bills, late fees that became "rent" due, and an eviction "fee" where no eviction notice was served.  Under the terms of the HAP contract, Torres should have had to pay only $145 per month and a $1,475 security deposit.  The excess fees should be refunded.

### 5.  Punitive damages under the FHA

The FHA expressly provides for the recovery of punitive damages by plaintiffs who have suffered discriminatory housing practices.  42 U.S.C. § 3613(c)(1) ("if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages").  Punitive damages are awarded "to punish the defendant for wrongful conduct and to deter the defendant and others from repeating that wrong."  *Dang v. Cross*, 422 F.3d 800, 810 (9th Cir. 2005).

Punitive damages are appropriate under the FHA "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Fair Housing of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002), *citing Smith v. Wade*, 461 U.S. 30, 56 (1983).  *See also United States v. Balistrieri*, 981 F.2d 916, 936 (7th Cir. 1992) (FHA case applying *Smith* standard); *Asbury v. Brougham*, 866 F.2d 1276, 1282 (10th Cir. 1989) (same); *Szwast v. Carlton Apartments*, 102 F. Supp. 2d 777, 780 (E.D. Mich. 2000) (same).

That Rothstein acted with reckless disregard to Torres's federally protected rights is established by the following evidence:

1.   Since he became licensed real estate professional, Rothstein has had training on the Fair Housing Act and is aware that sexual harassment of a tenant is unlawful.

-9-

2.      Rothstein is a member of the Greater Las Vegas Association of Realtors and National Association of Realtors.  He is also a member of the Risk Reduction Graduate Society and through that group has taken three days of contracts taught by attorneys regarding the requirements of Nevada real estate law and taken other classes and he holds himself out as a having a high level of expertise in the law governing real estate in Nevada. (See e.g., Exh. 24.)

3.      Rothstein knew Torres was in a vulnerable position.  As he informed SNRHA at the end of October when the final approval of the Wedgebrook house was lagging – Torres was "running out of money," was "a single mom with four children to care for," and, if SNRHA continued to delay, "[Torres] and her four children will probably be living either under the expressway or on the sidewalk."  (Exh. 93 at 6.)

4.      In order to interfere with Torres's enjoyment of her tenancy because of she rejected his request for sexual favors, Rothstein utilized what he knew were unlawful charges and fees on Torres in violation of the HAP contract governing her tenancy.

To set an appropriate award of punitive damages, courts look at several factors including the reprehensibility of the defendant's conduct, the ratio between compensatory and punitive damages, and sanctions for similar misconduct. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575-85 (1996).  "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW*, 517 U.S. 559, 575 (1996).  *See also* Ninth Circuit Manual of Model Civil Jury Instructions, 5.5 Punitive Damages ("In considering the amount of any punitive damages, consider the degree of reprehensibility of the defendant's conduct.")  Rothstein's conduct in this case was extremely reprehensible given his position of power over Torres, her precarious financial situation, and his knowledge that sexual harassment is unlawful under the FHA.

The sanctions for violations of the FHA are substantial.  In cases brought by the United States, after finding liability the court may award civil penalties.  42 U.S.C. § 3614. The court is authorized to award a $75,000 civil penalty for a defendant's first violation and

-10-

1   a $150,000 civil penalty for any subsequent violation.  42 U.S.C. § 3614(d)(1)(C).[2]  Here

2   Rothstein engaged in three discrete FHA violations – seeking a sexual favor, requiring Torres

3   to sign a sex contract, and then in harassing her by imposing unlawful fees and charges.

4          Although some states require evidence of a defendant's net worth in order to set the

5   amount of punitive damages, such evidence is not required under federal law.  *Rodriguez v.*

6   *Cnty. of Los Angeles*, 891 F.3d 776, 806 (9th Cir. 2018); *Kemezy v. Peters*, 79 F.3d 33, 36

7   (7th Cir. 1996).  In this case, Rothstein refused to produce evidence of his net worth.[3]  He

8   must therefore be precluded from attempting to offer evidence of his financial condition to

9   counter plaintiff's claim for punitive damages.

10                    **B.  Consumer Fraud/Deceptive Trade Practices**

11          Section 41.600 of the Nevada Revised Statutes provides a cause of action for any

12   person who is a victim of consumer fraud. NRS. § 41.600(1). Section § 41.600(3)(a) "permits

13   the plaintiff to recover compensation for the injuries they have suffered as a result of the

14   defendant's conduct" constituting consumer fraud.  *Leigh-Pink v. Rio Properties, LLC*, 138

15   Nev. Adv. Op. 48, 512 P.3d 322 (2022); *Cox v. Richland Holdings, Inc.*, No. 2:16-CV-

16   02914-APG-VCF, 2018 WL 456877, at *4 (D. Nev. Jan. 16, 2018).  "Consumer fraud" is

17   defined to include a "deceptive trade practice as defined in NRS 598.0915 to 598.0925,

18   inclusive." NRS § 41.600(2)(e).  It is a deceptive trade practice in violation of NRS §

19   598.092(8) to "[k]nowingly misrepresents the legal rights, obligations or remedies of a party

20

21

22          [2]Although § 3614(d)(1)(C) provides for penalties of $50,000 and $100,000, since
    2014 those penalties have been $75,000 and $150,000.  See Pub. L. 101-410, 104 Stat.

23   890, amending 28 U.S.C.A. § 2461 note; 28 U.S.C. § 85.3(b)(3)(i); U.S. Dept. of Justice,

24   *Civil Monetary Penalties Inflation Adjustment*, 79 Fed. Reg. 17,434 (Mar. 28, 2014).

25          [3]See Exh. 1 hereto, a true and correct copy of Defendant, Allan Rothstein's
    Amended Responses and Objections To Plaintiff's First Set of Interrogatories, Response

26   to Interrogatory No. 5, and Exh. 2 hereto, a true and correct copy of Defendant Allan

27   Rothstein's Response to Plaintiff's Third Request for Production of Documents
    Defendant Allan Rothstein, Responses to Request Nos. 27-32.  Plaintiff also requested

28   supplementation pursuant to Rule 26(e).  Attached hereto as Exh. 3 is a true and correct
    copy of Plaintiff's First Request for Supplementation, including Interrogatories 1-9.

to a transaction."  Proof is by a preponderance of the evidence.  *Betsinger v. D.R. Horton, Inc.*, 126 Nev. 162, 166, 232 P.3d 433, 436 (2010).

A "'knowing[ ]' act or omission under the NDTPA does not require that the defendant intend to deceive with the act or omission, or even know of the prohibition against the act or omission, but simply that the defendant is aware that the facts exist that constitute the act or omission." *Poole v. Nevada Auto Dealership Investments, LLC*, 135 Nev. 280, 284, 449 P.3d 479 (Nev. App. 2019).

A claim under the NDTPA requires a "victim of consumer fraud to prove that (1) an act of consumer fraud by the defendant (2) caused (3) damage to the plaintiff." *Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 658 (D. Nev. 2009) (noting Nevada Supreme Court has not specified the elements of a NDTPA claim and predicting how the court would rule). Rothstein committed consumer fraud by engaging in deceptive trade practices in the course of his business or occupation in violation of NRS § 598.092(8) on several bases including:

1.    Requiring Torres to sign the November 23, 2018 lease which contained terms contrary to HUD's HAP regulations.

2.    Requiring Torres to sign the November 23, 2018 "Release of Liability and Assumption of Risk."

3.    Failing to disclose to Torres that the Wedgebrook house was in foreclosure in violation of NRS § 118A.275(1).

Each of those actions constituted a "misrepresents the legal rights, obligations or remedies of a party to a transaction" in violation of NRS § 598.092(8).   The evidence shows that Rothstein was aware of the facts and engaged in purposeful conduct.

### *1  Requiring Torres to sign a second lease and lease addendum conflicting with the November 17 HAP contract*

Requiring Torres to execute a second lease and a lease addendum that did not comply with the Section 8 housing contract constituted a misrepresentation to Torres of her legal rights, obligations, or remedies.  Not only was it a misrepresentation, Rothstein enforced his misrepresentations against Torres by demanding payments and, eventually, serving her with an eviction notice.

The Southern Nevada Regional Housing Authority (SNRHA) approved the lease of the Wedgebrook house to Torres, but only on the condition that the monthly rent would be $1,475 ($1,330 paid by SNRHA and $145 paid by Torres) and that the owner, not Torres, would be responsible for paying gas, water, sewer and trash.  (Exh. 34 at 2, 8, 9, 21-22.)  Rothstein was aware of those conditions, as evidenced by his email to Puntney at the end of October stating that Section 8 would only pay $1,475 and the owner would have to cover utilities except power.  (Exh. 32.)  Nonetheless, a week after the Wedgebrook house was approved and the Housing Assistance Payments (HAP) Contract and November 17 lease signed and Torres had rejected his sexual advances, Rothstein required Torres to execute a second lease in which she was responsible for gas, water, sewer, and trash.  (Exh. 35 at 3.)  Then, on December 25, he required Torres to sign a lease addendum explicitly imposing on her the burden of paying all utilities.  (Exh. 40.)

The HAP contract for the Wedgebrook house provided that the lease executed between Torres and the owner must be consistent with the HAP contract.  (Exh. 34 at 23, ¶ 2; 24, ¶ 5(c).)  In case of conflict, the HAP contract controls.  (Exh. 34 at 31, ¶ 14(b).)  Under the Section 8 Housing Choice Voucher Program, an owner "may not demand or accept any rent payment from the tenant in excess of [the total rent minus the HAP payment], and must immediately return any excess rent payment to the tenant."  24 C.F.R. § 982.451(b)(4).  Under the terms of the HAP contract, Rothstein is an "owner."[4]  Here, the most Rothstein could collect from Torres was $145 per month.  The evidence will show that Rothstein collected hundreds of dollars more each month, imposing a multitude of bogus charges that

---

[4]The HAP Contract states that interpretation of the contract is governed by, *inter alia*, the HUD program requirements in 24 Code of Federal Regulations Part 982.  (Exh. 34 at p. 17, ¶ 17.)  Those regulations define "owner" as "[a]ny person or entity with the legal right to lease or sublease a unit to a participant."  24 C.F.R. § 982.4.  That definition includes Rothstein in his role as property manager.  (See Exh. 5, p. 3, ¶ 9 of Property Management Contract giving Rothstein to "negotiate, prepare and sign all leases . . . for Owner"; Exh. 27 [email from Rothstein telling Puntney that he needs to tell SNRHA that Rothstein represents property.)

were prohibited by the HAP contract.

Demanding that a tenant pay utilities the landlord is required to provide and pay for, is prohibited by the HAP contract. *See Coleman v. Hernandez*, 490 F. Supp. 2d 278, 280 (D. Conn. 2007) (charging tenant additional rent for water usage violated Section 8 rules and also constituted a violation of the False Claims Act). *See also United States ex rel. Holmes v. Win Win Real Est., Inc.*, No. 2:13-CV-02149-APG-GWF, 2015 WL 6150594, at *5 (D. Nev. Oct. 19, 2015) (charging tenant for additional payments beyond those stated in the HAP contract established that landlord "deliberately ignored or recklessly disregarded" the HAP contract and established "knowingly" element of False Claims Act even though lease between landlord and tenant submitted to housing authority reflected those charges). In fact, attached to the HAP contract for the Wedgebrook house was a notice from SNRHA to the owner stating, *inter alia*, that "[t]he owner may not accept any other monies from the client. Requiring extra ('side') payments in excess of the family's share of the rent as listed above is considered program fraud." (Exh. 34 at 32.) By imposing utility charges and other fees on Torres, Rothstein was misrepresenting Torres's right under the HAP contract.[5]

### 2. Requiring Torres to sign a Release of Liability

The lease packet Rothstein required Torres to sign on November 23, 2018 included a "Release of Liability and Assumption of Risk" which provided that the tenant

> hereby waives and releases Landlord, it owners, and agents and employees from any liability and/or claim for personal injury, property damage, or death that may arise from Tenant's use of the facility regardless of cause, even if

---

[5]Removing all doubt whether Rothstein was charging Torres additional "rent" in violation of the HAP contract when he charged her late fees and imposed other fees, is the language of the leases and forms used by Rothstein himself. For example, the leases state that "All late fees . . . shall become additional rent." "All unpaid charges or any fees owed by TENANT, including but not limited to notice fees, attorney's fees, repair bills, utility bills., landscape/pool repair and maintenance bills and CIC fines will become additional rent at the beginning of the month after TENANT is billed. TENANT'S failure to pay the full amount for a period may result in the initiation of eviction proceedings." (Exh. 34 p. 8, ¶ 7C; Exh. 35 p. 2, ¶ 7C.) The payment receipts make similar statements. (Exh. 43, 46.) And, Rothstein's eviction complaint states that Torres owes $4,221 "in rent." (Exh. 102 at 2.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> such cause can be associated in any way by the acts or failures to act of the landlord, or any of its agents, or employee in the installation, adjustment, inspection, maintenance and/or rental of the facility, or from Tenant's use of this facility.

(Exh. 36.)  Rothstein also required Torres to sign an "Indemnity Agreement" agreeing to indemnify him from all liability, damages, etc. "arising from the following:  [subject matter left blank]."  (Exh. 38.)

The "Release of Liability and Assumption of Risk" violated NRS § 118A.220(1)(d), (2), which renders void as against public policy any rental agreement in which the tenant agrees "to the exculpation or limitation of any liability of the landlord arising under law or to indemnify the landlord for that liability or the costs connected therewith if the liability is based upon an act or omission of the landlord or any agent or employee of the landlord." NRS § 118A.220(1)(d), (2).  By requiring Torres to sign that release, Rothstein was misrepresenting Torres's rights under Nevada law.  Later, Rothstein attempted to argue that that release resulted in Torres contractually waiving her right to damages in this action. (See ECF No. 55 at p. 13. )  This Court rejected that argument, however, granting summary judgment in Torres's favor that Rothstein cannot rely on that written release to support a waiver defense.  (ECF No. 155 at 12-14.)

### 3. Failing to advise Torres that the house was in foreclosure

Section 118A.275of the Nevada Revised Statutes requires a landlord to "disclose in writing to a prospective tenant if the property to be leased or rented is the subject of any foreclosure proceedings."  NRS 118A.275(1). A willful violation of § 118A.275(1) constitutes a deceptive trade practice under NRS 598.0903 to 598.0999. NRS § 118A.275(2). "'As a general rule, the word [willful] denotes an act which is intentional, or knowing, or voluntary, rather than accidental.'" *Dep't of Bus. & Indus., Fin. Institutions Div. v. TitleMax of Nevada, Inc.*, 135 Nev. Adv. Op. 44, 449 P.3d 835, 841 (2019) (quoting *In re Fine*, 116 Nev. 1001, 1021, 13 P.3d 400, 413 (2000). *See also* Nev. Jury Instructions, Civil, No. 17.13 (2018) ("willful misconduct" involves doing "an act with a positive, active and absolute disregard of its consequences").

It is undisputed that on August 13, 2018, the National Default Servicing Corporation,

acting as trustee for CMG Mortgage, Inc., filed a Notice of Default against Kyle Puntney, the owner of the 11893 Wedgebrook house.  (See Plaintiff's Request for Judicial Notice, ECF No. 193 ["RJN"], Exh. 3, a certified copy of the Notice of Default.)  By September 2018, Rothstein was aware of the recordation of the Notice of Default. He sent several emails in early and mid-September urging Puntney to pay the mortgage arrears and cure the default. (See Exh. 21, 23, 24, 25, 29, 66, 116.)  In fact, in one email Rothstein quoted the provision of NRS § 118A.275(1) requiring disclosure of foreclosure, clear evidence that his non-disclosure to Torres was willful.  (Exh. 29 at 2.)

In late September, Candy Torres contacted Rothstein about renting the Wedgebrook house.  Although he had Torres sign documents and pay a deposit and fees, Rothstein admits that he did not disclosure the house's foreclosure status to her, either orally or in writing. Then, Rothstein worked with Torres for a month to process SNRHA's approval of the Wedgebrook house, still without mentioning the default.  Although Puntney cured the default and his mortgage company rescinded the notice of default in a document recorded November 2, 2018, Rothstein's conduct constituted a deceptive trade practice.

### 4.  *Rothstein's conduct injured Torres*

Rothstein's misrepresentations caused damage to Torres.

Rothstein's misrepresentations that Torres owed money to pay for charges and fees prohibited by the HAP contract injured Torres by causing her to pay Rothstein sums that he was not entitled to collect.  Rothstein's constant demands for money and threats of eviction based on those unlawful charges caused Torres to suffer emotional distress and anxiety as described above.  Each escalating demand brought Torres one step closer to losing the housing she had worked so hard to provide for her children.

Rothstein's failure to advise Torres that the Wedgebrook house was in foreclosure directly resulted in Torres pay Rothstein a $150 broker fee and a $85 application fee to apply to rent the house and an additional $550 earnest money.  Those payments all took place in October after Rothstein was made aware of the foreclosure status.  Torres also incurred out-of-pocket costs in repairing the Wedgebrook house.  But for Rothstein's failure to disclose

the foreclosure status, Torres would not have paid those funds, nor would she have spent a month shuttling back and forth between Rothstein in SNRHA in an attempt to obtain approval to use her Section 8 voucher to rent the Wedgebrook house.

Rothstein's demand that Torres sign the release of liability also cause actual harm to Torres. Rothstein raised that unlawful release as a defense in this action, ultimately requiring Torres to expend resources to successfully move for summary judgment on that claim. (ECF No. 115 at 12-14.)

The Court should award Torres compensatory damages for her emotional distress and award her actual damages for the unlawful fees and charges she paid to Rothstein because of his deceptive trade practices.

**C. Wrongful Eviction**

Rothstein threatened or attempted to wrongfully evict Candy Torres from her dwelling by making false claims regarding the nonpayment of rent by Torres based on excessive, unlawful, or unauthorized fees or utility costs, a bogus accounting of rents paid, unconscionable and unlawful lease provisions, a refusal to accept tender of rent, or terms that violated the terms of Torres's Section 8 housing contract, or for a retaliatory motive.

Between September 27, 2018 and April 8, 2019, defendant Allan Rothstein threatened or attempted to wrongfully evict Candy Torres from her dwelling by:

• Falsely claiming the nonpayment of rent by Torres based on excessive and unlawful fees and charges in violation of NRS § 118A.210(4)(a);

• Falsely claiming the nonpayment of rent by Torres based on unauthorized fees and charges in violation of NRS §§ 118A.210(4), 118A.320(2) and 118A.350;

• Falsely claiming the nonpayment of rent by Torres based on unlawful imposition of utility costs in violation of the HUD HAP contract and NRS §§ 118A.320(1)(f) and 118A.350;

• Falsely claiming the nonpayment of rent by Torres based on bogus and fraudulent accounting of monies paid by Torres in violation of NRS §§ 118A.250 and 118A.350;

•      Falsely claiming the nonpayment of rent by Torres based on unconscionable and unlawful provisions in the November 23, 2018 rental agreement in violation of NRS § 118A.230 and HUD's HAP contract;

•      Falsely claiming the nonpayment of rent by Torres based on unlawful attempt to increase the monthly rent rate in violation of NRS § 118A.300 and the HUD HAP contract;

•      Falsely claiming the nonpayment of rent by Torres based on Rothstein's unlawful refusing to accept tender of full payments of rent in violation of NRS §§ 118A.390 and 118A.490;

•      Falsely claiming the nonpayment of rent by Torres based on Rothstein's refusal to deliver possession of the Wedgebrook house in accordance with the HAP agreement in violation of NRS §118A.370;

and,

•      Falsely claiming the nonpayment of rent by Torres based on retaliation in violation of NRS § 118A.510.

(See Exh. 102 [Rothstein's eviction complaint].)

Rothstein's attempt to evict Torres for failing to pay illegal charges directly caused Torres to suffer emotional distress and extreme anxiety and fear for the loss of her housing as described above. The Court should award her damages for Rothstein's unlawful conduct.

**IV.  EVIDENTIARY ISSUES**

At the Calendar Call on August 2, the Court granted plaintiff's request for judicial notice as to the Nevada Real Estate Commission documents, the recorded foreclosure documents regarding the Wedgebrook house, and the state court filings regarding Rothstein's attempt to evict Torres.  (ECF No. 193; Transcript at 6:22-8:2, filed ECF No. 202.)  The Court ruled that it would take judicial notice that each of the documents were filed, but not of the contents of the documents.  (Transcript at 7:22-8:1.)

**A.      Property Records.**  As for the foreclosure documents, Request for Judicial Notice Exhibits 4-5 (ECF Nos.  193-3 [Notice of Default] and 193-4 [Rescission of

Default]), their contents is admissible for under Fed. R. Evid. 803(14) and (15), which provide a hearsay exception for a the contents of recorded property documents. The Notice of Default and Rescission of Default were both recorded in the Clark County Recorder's Office and affect an interest in property and contain statements that purport "to establish or affect an interest in property" and the statement is relevant to the document's purpose.  Fed. R. Evid. 803(14) and (15); *United States v. Boulware*, 384 F.3d 794, 807 (9th Cir. 2004). Here, the certified copies of those documents are admissible to prove their contents. *In re Owner Mgmt. Serv., LLC Tr. Corps*, 530 B.R. 711, 718 (Bankr. C.D. Cal. 2015) (recorded deeds and notices of default admissible under FRE 803(14); see also *Pinson v. JPMorgan Chase Bank, Nat. Ass'n*, No. 13-80720-CIV, 2015 WL 1293051, at *4 (S.D. Fla. Mar. 23, 2015) (certified copy of recorded mortgage admissible to prove contents under FRE 803(14), 902(4), and 1005).

**B.     Evict Court Records.**   The contents of Rothstein's eviction complaint (ECF No. 193-6) is also admissible for its truth under Fed. R. Evid. 801(d)(2) in that it represents a statement against the interest of a party opponent, this case that all funds Rothstein sought to collect from Torres were "rent" in the amount of $4,221.

**C.     NREC Findings (RJN Exh. 2).**   In February 2022, the Real Estate Division of the Nevada Department of Business and Industry filed an administrative complaint against Allan Rothstein for violations of his duties and obligations as a licensed real estate professional. (RJN, Exh. 1; Exh. 108.)  The matter was set for hearing in March 2022. (Id. at 8.)  The complaint arose out of a complaint filed in April 2020 by Kyle Puntney with the Division against Rothstein alleging that Rothstein had sexually harassed Candy Torres, failed to communicate repairs, and was deceitful and dishonest in collecting fees. (RJN, Exh. 2 at 2, ¶ 9; Exh. 109.)

These findings may be admitted for their truth under several theories:   First, under Fed. R. Evid. 803(8)(A)(iii), the findings in NREC's order (RJN Exhibit 2) reflect the "factual findings from a legally authorized investigation."   The NREC order also records admissions by Rothstein that are directly relevant here, including, for example, that Rothstein

"admitted on two separate occasions to the Division that he had [Torres] sign the [Direct Consent for Sexual Intercourse and or Fellatio or Cunnilingus" document." (RJN, Exh. 2 at 5, ¶ 33.)  Although Rothstein failed or refused to appear at the NREC's hearing after proper notice (RJN, Exh. 2 at 7, ¶¶ 58-64), Rothstein did speak with the NRED in the course of its investigation of the Puntney complaint.  Rothstein's statements to NRED may be considered for their truth as party-opponent admissions, Fed. R. Evid. 801(d)(2), and the recordation of those admissions in NREC's order (RJN Exhibit 2) may be established either by way of judicial notice, Fed. R. Evid. 201, or  Fed. R. Evid. 803(A)(ii)("matters observed under a legal duty to report").

Thus, while the entire contents of NREC's order (RJN Exh. 2) may not be admissible for its truth, several key findings are admissible for that purpose under Fed. R. Evid. 801(d)(2) and 803(8)(A)(ii) and (iii); specifically, that Rothstein:

> "violated NRS 645.633(1 )(i) by engaging in conduct that was deceitful, fraudulent, or dishonest by asking [Torres] to sign the Direct Consent for Sexual Intercourse and/or Fellatio or Cunnilingus and admitting on October 4, 2021, that he asked [Torres] to sign the document;" and,

> "violated NRS 645.252(1) for failing to exercise reasonable skill and care with respect to all parties in a real estate transaction when he:  a. Tried to evict [Torres] without just cause."

(RJN, Exh. 2 at p. 7, ¶¶ 3, 5.)

Finally, NREC's determination to revoke Rothstein's licenses, imposed an administrative fine to the Division in the amount of $90,000 along with the Division's costs of $4,039.76 is admissible.  (RJN, Exh. 2 at p. 8, ¶¶ 1-2.)

## V. ATTORNEYS' FEES AND COSTS

If Torres is the prevailing party, both the FHA and NRS § 41.600 provide for an award of attorneys' fees and costs. 42 U.S.C. § 3613(c)(2); NRS § 41.600(3).

Dated:  August 2, 2022.

Respectfully submitted,

-20-

NEVADA LEGAL SERVICES
 Kristopher Pre (NV 14106)
 kpre@nevadalegalservices.org
530 South 6th Street
Las Vegas, NV 89101
Tel:   (702) 388-1641
Fax:   (702) 386-0404

BRANCART & BRANCART

*/s/ Christopher Brancart*
Christopher Brancart (NV 8969)
cbrancart@brancart.com
Post Office Box 686
Pescadero, CA  94060
Tel:   (650) 879-0141
Fax:   (650) 879-1103

Attorneys for Plaintiff

1

**CERTIFICATE OF SERVICE**

2

3        Pursuant to Rule 5 of the Federal Rules of Civil Procedure, on August 3, 2022, I
served by email via the ECF system a copy of the attached document – **PLAINTIFF'S
TRIAL BRIEF** –  on the following persons:

4

5     Andrew Wasielewski                          Kristopher Pre
      The Wasielewski Law Firm                    Nevada Legal Services
6     8275 S. Eastern Avenue                      530 South 6th Street
      Suite 200-818                               Las Vegas, NV 89101
7     Las Vegas, Nevada 89123                     Fax:    (702) 386-0404
      andrew@wazlaw.com                           kpre@nevadalegalservices.org

8

9

10                                      */s/ Christopher Brancart*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28